IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

UNITED STATES OF AMERICA

v.

JOHN ANTHONY CASTRO (01)

CRIMINAL NO.  4:24-CR-001-Y

## GOVERNMENT'S PROPOSED FINDINGS
## OF FACT AND CONCLUSIONS OF LAW

This Court is scheduled to conduct a bench trial in the above captioned case on May 20, 2024.  (*See* Dkt. No.  26.)  Per Local Criminal Rule 23.1, the government hereby submits the following Proposed Findings of Fact and Conclusions of Law with respect to the trial.

Respectfully submitted,

LEIGHA SIMONTON
UNITED STATES ATTORNEY

/s/  *P.J. Meitl*
P.J. Meitl
Assistant United States Attorney
D.C. Bar No. 502391
801 Cherry Street, 17th Floor
Fort Worth, Texas 76102
Telephone:  817-252-5272
E-mail: philip.meitl@usdoj.gov

/s/  *Nancy Larson*
Nancy E. Larson
Assistant United States Attorney
D.C. Bar No. 430780
801 Cherry Street, 17th Floor
Fort Worth, Texas 76102
Telephone:  817-252-5200
E-mail: nancy.larson@usdoj.gov

# TABLE OF CONTENTS

**Page**

GOVERNMENT'S PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW ...................................................................................... 1

A.     Introduction ................................................................................... 1

B.     Criminal Charges, Elements of the Crime, and Mens Rea Standard ........... 2

C.     Detail Regarding the Counts of the Indictment.............................................. 5

D.     Background on Defendant John Anthony Castro........................................... 6

E.     Castro and Co. Processes............................................................................ 11

F.     Background on IRS and General Tax Law ................................................. 14

G.     Relevant Law Related to the Tax Issues in the Instant Case...................... 16

        i.     Unreimbursed Employee Expenses................................................. 16

        ii.     Schedule C Employee Benefit Program Expenses........................... 22

        iii.     Depreciated..................................................................................... 29

        iv.     Childcare ........................................................................................ 40

        v.     Impairment-Related Work Expenses ............................................... 44

        vi.     Charity and Advertising Expenses ................................................... 48

H.     Specific Counts in the Indictment and Anticipated Testimony of Victims 52

        i.     *Undercover Agent – "Angela Jackson" (Count 1)* ......................... 52

            a.     2017 Taxes for Angela Jackson (Count 1)............................ 54

        ii.     *Victims Paul and Alissa Clayton (Count 2)* ..................................... 59

a.  Clayton 2017 Taxes (Count 2) ............................................. 60

iii.  *Victims James Boggs and Frances Fifis-Boggs (Counts 3-5)*.......... 63

a.  Boggs and Fifis-Boggs 2017 Taxes (Count 3) ..................... 65

b.  Boggs and Fifis-Boggs 2018 Taxes (Count 4) ..................... 68

c.  Boggs and Fifis-Boggs 2019 Taxes (Count 5) ..................... 71

iv.  *Victim Linda Rivera (Counts 6-8)* ..................................................... 75

a.  Rivera's 2017 Taxes (Count 6) ........................................ 77

b.  Rivera's 2018 Taxes (Count 7) ........................................ 79

c.  Rivera's 2019 Taxes (Count 8) ........................................ 80

v.  *Victims Christian and Ciara Karavangelos (Counts 9-11)* ............ 82

a.  Karavangelos 2017 Taxes (Count 9) ................................... 84

b.  Karavangelos 2018 Taxes (Count 10) .................................. 87

c.  Karavangelos 2019 Taxes (Count 11) .................................. 90

vi.  *Victims Randolph and Robin Ragsdale (Counts 12-14)* ................. 94

a.  Ragsdale 2017 Taxes (Count 12) ........................................ 95

b.  Ragsdale 2018 Taxes (Count 13) ........................................ 97

c.  Ragsdale 2019 Taxes (Count 14) ........................................ 99

vii.  *Victims Javier and Betsy Sola (Counts 15-17)*............................. 102

a.  Sola 2017 Taxes (Count 15)............................................. 104

b.  Sola 2018 Taxes (Count 16)............................................. 106

c. Sola 2019 Taxes (Count 17)................................108

viii. *Victims Joseph and Kayla Zilinski (Counts 18-20)* ....................113

a. Zilinski 2017 Taxes (Count 18) ...........................115

b. Zilinski 2018 Taxes (Count 19) ...........................117

c. Zilinski 2019 Taxes (Count 20) ...........................119

ix. *Victims Joseph and Kelley Meyer (Count 21)* ................................121

a. Meyer 2017 Taxes (Count 21) .........................124

x. *Victim Crystal Wells (Counts 22-24)* ..............................127

a. Wells 2017 Taxes (Count 22) ...........................128

b. Wells 2018 Taxes (Count 23) ...........................130

c. Wells  2019 Taxes (Count 24) ...........................131

xi. *Victims Brian and Kimberley Quigley (Count 25)* .......................133

a. Quigley 2017 Taxes (Count 25)...........................135

xii. *Victims Michael and Miranja Putica (Count 26)* ..........................137

a. Putica 2019 Taxes (Count 26)...........................142

xiii. *Victims Michael and Angelita Natt (Count 27)* .............................145

a. Natt 2017 Taxes (Count 27)................................149

xiv. *Victim Ahmad Lampkin (Counts 28-29)* ........................................151

a. Lampkin 2017 Taxes (Count 28) .......................152

b.     Lampkin 2018 Taxes (Count 29) .........................................154

xv.   *Victim Fabio Tozeto Ramos (Count 30)* ........................................158

a.     Ramos 2019 Taxes (Count 30).............................................160

xvi.   *Victims Federico and Justine Turatti (Counts 31-33)* ...................163

a.     Turatti 2017 Taxes (Count 31).............................................166

b.     Turatti 2018 Taxes (Count 32)............................................168

c.     Turatti  2019 Taxes (Count 33).............................................169

I.     Castros Emails to Investigators .................................................172

J.     Total Losses....................................................................174

K.     Summary Application of Facts to the Law.................................176

L.     Conclusion.....................................................................179

CERTIFICATE OF SERVICE.......................................................180

UNITED STATES OF AMERICA

v.

JOHN ANTHONY CASTRO

CRIMINAL NO. 4:24-CR-1-Y

**GOVERNMENT'S PROPOSED FINDINGS
OF FACT AND CONCLUSIONS OF LAW**

A.     **Introduction**

1.     Defendant John Anthony Castro ("Castro") is charged by Indictment with thirty-three counts of aiding and assisting in the preparation and presentation of a false and fraudulent return, in violation of 26 U.S.C. § 7206(2).  (*See* Dkt. No. 3.)

2.     In summary, the government alleges that Castro, who has a long history of personal aggrandizement, engaged in a scheme whereby he recruited clients, promised returns well-above those of other tax preparers, and then falsely engineered tax returns replete with false and fraudulent deductions that have no basis in law or fact.  The government alleges that Castro purposefully failed to review the returns with his clients and failed to obtain their signatures before he filed them.  Instead of charging a set fee, Castro took a percentage of the refund for each client, which was well-above the properly calculated refund that they would have received had the returns been truthful and accurate. In defense, Castro, who is well educated and well-versed in tax law, argues that the established tax law and IRS regulations are simply wrong, and his interpretations should

prevail. Not only is this not a valid defense, but it is also evidence of Castro's willfulness. Through this scheme, the government alleges Castro obtained criminal proceeds in excess of $15.5 million. When challenged regarding his scheme by clients, employees, or investigators, Castro acted in a vindictive manner, causing significant financial harm to anyone who questioned his practices. Following his Indictment, Castro went on a press tour to promote his presidential campaign, claiming that his prosecution was politically motivated and manufactured by the ex-President.

3. The government anticipates proving its case by calling as witnesses several victims/clients (there are fifteen named in the Indictment), former employees of Castro, case agents, revenue agents, and others. The government exhibits will consist of tax returns, communications between Castro and his clients, emails sent by Castro to a variety of investigators, and records related to Castro's education and history. The parties are discussing factual stipulations that would narrow the trial but have not yet reached agreement.

**B.    Criminal Charges, Elements of the Crime, and Mens Rea Standard**

4. Each count in the Indictment is based on the same statute and thus, the government is required to prove the following elements beyond a reasonable doubt to establish a conviction:

*First*:    That the defendant aided in, assisted in, procured, counseled, or advised the preparation or presentation of a return arising under or in connection with any matter arising under the internal revenue laws;

*Second*:    That this return falsely or fraudulently stated the items identified in the indictment for each count;

*Third*:    That the defendant knew that the statement in the return was false or fraudulent;

*Fourth*:    That the false or fraudulent statement was material; and

*Fifth:*    That the defendant aided in, assisted in, procured, counseled, advised, the preparation or presentation of this false or fraudulent statement willfully, that is, with intent to violate a known legal duty.[1]

5.    Per the Fifth Circuit pattern jury instructions, it is not necessary that the government prove that the falsity or fraud was with the knowledge or consent of the person authorized or required to present such return. (*See* Fifth Circuit Pattern Jury Instructions 2.104B.)

6.    Per the Fifth Circuit Pattern Jury Instructions, a statement is "material" if it has a natural tendency to influence, or is capable of influencing, the Internal Revenue Service ("IRS") in investigating or auditing a tax return or in verifying or monitoring the reporting of income by a taxpayer.  (*See id*.)

7.    The Note to Fifth Circuit Pattern Jury Instruction 2.104A provides that willfulness, as it relates to tax offenses, is defined as the "voluntary, intentional violation of a known legal duty." *citing Cheek v. United States*, 111 S. Ct. 604, 610 (1991); *see United States v. Charroux*, 3 F.3d 827, 831 n.6 (5th Cir. 1993); *see also Boyd*, 773 F.3d 637, 645 (5th Cir. 1993) (finding an instruction defining "willfully" as "with intent to

_____

[1]    Fifth Circuit Pattern Jury Instructions 2.104B

violate a known legal duty" and as acting" intentionally—not by accident or mistake—with knowledge his conduct violated the law" to be consistent with *Cheek's* definition of willfulness); *United States v. Simkanin*, 420 F.3d 397, 404, 410–11 (5th Cir. 2005) (no good faith instruction required when charge adequately instructed the jury on the meaning of willfulness under *Cheek* and *Pomponio*); *United States v. Montgomery*, 747 F.3d 303, 308–10 (5th Cir. 2014) (holding that mentioning *Cheek's* good-faith defense in a jury instruction requires further explanation that the "defendant's good-faith belief need not be objectively reasonable").[2]

8.    While a defendant may raise a good faith defense to a tax crime, (and the government anticipates a variant of such an argument from Castro), disagreement with the tax laws of the United States is not a defense to tax evasion. *Cheek*, 11 S. Ct. at 611-12.  A person "cannot be aware that the law imposes a duty upon him and yet be ignorant of it, misunderstand the law, or believe that the duty does not exist." *Id*. at 610-11. Such a defense, which is a question of fact, must be based on a good faith misunderstanding of the law or ignorance of the law, even if the ignorance or misunderstanding is not objectively reasonable. *Id*.   In deciding whether to credit a defendant's good-faith-belief claim, however, the factfinder may consider any admissible evidence from any source showing that the defendant was aware of his duty, including evidence showing his awareness of the relevant provisions of the U.S. Code or tax regulations, of court decisions rejecting his

---

[2] *See also* Instruction No. 1.43, "Willfully"—To Act.

interpretation of the tax law, of authoritative rulings of the Internal Revenue Service, or of any contents of the tax return forms and accompanying instructions. *Id*. at 611. And "the more unreasonable the asserted beliefs or misunderstandings are, the more likely the [factfinder] will consider them to be nothing more than simple disagreement with known legal duties imposed by the tax laws . . ." and will find that the government has carried its burden of proving knowledge" of the legal duty. *Id*. at 611-12.

9.      Per the notes to the Fifth Circuit Pattern Jury Instruction, in a willfulness instruction, it is erroneous to mention the good-faith defense but fail to instruct that a good-faith belief need not be objectively reasonable, if it is sincerely held. *See United States v. Carter*, 638 F. App'x 268, 275 (5th Cir. 2015); *see also United States v. Montgomery*, 747 F.3d 303, 308–10 (5th Cir. 2014) (holding, in a case involving § 7206(1) rather than § 7206(2), mentioning the good-faith defense in a jury instruction requires further explanation than that the "defendant's good-faith belief need not be objectively reasonable").

## C.      Detail Regarding the Counts of the Indictment

10.      The thirty-three counts of the Indictment relate to fifteen victims and one undercover agent.  The Indictment identified the victims by their initials but their names are used in this document.  The counts cover tax years 2017 through 2019.

11.      Within each count, the government identified multiple "false or fraudulent material items."  These include deductions for (1) Schedule A "unreimbursed employee expenses," (2) Schedule A "other expenses," (3) miscellaneous Schedule C deductions, (4)

depreciation, (5) Schedule C "employee benefit program expenses," (6) Schedule A "other miscellaneous deductions," including those for "impairment related work expenses," and the resulting false tax refunds.

12.     The government must prove only the elements of the crime with respect to one of the "items" alleged in each count to prevail on that count, not all of the "items" listed in each count.

13.     Exhibit A to this filing provides a chart of the counts with additional information that identifies the specific detail underlying the false or fraudulent nature of the item.  This chart is color-coded to show categories of the false and fraudulent items listed above in paragraph 11.

**D.     Background on Defendant John Anthony Castro**

14.     Defendant John Anthony Castro is a resident of Mansfield, Texas.

15.     Castro was born in 1983. Castro's father was a member of the United States military and Castro grew up in Laredo, Texas, among other places.

16.     In 2002 and 2003, Castro was a student at the U.S. Military Academy Preparatory School ("Prep School"), in Monmouth County, New Jersey.  (*See* Government Exhibit 3.)  The Prep School is designed to prepare candidates to qualify for admission to U.S. military academies.  Castro did not graduate from the preparatory school.[3]

---

[3]     Much of the background is provided because it is relevant the counts charges in terms of his claimed experience and his tax preparation business.

17.     Though Castro did not attend a military academy, did not serve in the military, and is not a veteran, Castro identifies himself as a veteran on his current Texas driver's license. (*See* Government Exhibit 2.)

18.     Castro graduated from the Texas A&M International University in Laredo, Texas in 2008, with a Bachelor of Arts, majoring in political science, with a minor in psychology.  (*See* Government Exhibit 4.)

19.     Castro graduated from the University of New Mexico School of Law ("UNM") with a Doctor of Jurisprudence degree (J.D.) in May 2012.  (*See* Government Exhibit 5.)  He transferred to UNM after attending the New England School of Law in the Fall of 2009 and Spring of 2019.

20.     Castro graduated from Georgetown University Law School ("GULC") in 2013 with a Master of Laws (L.L.M.) degree with a concentration in Tax Law and a certificate in International Taxation.  (*See* Government Exhibit 6.)   Based on school transcript records, Castro completed courses in U.S. Taxation of Domestic Persons with Activities Outside the U.S., U.S. Taxation of Foreign Persons in the U.S., Income Tax Accounting, Corporate Income Tax, Tax Treaties, and Advanced International Taxation. (*See id*.)

21.     As Judge Barbara M.G. Lynn wrote, "while enrolled [at GULC], the University allegedly learned that Castro had mischaracterized information on his résumé and considered expelling him, but the University ultimately did not do so."  (*See* Case No. 3:18-cv-645-M, Dkt. No. 19, at 1.)

22.     Although Castro is a law school graduate and holds an LLM, he has admitted in certain filings in federal court in other cases, that he is not licensed with any state bar in the United States; thus, he is not an attorney.

23.     In 2013, Castro briefly worked for the Gudorf Law Group, based in Ohio. He left the firm after failing to pass the bar and sued the Gudorf Law Group in the Northern District of Texas for defamation.  *See* Case No. 3:18-cr-375-K.  The case was transferred to Ohio and eventually dismissed.

24.     Castro then went to work for a firm in Orlando, Florida, named CliftonLarson Allen, LLP.

25.     Though he is not an attorney, in or about 2016, Castro started and opened his own firm, named Castro & Co., LLC "(Castro & Co.").  Castro & Co. describes the firm as a "U.S. based International Tax law firm."  (*See* Dkt. No. 1 in Case No. 3:18-cv-573, ¶ 9, filed by Castro & Co., stating "John Anthony Castro is the founder and managing partner of a U.S. based International Tax law firm known as Castro & Co., LLC that specializes in International Tax matters. Services provided by Castro & Co. to clients include, U.S. based Federal annual tax compliance, issuing tax opinions on complex International and Tax Treaty compliance issues, tax return amendments, tax planning and consulting, among other tax matters.")

26.     Castro & Co. originally operated from a residence Castro purchased in Orlando, Florida.  The offices, however, were relocated to Mansfield, Texas, when Castro moved there in 2016.

27.     Castro claims to be a "federal practitioner" and registered as an "enrolled agent" with the IRS.

**John Anthony Castro**

John Anthony Castro is the managing partner of Castro & Co. Dr. Castro earned his Master of Laws (LL.M.) in International Taxation from Georgetown University Law Center in Washington, DC. Dr. Castro also earned a Doctor of Jurisprudence (J.D.) from UNM School of Law and a Bachelor of Arts (B.A.) from Texas A&M International University. Dr. Castro is an internationally recognized published scholar and author of International Taxation in Plain English, a soon to be published practitioner's guide for attorneys practicing in the field of international tax and estate planning.

28.     His enrolled agent status was inactive from July 2017 through August 2019 because Castro did not send in his Application for Renewal of Enrollment to Practice Before the Internal Revenue Service. (*See* Government Exhibit 8.)

29.     On July 18, 2016, the Florida Bar sent Castro a cease-and-desist letter for the unlicensed practice of law. (*See* Government Exhibit 7.)   The complaint warned Castro that "[u]sing J.D., or a title indicating that you are a lawyer to give the impression that you are a licensed attorney, is improper."  (*Id*.)  The complaint also advised, "[b]eing a law school graduate does not authorize you to hold yourself out as an attorney. Accordingly, you must cease and desist from identifying yourself on any advertisement such as your website, letterhead, business cards, etc. as an attorney with an office in Florida." (*Id*.)  The letter further stated that "[u]sing J.D., or a title indicating that you are a lawyer to give the impression that you are a licensed attorney, is improper." (*Id*.)

30.     Judge Mark Pittman found that Castro is a "vexatious litigant." (*See* Case No. 4:23-cv-613-P, Dkt. No. 63, at 2.)  Judge Pittman noted that Castro had filed ten cases in the Northern District over the last five years, six of which had been filed since April 2021, and "that says nothing of his dozens of other cases filed across the country in the last few years."  (*Id*. at 3.)  Many of these cases, including one before this Court, were dismissed, based on lack of jurisdiction.  *See* Case No. 4:23-cv-556-Y (where he sued the investigating agent in this instant case).

31.     Judge Pittman noted that Castro had has been cautioned elsewhere regarding his inappropriate behavior.  *Id*. at 4-5, *citing Castro v. Oliver*, No. 1:23-cv-00766- MLG-GJF, slip op., at 3 (D.N.M. Oct. 18, 2023) ("Having put this legal matter to rest, the Court concludes by noting that Castro's filing employs a tenor unfamiliar to this Judge and one that is out of step with practice in this district. The Court cautions Castro and requests that any future filings comport with decorum and the respect practitioners typically afford federal judges."); *Castro v. Warner*, No. 2:23-cv-00598, 2023 WL 7171462 at *6, *7 (S.D.W. Va. Oct. 31, 2023) (observing that Castro's filings "contain numerous examples of clearly inappropriate attacks" and noting that "derisive commentary is of little value to the Court in resolving motions").  Judge Pittman noted similar behavior in the case before him. (*See* Case. No. 4:23-cv-613-P, Dkt. No. 63, at 5, citing, ECF No. 45 in that case at 2 (accusing opposing counsel of lying to the Court and engaging in deception as well as accusing the Court of not enforcing ethical rules).

32.     With regards to his own criminal history, Castro has a misdemeanor assault charge when he was a juvenile (September 2000); misdemeanor charge for filing a false report/alarm (June 2003); and a misdemeanor harassment charge (April 2005). (*See* Government Exhibit 15.)

33.     On Castro's personal tax returns Forms 1040, Castro and his wife reported total income of $376,545 in 2016; $511,951 in 2017; $983,826 in 2018; and $893,766 in 2019 (the years that form the basis of the charges).  Their main source of income was from W-2 wages and passthrough income from Castro & Co., LLC.  (*See* Government Exhibits 9-11.)

34.     Castro owns many vehicles, including a 2014 Ferrari convertible, a 2017 Bentley Bentayaga SUV, and a 2014 Mercedes-Benz ML350 sedan.

35.     In March 2023, Castro notified the Federal Election Commission that he had loaned $20 million to his own presidential campaign.

**E.     Castro & Co. Processes**

36.     As noted above, Castro owned and operated a virtual tax preparation business, Castro & Co.  Castro was the founder and controlling individual for the firm.

37.     Castro employed multiple individuals, including family members, as part of his business. Castro & Co. offered consulting, tax planning, and tax preparation services to clients and claims to have multiple locations throughout the United States.

38.     Employees included several young attorneys and a certified public accountant ("CPA".)

39.     Employees would report to work at Castro's residence or work from their homes.  Castro & Co, claimed to have offices in Orlando, New York, Los Angeles, Washington, D.C., and Dallas.

40.     For clients who sought tax preparation and filing from Castro & Co., the same procedure was generally followed.  Castro would either recruit clients or clients would find Castro through online searches.  Prospective clients would complete a short client questionnaire that was submitted electronically to Castro.

41.     A Castro & Co. employee would then arrange and perform a phone interview with the client, following a script that Castro had been prepared.  (*See e.g.*, Government Exhibit 109.)  The script instructed employees to push and "dig" for information that could lead to deductions.  For example, in relation to any potential side business, Castro instructed: "I'm gonna be pissed if this is blank.  Cross examine the client! Don't give up. Keep digging.  FIND A FREAKIN BUSINESS. Something; anything." (*See* Government Exhibit 259.)

42.     Clients would be instructed to upload relevant documents (such as W-2's, bank information, etc.) to a portal managed by Castro & Co.

43.     A Castro & Co. employee would then perform data input into a tax software used by Castro & Co.  Castro would then perform a final review.  Castro's role as the final reviewer of the tax returns is uncontroverted and substantiated by multiple employee interviews and the tax software, which logged the work of each user by time, duration, and action.  (*See* Government Exhibit 25.)

44. Before filing, Castro would email a tax proposal to the client that noted: (1) that the taxes had been completed, (2) identifying the anticipated refund, (3) identifying what the refund (always less) would have been if the client had used another tax preparer, (4) identifying the amount Castro would be paid, which was not a consistent set fee but was rather based on the anticipated refund, (5) and asking the client if they wanted to proceed with the filing of the taxes. (*See e.g.*, Government Exhibit 121.)

45. If the client accepted the proposal, Castro filed the taxes on behalf of the client. The clients neither signed the tax returns nor were given the opportunity to review them prior to submission. Castro did not identify, explain, or review with the client any specific positions he was taking on behalf of the clients in the returns he filed. Castro typically used his office address on each tax form as the address for the client.

46. In general, Castro refused to meet with clients in person. Castro also made it a practice to not provide copies of filed tax returns to clients unless the client demanded them and only if they had already agreed to have Castro file the taxes and after the taxes had been filed Even then, Castro often delayed in providing the returns to the taxpayers for several months or longer.

47. Castro would often refuse to engage in communications once questioned about the filings or he would take retaliatory action against the taxpayers.

48. The static IP Address 47.44.60.154 that was used to file tax returns for Castro's clients since tax year 2017 was registered to Castro's residence in Mansfield, Texas. (*See* Government Exhibit 22.)

49.     Although Castro used other employees to communicate with clients, input data, and perform other tasks, Castro made it clear that he personally filed all of the taxes for his clients with the IRS between 2017 and 2019.

50.     Castro typically employed younger employees, who were hesitant to challenge any positions taken by Castro with respect to client's taxes.  When they did question Castro, Castro would explain away their concerns.  Employees often left Castro & Co. because they were concerned about legality and ethics of Castro's practices.

51.     Based on reports generated using Castro's own software, and statements made by Castro's regarding what that software contains, Castro had approximately Castro filed 496 unique (different names) 1040s in 2016, 693 in 2017, 562 in 2018, and 674 in 2019.

## F.     Background on IRS and General Tax Law

52.     The IRS was an agency of the United States Department of Treasury, a department of the United States of America, which was responsible for enforcing and administering the tax laws of the United States.

53.     IRS Form 1040, also known as the U.S. Individual Income Tax Return, was an IRS tax form used for personal federal income tax returns filed by United States residents.  When properly completed, the form calculated the total taxable income of the taxpayer and determined how much was to be paid to or refunded by the federal government.

54.    Under States tax law, itemized deductions were eligible expenses that individual taxpayers can claim on federal income tax returns, which decrease taxable income, and are claimable in place of a standard deduction, if available.  Most taxpayers were allowed a choice between itemized deductions and the standard deduction.  When a taxpayer elected to itemize deductions, they often used an attachment to IRS Form 1040, known as Schedule A.  Eligible deductions included, but were not limited to qualified medical expenses, a portion of state and local taxes, mortgage interest, certain sales tax payments, and certain charitable contributions.

55.    Prior to 2018, taxpayers could claim certain unreimbursed employee business expenses as a deduction on Schedule A, including expenses related to job travel, certain work-related education, and other business-related items.  To qualify, the expense had to be directly related to a taxpayer's job, it had to be common and necessary to the taxpayer's line of work and had to be paid during the tax year.  Taxpayers often used IRS Form 2106 to claim these deductions.  The total of these expenses could not exceed 2% of a taxpayer's adjusted gross income.  As a result of changes in tax law, starting in 2018, most taxpayers could no longer claim unreimbursed business expenses as a deduction.  This is discussed in greater detail in Section G(i) below.

56.    A taxpayer also could deduct certain "other" expenses as a deduction on Schedule A.  The IRS identified such other expenses as including impairment-related work expenses of a disabled person, certain unrecovered investments in a pension, and federal estate tax on income in respect of a decedent.  If an expense was not specifically identified

by the IRS as subject to this deduction, the "other" expenses deduction could not be used by a taxpayer.  This is discussed in greater detail in Section G(v) below.

57.     If a taxpayer owned or operated their own business, an attachment to IRS Form 1040, known as Schedule C, was used report profits and losses from that business.  To qualify, the primary purpose for engaging in the activity had to be for income or profit and a taxpayer had to be involved in the activity with continuity and regularity.  A hobby did not qualify as a business.  Taxpayers were required to report all money flowing into the business as their "gross receipts" on Schedule C.  Taxpayers could deduct certain expenses from these gross receipts, including costs related to licenses, utilities, and insurance.  Taxpayers could also deduct the actual expenses of operating their car or truck or take the standard mileage rate.  This is discussed in greater detail in Section G(ii) below.

58.     In order to deduct home expenses related to a Schedule C business, a taxpayer must use a portion of their personal residence exclusively for business purposes to consider whether a home office deduction applies.  If the taxpayer meets the exclusive use test, deductible expenses would only be allowed for the pro-rated portion of business use - not for the entire home.

## G.     Relevant Law Related to the Tax Issues in the Instant Case

### i.      Unreimbursed Employee Expenses

59.     For most of the taxpayers identified in the indictment, Castro deducted certain expenses on Schedule A that he categorized as a "miscellaneous deduction" and further identified as "unreimbursed employee expenses."

60. An employee is treated for federal tax purposes as being engaged in the trade or business of being an employee and therefore is entitled to deduct ordinary and necessary business expenses under section 162 of the Code. *See, e.g.*, *Primuth v. Commissioner*, 54 T.C. 374, 377-78 (1970). Whether an individual is an employee (rather than an independent contractor) is determined by applying a multi-factor, common law test. *See, e.g.*, *Hathaway v. Commissioner*, T.C. Memo. 1996-389 (1996).

61. For an employee to deduct business expenses, all requirements of section 162 of the Code must be met, including that the expense must be ordinary and necessary and must actually be paid or incurred during the taxable year. An employee can deduct expenses under section 162 of the Code only if the employee can establish a business purpose for the expense, i.e., that the expense is directly related to the taxpayer's employment, and if the employee can substantiate the amount and purpose of the expense. *See, e.g.*, *Simpson v. Commissioner*, T.C. Memo. 2023-4 (2023); *Dunkelberger v. Commissioner*, T.C. Memo. 1992-723 (1992).

62. If a cost paid or incurred by an employee is deductible under section 162 of the Code, then the employee must report the deduction on the employee's federal income tax return in one of two ways. First, if the employee incurs the expense under a reimbursement or other expense allowance arrangement with his employer, then the employee includes the reimbursement received from the employer in the employee's gross income and, pursuant to section 62(a)(2)(A) of the Code, subtracts the expense as a

deduction from the employee's gross income on Form 1040 to arrive at the employee's adjusted gross income.

63. Relevant Treasury Regulations simplify the reporting of such reimbursed employee business expenses and provide that, if the employer's reimbursement or other expense allowance arrangement is an accountable plan as defined in Treas. Reg. § 1.62-2(c)(2), (d), (e), and (f), then the employee need not include in gross income the reimbursement received from gross income and therefore does not deduct the reimbursed expense. Treas. Reg. 1.62-2(c)(4).

64. Second, if the employee did not incur the expenses under a reimbursement or other expense allowance arrangement with his employer, then the employee, prior to 2018, could report the unreimbursed employee business expenses as an itemized deduction on Schedule A of the individual's federal income tax return (Form 1040). *See, e.g.*, *Simpson v. Commissioner*, T.C. Memo. 2023-4 (2023).

65. Such unreimbursed employee business expenses that are reported on Schedule A are categorized as "miscellaneous itemized deductions" by section 67(b) of the Code and, prior to 2018, pursuant to section 67(a) of the Code, a taxpayer's aggregate miscellaneous itemized deductions, including unreimbursed employee business expenses, were deductible only to the extent they exceeded 2% of a taxpayer's adjusted gross income. For tax years 2018 through 2025, section 67(g) of the Code disallows the deduction of all miscellaneous itemized deductions, including unreimbursed employee business expenses.

66.     Castro concedes that, for an employee to subtract expenses from gross income to arrive at adjusted gross income as expenses incurred under a reimbursement or other expense allowance arrangement with his employer within the meaning of § 62(a)(2)(A), the expense must be connected "in some way to performing [the taxpayer's] duties." He argues, however, that this section covers expenses even if the employer had no intention of reimbursing the employee for the expense. In other words, Castro argues that *unreimbursed* employee business expenses can, pursuant to § 62(a)(2)(A), be subtracted from an employee's gross income to arrive at adjusted gross income. In this way, Castro attempts to vastly expand what expenses are covered by § 62(a)(2)(A).

67.     As alleged in the indictment, this is exactly what Castro did.  For Counts 1-3, 6-7, and 9-31, Castro claimed a deduction for "unreimbursed employee expenses" for expenses related to: (1) personal vehicle expenses, (2) work clothes, and (3) work tools. To deduct personal vehicle costs as a business expense under § 162(a), an employee "must first prove that their vehicle mileage arises from deductible business-related travel rather than nondeductible commuting." *Patitz v. Commissioner*, T.C. Memo. 2022-99. In addition, the employee must comply with the strict substantiation requirements of § 274(d). See IRC § 274(d)(3) (strict substantiation requirements apply with respect to any "listed property," defined in § 280F(d)(4)(i) to include passenger automobiles). To comply, the employee must substantiate (1) the amount of the expenditure, (2) the amount of business use and the amount of total use, both measured in miles, (3) the date of the business use, and (4) the business purpose of the use of the automobile. Treas. Reg. § 1.274-5T(b)(6).

Instead of substantiating the amount of the expenditure (requirement number 1), an employee can use a standard mileage rate published by the IRS. Treas. Reg. § 1.274-5(j)(2). Using the standard mileage rate establishes the amount of the expenditure but does not relieve the employee of the burden of substantiating the other four items that must be substantiated.

68.     The strict substantiation rules of § 274(d) supersede the *Cohan* doctrine. Under this doctrine, if a taxpayer incurs deductible expenses but cannot prove the exact amount, the trial court must make as close an approximation as it can instead of disallowing the entire deduction. *Cohan v. Commissioner*, 39 F.2d 540 (2d Cir. 1930). The regulations issued under § 274(d) provide that, for tax years beginning on or after January 1, 1986, no deduction or credit shall be allowed with respect to—

> (4) Any listed property (as defined in section 280F(d)(4) and § 1.280F–6T(b)), unless the taxpayer substantiates each element of the expenditure or use (as described in paragraph (b) of this section) in the manner provided in paragraph (c) of this section. This limitation supersedes the doctrine found in *Cohan v. Commissioner*, 39 F. 2d 540 (2d Cir. 1930).

69.     The cost of clothing is deductible as a business expense under § 162 if "(1) the clothing is of a type specifically required as a condition of employment, (2) it is not adaptable to general usage as ordinary clothing, and (3) it is not so worn." *Pevsner v. Commissioner*, 628 F.2d 467 (5th Cir. 1980). Under this standard, an employee can deduct the cost of a uniform that is required to be worn by the employer and is not suitable for everyday use outside of work. For example, if a taxpayer must wear a shirt with a company

logo on it, the cost of that clothing can be deducted if not paid for by the employer. On the other hand, typical work clothes, such as a suit, business casual clothing, or dress shoes cannot be deducted as unreimbursed employee expenses. *See, e.g.*, *Pevsner*, 628 F.2d at 470-71; *Ayria v. Commissioner*, T.C. Memo. 2022-123.

70. A taxpayer can deduct expenses associated with "work tools" if (1) the employee is required to have the tool for their trade, (2) they work for an employer, as opposed to being self-employed, and (3) the employer did not pay for or reimburse the employee for that tool. A personal cell phone that is not reimbursed or required to be used by an employer is not deductible. Home internet connectivity that is not required or reimbursed by an employer is not deductible.

71. Starting in 2018, most taxpayers could no longer claim unreimbursed employee business expenses as a deduction because such deductions are miscellaneous itemized deductions. As discussed earlier, for tax years 2018 through 2025, section 67(g) of the Code disallows the deduction of all miscellaneous itemized deductions, including unreimbursed employee business expenses. Starting in 2018, taxpayers could deduct unreimbursed employee business expenses only if they were an Armed Forces reservist, qualified performing artist, fee-basis state or local government official, or an employee with impairment-related expenses. As a result, all of the deductions that Castro claims for unreimbursed employee expenses for tax years 2018 and 2019 were improper deductions for this additional reason. These relate to Counts 7, 10, 11, 13, 14, 16, 17, 19, 20, 23, 24, 26, 29, 30, and 31.

72.     As an example, in Count 1, related to the undercover agent Angela Jackson, Castro claimed a deduction for "work tools" in the amount of $2,400.  Based upon the recorded interview by Castro & Co. with Jackson, she was asked how much she spent on her cell phone and home internet.  Jackson provided those figures which amounted to a sum of $2,400.  Jackson did not tell Castro or his employees that she used her home internet or cell phone for work related activities.  She also did not tell Castro and Co. that these items were required by her employer.

73.     As another example, in Count 26, related to victims Michael and Mirjana Putica, and their 2019 tax return, Castro claimed a deduction of $47,160 in unreimbursed employee expenses as listed on Form 2106, which was attached to the 2019 tax return.  The Puticas observed that the bulk of that figure emanated from a $46,200 entry that was related to Michael Putica's vehicle.  Michael Putica would testify that he only used the vehicle to travel to and from work and never provided Castro or his employees with any information related to his use of the vehicle.  Michale Putica would testify that this deduction was not based in fact.

### ii.     Schedule C Employee Benefit Program Expenses

74.     For several taxpayers, Castro claimed a deduction on Schedule C for "employee benefit program expenses."  These claimed deductions include expenses for mortgage payments, utilities, meals, rent, phones, kitchen appliances, gas, tires, tolls, child care, and prescriptions.  In each instance, the taxpayers would testify that they had no employees and simply ran a small side Schedule C business.

75.     Title 26 § 162 allows for the deduction of all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. Provided all requirements of section 162 are satisfied, an individual engaged in the conduct of a trade or business can deduct "employee benefit program expenses" and report these deductions on line 14 of Schedule C.

76.     These expenses include payments made on behalf of employees (that are not related to pensions or profit-sharing plans) such as for accident and health plans, group term life insurance, and dependent care assistance programs. The category of deductible employee benefit program expenses does not include personal expenses or non-substantiated expenses.

77.     A self-employed person cannot deduct as an employee benefit program expense amounts paid on the individual's own behalf for group term life insurance or for contributions to an accident or health plan.

78.     Castro asserts that 26 U.S.C § 119, which is titled "Meals or lodging furnished for the convenience of the employer" allows a taxpayer, who operates a Schedule C business, to deduct a wide swath of expenses that can be generally defined as living expenses.  These include a taxpayer's mortgage, utility bills, car expenses, gas, child care, and prescriptions.   But, on its face, Section 119 is not a deduction-granting provision – instead it merely identifies what items can be excluded from an employee's gross income. His argument is not based in the law.

79.     Castro argues, in essence, that (1) 26 U.S.C § 119 provides that an employee can exclude from gross income the value of meals or lodging provided by his or her employer provided that certain requirements are met, (2) in *Armstrong v. Phinney*, 394 F.2d 661 (5th Cir. 1968), the U.S. Court of Appeals for the Fifth Circuit held that, depending on the facts, a partner in a partnership could be an employee of the partnership for purposes of the exclusion provided by § 119, and (3) it is therefore reasonable to conclude that a self-employed person with his or her own business who reports the income and deductions of the business on Schedule C can deduct as a business expense personal living expenses such as the monthly mortgage, utility bills, child care, and prescriptions. This argument is flawed for several reasons.  One of the primary flaws is that the argument reaches a conclusion that is unsupported by the assumptions made. The Fifth Circuit's decision in *Armstrong v. Phinney* held only that a partner might, under appropriate circumstances, be regarded as an employee of the partnership for purposes of the exclusion provided by § 119 and, if so, would be entitled to exclude from gross income the value of meals or lodging provided by the partnership for the convenience of the employer. The decision is one of many examples in the area of partnership taxation where there is an issue concerning the nature of the relationship between the partnership on the one hand and its partners on the other. However, the court's decision in *Armstrong* provides no support for the proposition that a sole proprietor can be treated as an employee of the sole proprietorship for purposes of §119.  And it certainly provides no support for the positions taken by Castro on the tax returns in question. That position was not that the sole

proprietors could exclude from their income the value of meals or lodging provided by their employer; rather, the position was that these sole proprietors could treat personal expenses as business expenses and deduct them on Schedule C as a way of reducing business profits.

80.     For example, Count 8 relates to victim Linda Rivera and her 2019 taxes. Rivera has a very small side cupcake-making hobby that Castro deemed a business with $250 in gross receipts/sales.  Castro claimed a Schedule C deduction for "employee benefit program expenses" related to this "business" in the amount of $25,677.   This amount ($25,677) consisted of:

- $1,908 for "phone usage,"
- $540 for "internet,"
- $1,700 for a "computer,"
- $350 for a "kitchen mixer,"
- $13,427 for her "mortgage,"
- $3,192 for "water & electricity,"
- $50 for "tollway,"
- $1,300 for "vehicle cost-gas,"
- $250 for "vehicle cost-gas,"
- $478 for "vehicle cost-tires,"
- $2,406 for "vehicle cost-car insurance," and
- $76 for "vehicle cost – renewal."

81.     Rivera had no employees in her cupcake business.  Many of these expenses, such as those for her mortgage, utilities, and vehicle represent the full amount of those expenses for her entire residence or vehicle, as opposed to the percentage of expenses

related to her home or vehicle that she used solely for her "business." Castro did not explain to Rivera that he would be claiming a deduction in this manner.

82. Moreover, many of the items Castro includes in his claimed deductions for employee benefit employee expenses simply do not qualify as that type of expense. 26 U.S.C. § 262(a) provides that no deduction shall be allowed for personal, living and family expenses. Treasury Regulation 1.262-1(b)(1) through (9) identify examples of personal, living and family expenses that are not deductible, including, but not limited to, life insurance premiums; the cost of insuring a dwelling owned and occupied by the taxpayer as a personal residence; the expenses of maintaining a household, including amounts paid for rent, water, utilities and domestic service; travel expenses (including transportation expenses, meals and lodging) that do not qualify as expenses deductible under IRC 162 (relating to trade or business expenses) and the taxpayer's cost of commuting to his place of business or employment.

83. Similarly, in Count 15, he claims a $2,348 deduction in Schedule C "employee benefit programs" expenses that consists of $1,700 in "Section 165," $408 in "Health Reimbursement," $240 for "Health Reimbursement."

84. IRC 213(a) allows a deduction for medical care of the taxpayer, his spouse or a dependent paid during the taxable year that are not compensated for by insurance or otherwise to the extent that the aggregate of such expenses exceeds 7.5% of adjusted gross income. IRC 213(d) defines "medical care" as doctors, transportation, insurance premiums, medications and long-term care services. As indicated by the 7.5% limitation,

a taxpayer's personal health insurance is reported as an itemized deduction on Schedule A, Itemized Deductions, not on Schedule C.

85.     Self-Employed individuals may be able to deduct health insurance premiums as an "above-the-line" deduction even if they don't itemize deductions.  The term above-the-line deductions refers to deductions listed in IRC § 62(a). A taxpayer subtracts above-the-line deductions from the taxpayer's gross income to determine the taxpayer's adjusted gross income. If a taxpayer is eligible for an above-the-line deduction, the taxpayer can take the above the-line deduction regardless of whether the taxpayer takes the standard deduction or instead itemizes his or her remaining deductions. To qualify for deducting health insurance premiums as an above-the-line deduction, the taxpayer must have reported net profit (income) as a sole proprietor on Schedule C AND cannot have had access to employer-sponsored health coverage (neither taxpayer nor spouse).  If either spouse could have joined a health insurance plan at work, the deduction cannot be claimed.

86.     The Affordable Care Act requires employers to report the cost of coverage under an employer-sponsored group health plan on an employee's Form W-2, Wage and Tax Statement, in Box 12, using Code DD.  Individuals (employees) do not have to report as income the cost of coverage under an employer-sponsored group health plan that is shown on Form W-2, Box 12 using Code DD.  The amount reported does not affect the employee's tax liability, as the value of the employer contribution continues to be excludible from an employee's income and is not taxable - is also not deductible by the employee because it is paid entirely by the employer.

87.     In Count 17, related to victims Javier and Betsy Sola, Castro claims a deduction for $5,608 in Schedule C "employee benefit programs" expenses, which consisted of $420 for Prescriptions, $2,800 for Dependent Care, $240 for Insurance Premium Kids, $1,728 for Insurance Premiums H&W, and $420 for Prescriptions.  As previously explained, the category of deductible employee benefit program expenses does not include personal expenses or non-substantiated expenses.  Further, as previously explained, a self-employed person cannot deduct as an employee benefit program expense amounts paid on the individual's own behalf for group term life insurance or for contributions to an accident or health plan.  The deductions claimed in Count 17 are either personal expenses or are insurance premiums paid on the taxpayers' own behalf.  Accordingly, these items are not properly deductible as employee benefit plan expenses.

88.     As stated previously, IRC 213 allows a deduction for medical expenses (including insurance premiums, doctors and medications for a taxpayer, his spouse and his dependents to the extent the aggregate medical expenses exceed 7.5% of adjusted gross income.  As indicated by the 7.5% requirement, personal medical expenses are properly included on Schedule A, Itemized Deductions – not Schedule C, Profit or Loss from Trade or Business.

89.     In general, IRC 21(a)(1) allows as a credit against the tax for the taxable year an amount equal to the applicable percentage of the employment-related expenses paid by such individual during the taxable year for a "qualifying individual".  IRC 21(b) defines a qualifying individual as a dependent who has not attained age 13; the spouse or a dependent

of the taxpayer who is physically or mentally incapable for caring for himself/herself and has the same principal place of abode as the taxpayer for more than half of the taxable year. Should the taxpayer meet these requirements, the credit should be computed and reported as a credit on Form 2441, Child and Dependent Care Expenses – not as a deduction on Schedule C, Profit or Loss from Trade or Business.   There is no basis in the law for interpreting section 119 as authorizing deduction of these personal expenses.

90.    Castro utilizes this deduction in the tax returns identified in Counts 2, 3, 4, 5, 8, 9, 10, 11, 15, 17, 26, 30, 32, and 33.

### iii.    Depreciation

91.    For certain taxpayers, Castro deducted depreciation expenses in a manner inconsistent with the law.

92.    26 U.S.C. § 167 states that there "[t]here shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) of property used in the trade or business or of property held for the production of income."

93.    26 USC § 179 is a section of the United States Internal Revenue Code that allows a taxpayer to elect to treat the cost of any section 179 property as an expense which is not chargeable to capital account.

94.    A vehicle may be depreciated only if it was used in the taxpayer's trade or business or for the production of income and only to the extent of the percentage it was used for these purposes, subject to business income limitations and recordkeeping

requirements.  Pursuant to IRC 1011, the property's basis generally is determined under IRC 1012, which specifies that the basis of property shall be the cost of such property, and is adjusted as provided in IRC 1016 for depreciation.

95.    The section 179 deduction can only be elected if the property is used more than 50% for business in the year it is placed in service.  If the property is used more than 50% (but less than 100%) for business, the cost of the property is first multiplied by the percentage of business use to figure the section 179 deduction.

96.    A taxpayer's total section 179 deduction and depreciation deduction (including the special depreciation allowance authorized by IRC 168(k), commonly called first-year bonus depreciation) you can claim for a passenger automobile (any four-wheeled vehicle made primarily for use on public street and roads and rated at 6,000 pounds or less) each year is limited by IRC 280F.  For instance, for passenger automobiles placed in service in 2017 the maximum depreciation deduction (regular depreciation, bonus depreciation, and section 179) for most passenger automobiles is $11,160 in the first year. Rev. Proc. 2017-29, 2017-14 I.R.B. 1065.

97.    Castro claimed deductions for depreciation related to vehicles on both Schedule A's (itemized personal deductions) and Schedule C's (Profit to Loss from Business).  There is nothing in the tax law that permits a deduction for a vehicle on Schedule A.

98.    For example, in Count 1, related to the undercover agent, Angela Jackson, Castro deducted $26,000 related to Jackson's personal vehicle, an Audi Q5, on her 2017

Schedule A. Jackson told Castro she had purchased the vehicle for an estimated $27,000 but did not tell him when she purchased the vehicle or whether she had depreciated the asset in previous years. There is no basis in the law that allows an individual taxpayer to deduct a vehicle for a non-business-related expense on Schedule A.

99. In Count 2, related to victims Paul and Alissa Clayton's 2017 taxes, Castro deducted, on a Schedule C, $20,000 related to a VW GTI, that Clayton had owned since 2014. In 2015 and 2016, Castro had prepared and filed Clayton's taxes and reported that the vehicle cost $25,000 and claimed depreciation in the amount of $6,318 (2015) and $3,765 (2016). When combined, these three amounts ($20,000, $6,318, and $3,765) equaled $29,903, more than four thousand above the purchase price.

100. For example, in Counts 3 & 4, related to victims James Boggs and Frances Fifis-Boggs's 2017 and 2018 tax returns respectively, Castro claimed a deduction for depreciation related to their two vehicles – a Kia Sorrento and a Toyota Tundra.

101. In 2017, per Castro's own filings, the Kia Sorrento's cost was $23,248. In 2017, Castro claimed a deduction in the amount of $13,950 for depreciation on Schedule A under "other expenses" and did it over a five-year period related to the Kia Sorrento. There is no basis in the law that allows an individual taxpayer to deduct a vehicle for a non-business-related expense on Schedule A. In 2018, Castro changed course and deducted $20,924 for the Kia Sorrento on the Boggs' Schedule C. Combined, these two amounts ($13,950 and $20,924) were far greater than the overall cost of the Kia Sorrento. Further, Fifis-Boggs would testify that the Kia Sorrento was not used for business uses and was

instead, used for personal reasons. So, Castro's claimed deductions for this vehicle fails for multiple reasons.

102. In 2017, Castro deducted $6,524 on Schedule C for depreciation of a Toyota Tundra related to Fifi-Boggs' travel agency business. Fifis-Boggs will testify that she did not have business related depreciation for the Toyota Tundra. In 2018, Castro claimed a deduction in the amount of $9,787 for the Tundra on the Schedule C. These two amounts ($6,524 and $9,787) exceeded the overall cost of the Tundra ($10,783) as identified by Castro. Further, Fifi-Boggs would testify that the Tundra was not used for business purposes and was instead, used for personal reasons. Like before, Castro's claimed deductions for this vehicle fails for multiple reasons.

103. In Counts 6 and 7, related to victim Linda Rivera's taxes. In 2017, Castro claimed $19,400 in Schedule A "other expenses." Based on worksheets attached to the taxes, this amount was comprised of $2,600 in "workplace goodwill development," and $16,800 for "depreciation." The depreciation was related to Rivera's Hyundai Elantra on Schedule A under "other expenses." There is no basis in the law that allows an individual taxpayer to deduct a vehicle for a non-business-related expense on Schedule A. In 2018, for Rivera's taxes, Castro claimed $32,018 in unreimbursed employee expenses which included $25,200 in depreciation for the same Hyundai Elantra. So, over two years, Castro claimed depreciation in the amount of $42,000 for one car that cost $25,200 at the time of purchase. Castro's claimed deductions for this vehicle fails for multiple reasons.

104.    In Count 12, related to victims Randolph and Robin Ragsdale for their 2017 taxes, Castro claimed a deduction on Schedule A for "other expenses" in the amount of $8,265.    Based on attached worksheets, this amount was comprised of $1,404 in "workplace goodwill development," $416 for "work-related family supervision," and $729 for "qualified deductible legal fees," and $5,716 for depreciation.    With regard to the depreciation amount ($5,716), backup worksheets reflect that this relates to two different vehicles – both Ford Explorers owned and used by the Ragsdales.    Castro claimed $1,300 in depreciation for one and $4,416 for the other, for a total amount of $5,716. There is no basis in the law that allows an individual taxpayer to deduct a vehicle for a non-business-related expense on Schedule A.    Castro's claimed deductions for this vehicle fail.

105.    In Count 21, related to victims John and Kelley Meyer for their 2017 taxes, Castro claimed a deduction on Schedule A for "other expenses" in the amount of $7,516. Based on attached worksheets, this amount was comprised of $120 in "workplace goodwill development," $1,156 for "deductible investment interest," and $6,240 for "depreciation." With regard to the depreciation amount ($6,240), backup worksheets reflect that this relates to two different vehicles – a Nissan Murano and a Chevy Suburban owned and used by the Meyers.    Castro claimed $2,700 in depreciation for the Murano and $3,540 for the Suburban, for a total amount of $6,240. There is no basis in the law that allows an individual taxpayer to deduct a vehicle for a non-business-related expense on Schedule A.

106.    In Count 26, related to victims Michael and Mirjana Putica's 2019 taxes Castro claimed $38,000 in Schedule C "depreciation" expenses related to a 2018 Mazda

CX-9. The Puticas would testify that this would have not been correct as Mirjana Putica did not use her personal vehicle (the Mazda CX-9) for any tutoring duties and that $38,000 would have represented the full cost of her vehicle. Castro also identified the full cost of the vehicle as $38,000.

107. In Count 27, related to victims Michael and Angelita Natt's 2017 taxes, Castro claimed $15,648 in Schedule A "other expenses." This amount ($15,648) consisted of $1,248 for "workplace goodwill development" and $14,400 for "depreciation" related to the Natts' Nissan Rogue, valued at $24,000. There is no basis in the law that allows an individual taxpayer to deduct a vehicle for a non-business-related expense on Schedule A. Further, Natt would testify that although he did tell Castro employees that he owned this vehicle and provided the amount that he purchased it for ($24,000) he did not provide any additional documentation or information to Castro or his employees to support this claimed deduction, such as whether it had been depreciated in prior years, or when he purchased it.

108. In Count 30, related to victim Fabio Ramos's 2019 taxes, Castro claimed $21,000 in Schedule C "depreciation" expenses. This amount related to a Toyota Sienna that cost $30,000 and Castro claimed that Ramos used the vehicle 30% of the time for business purposes. Ramos would testify that did not tell Castro & Co. he used this car for business; he would rarely if ever use this car for business.

109. This same type of analysis applies to Counts 9, 15, 18, and 25.

110. Castro's arguments regarding depreciation entirely misconstrue the law. Castro's arguments, in essence, are that: (1) taking depreciation deductions is optional

rather than mandatory, (2) under section 263 of the Code, taxpayers must treat as capital expenditures only amounts paid for new buildings and permanent improvements made with the intent to increase the value of the buildings, and accordingly amounts paid to purchase an existing building or permanent improvements for reasons other than increasing value are not capital expenditures and therefore are currently deductible, and (3) any existing Treasury regulations contrary to this interpretation are somehow invalid in light of the U.S. Supreme Court's decision in *Home Concrete and Supply, LLC*, 566 U.S. 478 (2012).

111.    The starting point in analyzing depreciation is the rule enacted by Congress in section 263(a) of the Code, which provides that, subject to certain exceptions, "No deduction shall be allowed for … [a]ny amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate[,]" or for "[a]ny amount expended in restoring property or in making good the exhaustion thereof for which an allowance is or has been made."

112.    Contrary to Castro's assertion, section 263(a) has been interpreted by the U.S. Supreme Court on many occasions to disallow a taxpayer's deduction of a capital expenditure, and for this purpose a capital expenditure is not confined to amounts paid for new buildings and permanent improvements made with the specific intent to increase the value of the buildings. For example, in *Commissioner v. Idaho Power Corp.*, 418 U.S. 1 (1974), the issue before the Court was whether the taxpayer could take depreciation deductions under section 167 of the Code on vehicles and equipment the taxpayer used to construct facilities that had a useful life of more than one year. The Court held that,

although section 167 authorized depreciation deductions for the vehicles and equipment, section 263 disallowed these deductions because the depreciation was a capital expenditure, i.e., was a cost incurred in constructing the facilities that the taxpayer was required to add to its basis in the facilities. In reaching this conclusion, the court stated:

> The presence of s 263(a)(1) in the Code is of significance. Its literal language denies a deduction for '(a)ny amount paid out' for construction or permanent improvement of facilities. … The purpose of s 263 is to reflect the basic principle that a capital expenditure may not be deducted from current income. It serves to prevent a taxpayer from utilizing currently a deduction properly attributable, through amortization, to later tax years when the capital asset becomes income producing.

113.  Similarly, in *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79 (1992), the Court held that certain costs incurred in connection with a corporate acquisition were not currently deductible business expenses under section 162 of the Code, but rather were nondeductible capital expenditures, because those costs produced significant benefits to the taxpayer that extended beyond the close of the tax year at issue. The court stated:

> In contrast, § 263 of the Code allows no deduction for a capital expenditure—an "amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate." § 263(a)(1). The primary effect of characterizing a payment as either a business expense or a capital expenditure concerns the timing of the taxpayer's cost recovery: While business expenses are currently deductible, a capital expenditure usually is amortized and depreciated over the life of the relevant asset, or, where no specific asset or useful life can be ascertained, is deducted upon dissolution of the enterprise. See 26 U.S.C. §§ 167(a) and 336(a); Treas. Reg. § 1.167(a), 26 CFR § 1.167(a) (1991). Through provisions such as these, the Code endeavors to match expenses with the revenues of the taxable period to which they are properly attributable,

thereby resulting in a more accurate calculation of net income for tax
purposes.

*Id*. at 84. Thus, contrary to Castro's assertion, the disallowance of deductions for capital

expenditures in section 263 of the Code is not limited to amounts paid out to increase the

value of buildings. Instead, section 263 reflects Congress's determination that costs

incurred by a taxpayer that produce significant benefits to the taxpayer in a later tax year

are not deductible in the current tax year.

114.    The deduction for depreciation authorized by section 167 of the Code is an

exception to the rule of section 263 that no deduction is allowed for capital expenditures.

For example, if a taxpayer purchases a vehicle exclusively for use in the taxpayer's trade

or business, the cost of the vehicle is a capital expenditure and therefore not deductible.

However, because the vehicle is subject to exhaustion, wear, and tear and the taxpayer uses

the vehicle in a trade or business, then, pursuant to section 167, the taxpayer can deduct

the cost of the vehicle over time through depreciation deductions.

115.    Similarly, the deduction authorized by section 179 of the Code for the cost

of section 179 property is an exception to the rule of section 263 that no deduction is

allowed for capital expenditures. Section 179(a) provides:

A taxpayer may elect to treat the cost of any section 179 property as
an expense which is not chargeable to capital account. Any cost so
treated shall be allowed as a deduction for the taxable year in which
the section 179 property is placed in service.

116.    Generally, the term "section 179 property" is defined in section 179(d) as

depreciable, personal (as opposed to real) property that a taxpayer acquires by purchase for

use in the taxpayer's trade or business. For example, if a taxpayer purchases equipment for use exclusively in the taxpayer's trade or business, the cost of the equipment is a capital expenditure and therefore not deductible. However, assuming the equipment meets the definition of section 179 property, the taxpayer can deduct the cost of the equipment, subject to applicable limitations, in the year the taxpayer puts the equipment in service.

117. Castro argues that section 263 disallows deductions only for amounts paid for new buildings and permanent improvements made with the intent to increase the value of the buildings. This interpretation would render meaningless other provisions of the Code in which Congress has permitted taxpayers to deduct the cost of capital expenditures. For example, if section 263 did not prohibit a taxpayer's deduction of the cost of equipment used in the taxpayer's trade or business, then there would be no need for either section 179 of the Code, which authorizes deduction of the cost of section 179 property, or for section 167 of the Code, which authorizes depreciation deductions. In recent years, Congress has authorized in section 168(k) of the Code what practitioners commonly refer to as first-year "bonus" depreciation. For qualifying property, section 168(k) allows a taxpayer to increase the normal first-year depreciation by a specified percentage of the cost of the qualifying property. Again, there would be no need for section 168(k) of the Code if, as Castro incorrectly asserts, section 263 prohibited deduction of only a narrow class of costs, i.e., those made with the specific intent to increase the value of property.

118. Castro also misinterprets the U.S. Supreme Court's decision in *United States v. Home Concrete and Supply, LLC*, 566 U.S. 478 (2012). Castro appears to interpret *Home*

*Concrete* as support for disregarding any applicable Treasury Regulations that might contradict his reading of section 263 of the Code. In *Home Concrete*, the taxpayer had overstated its basis in certain assets and, as a result, reported less gain from the sale of those assets. The issue was whether the government had three years within which to assess additional tax on the gain, or instead six years. Generally, under section 6501(a) of the Code, the limitations period within which the government must assess tax is three years from the time the return is filed. However, under section 6501(e), the limitations period is six years from the time the return is filed if the taxpayer omits from gross income an amount greater than 25% of the amount of gross income stated in the return. The specific issue in *Home Concrete* was whether the taxpayer's overstatement of its basis in the assets sold was an "omission" from gross income within the meaning of section 6501(e). In a previous decision, *Colony, Inc. v. Commissioner*, 357 U.S. 28 (1958), the Court had interpreted a similar provision in the Internal Code of 1939 and had held that an overstatement of basis was not an omission from gross income. The Treasury Department issued final regulations in 2010 taking a contrary position, i.e., taking the position that an overstatement of basis is an omission from gross income for purposes of section 6501(e). The government in *Home Concrete* argued that the 2010 Treasury Regulations were entitled to so-called *Chevron* deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.* (1984*).* The Court in *Home Concrete* rejected the government's argument. The Court relied on its decision in *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Services*, 545 U.S. 967 (2005), in which the Court had held:

> A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to Chevron deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and this leaves no room for agency discretion.

119.     The Court in *Home Concrete* concluded that its prior decision in *Colony, Inc. v. Commissioner*, 357 U.S. 28 (1958), had interpreted section 6501(e) and that the *Colony* decision was based on the unambiguous terms of the statute, which left no room for a contrary interpretation in the 2010 Treasury Regulations. Therefore, the Court in *Home Concrete* declined to give *Chevron* deference to the 2010 Treasury Regulations. Thus, *Home Concrete* stands for the narrow proposition that, when a court has interpreted a statute based on the statute's unambiguous terms, there is no room for a federal agency to interpret the statute differently. *Home Concrete* provides absolutely no support for the proposition that a tax preparer can adopt unique interpretations of Internal Revenue Code provisions that find no basis in existing authority and reject any contrary interpretations in Treasury Regulations.

### iv.     Childcare

120.     For several taxpayers, Castro claimed a deduction related to child care expenses. Although taxpayers can claim a ***credit*** for certain child care, there are no deductions available for personal child care on a Schedule A or a Schedule C.  (*See* 26 U.S.C. § 262 states that "[e]xcept as otherwise expressly provided in this chapter, no deduction shall be allowed for personal, living, or family expenses"); *see* 26 U.S.C. § 24(a),

(h)(1)-(2) (statute providing for $1,000 tax credit for each qualifying child, increased to $2,000 for each qualifying child for 2018 through 2025).

121.    For individuals, title 26 USC § 21 allows as a credit against the individual's federal income tax liability an amount equal to the applicable percentage of expenses for household and dependent care services necessary for gainful employment subject to specific limitations. This credit is commonly referred to as the Child and Dependent Care Credit.

122.    The Child and Dependent Care credit is reported on Form 2441, Child and Dependent Care Expenses, which is attached to Form 1040.

123.    In Count 2, related to victims Paul and Alissa Clayton and their 2017 taxes, Castro included a deduction for $5,290 in Schedule A "other expenses." Based on worksheets attached to the filed taxes, this amount ($5,290) consists of $800 for "workplace goodwill development" and $4,490 for "work-related family supervision." The Claytons would testify that they spent $4,490 on child care expenses in 2017.

124.    In Count 12, related to victims Randolph and Robin Ragsdale and their 2017 taxes, Castro included a deduction for $8,265 in Schedule A "other expenses." Based on worksheets attached to the filed taxes, this amount ($8,265) consists of $1,404 for workplace goodwill development, $729 for legal fees, $5,716 for depreciation, and $416 for "work-related family supervision." The Ragsdales would testify that they spent $416 on child care expenses in 2017.

125. In Count 17, related to victims Javier and Betsy Sola and their 2019 taxes, Castro included a deduction for $5,608 in Schedule C "employee benefit programs" expenses. Based on the tax software utilized by Castro, which includes the backup data for each tax filing, this amount ($5,608) consists of $420 for "Prescriptions," $2,800 for "Dependent Care," $240 for "Insurance Premium Kids," $1,728 for "Insurance Premiums H&W," and $420 for "Prescriptions." The Solas would testify that they spent $2,800 on childcare in 2019. Notably, even though the Solas spent similar amounts of money on other years in which Castro prepared their taxes, a similar deduction was never claimed by Castro.

126. The government anticipates that Castro will testify in accordance with his draft appendix to a proposed expert report, that *Smith v. Commissioner*, 40 B.T.A. 1038 (1939), *aff'd* 113 F.2d 114 (2d Cir. 1940), which interpreted and upheld the law denying a deduction for childcare expenses, is invalid. Castro faults the case for using discriminatory reasoning, claiming it is not entitled to *stare decisis*. In effect, Castro asks this Court to endorse his view that the relevant Internal Revenue Code and relevant case law interpreting it is invalid. This is not a question of fact, but a question of law.

127. Castro's position regarding the deductibility of child care expenses reflects a complete misreading of the relevant Internal Revenue Code provisions. Castro argues that section 262 of the Code, which disallows deductions for personal, living, or family expenses, is different from its statutory predecessor because it begins with the words "Except as otherwise expressly provided in this chapter." According to Castro, the

exception means that, if costs of child care are a deductible business expense under section 162 of the Code, then a taxpayer can deduct the cost of child care notwithstanding Congress's express disallowance in section 262. This argument is flawed for several reasons. First, section 162 is not an exception to section 262. If a cost is a deductible business expense under section 162, then by definition, it is not an expense for personal, living, or family expenses. Examples of costs that are disallowed by section 262 but authorized as deductions by specific Code provisions include home mortgage interest, real property taxes on a taxpayer's home, and charitable contributions. Interest on a home mortgage, or real property taxes on a taxpayer's home, or charitable contributions to a religious organization are all personal expenses that are disallowed by section 262 unless Congress specifically authorizes a deduction. Congress has done so in section 163(a), (h) (home mortgage interest), section 164 (real property taxes), and section 170 (charitable contributions). In contrast, business expenses are not personal, living, or family expenses in the first place and therefore are not disallowed by section 262.

128.    Second, Castro omits from his analysis the development of the law regarding the tax treatment of child care expenses. For the tax year at issue in *Smith v. Commissioner*, 40 B.T.A. 1038 (1939), *aff'd* 113 F.2d 114 (2d Cir. 1940), Congress had not authorized a deduction for child care expenses. Castro reasons that because, in his view, the reasoning in *Smith* is discriminatory and invalid, working taxpayers should be allowed to deduct child care expenses under current law. This ignores the fact that Congress authorized an itemized

deduction for child care expenses in section 214 of the Internal Revenue Code of 1954.

Section 214(a) of the Internal Revenue Code of 1954 provided:

> There shall be allowed as a deduction expenses paid during the taxable year by a taxpayer who is a woman or a widower for the care of one or more dependents (as defined in subsection (c) (1)), but only if such care is for the purpose of enabling the taxpayer to be gainfully employed.

129.    In The Tax Reform Act of 1976, Congress converted the deduction for child care expenses to a credit. *See* Joint Comm. on Taxation, Summary of the Tax Reform Act of 1976 at 20-21 (Oct. 1976). When Congress enacted the Internal Revenue Code of 1986, which is the current version of the Code, it kept the tax credit for child care expenses (now reflected in section 21 of the Code) in lieu of a deduction for those expenses. Thus, for a limited period of time, Congress authorized a deduction for child care expenses paid to allow the taxpayer to be gainfully employed, but eliminated this deduction in favor of the current credit. Congress knows how to authorize a deduction for child care costs when it wishes to do so. In light of this development of the law, there is no room to argue that a deduction exists under current law for child care costs.

### v.    Impairment-Related Work Expenses

130.    For certain taxpayers, Castro included a deduction on Schedule A for other "miscellaneous deductions" that was further identified as representing impairment-related work expenses. This deduction was included in Counts 6, 8-9, 12-14, 18, 22, 24, 27, and 31-32.

131.    After an individual determines total income for a taxable year, the individual subtracts any allowable "above-the-line" deductions, which are those listed in § 62(a) of the Code, to determine "adjusted gross income." At that point, the individual can elect either to take the standard deduction for the year, or instead to itemize (i.e., list separately) his or her deductions, such as home mortgage interest, state and local taxes, and charitable contributions. A taxpayer will choose to take the greater of the standard deduction or the taxpayer's itemized deductions.

132.    Some itemized deductions are categorized by § 67(b) of the Code as "miscellaneous itemized deductions." Miscellaneous itemized deductions are subject to limitations that do not apply to other itemized deductions. If a deduction is listed in § 67(b) of the Code, then it is <u>not</u> a miscellaneous itemized deduction and therefore is not subject to the limitations on miscellaneous itemized deductions. It is important to note that § 67(b) is not a deduction-granting provision. It is a definitional provision that identifies which itemized deductions authorized by other Code sections are categorized as miscellaneous itemized deductions.

133.    Before 2017, under § 67(a) of the Code, miscellaneous itemized deductions were allowed only to the extent that, in the aggregate, they exceeded 2% of the taxpayer's adjusted gross income. For example, if a taxpayer's adjusted gross income were $100,000, and if the taxpayer had total miscellaneous itemized deductions of $3,000, then § 67(a) of the Code limited the taxpayer's deduction of these miscellaneous itemized deductions to

$1,000 (the amount by which the $3,000 of miscellaneous itemized deductions exceeded $2,000, which is 2% of the taxpayer's adjusted gross income).

134.    For 2018 through 2025, § 67(g) of the Code states that, notwithstanding subsection (a), no miscellaneous itemized deduction shall be allowed for any taxable year. In other words, miscellaneous itemized deductions, although authorized by other Code sections, are disallowed entirely as deductions for these years.

135.    An employee who has impairment-related work expenses (as defined below) can deduct those expenses as a business expense pursuant to § 162 of the Code.  The employee would report this deduction as an itemized deduction on Schedule A of the individual's federal income tax return. The employee also must complete and attach to the tax return IRS Form 2106.

136.    Title 26 U.S.C. § 67(b)(6) lists "any deduction allowable for impairment-related work expenses."  Because this deduction is listed in § 67(b), it is <u>not</u> a miscellaneous itemized deduction and therefore is not subject to the 2% of adjusted gross income limitation of § 67(a) (and, for tax years 2018 through 2025, is not disallowed entirely by § 67(g)).

137.    In § 67(d), the Code defines "impairment-related work expenses" as expenses of a handicapped individual for attendant care services at the individual's place of employment and other expenses in connection with such place of employment which are necessary for such individual to be able to work.

138.    The term "handicapped" is defined in § 190(b)(3) as "any individual who has a physical or mental disability (including, but not limited to, blindness or deafness), which for such individual constitutes or results in a functional limitation to employment, or who has any physical or mental impairment (including, but not limited to, a sight or hearing impairment), which substantially limits one or more major life activities of such individual."

139.    Since at least 2017, IRS Publication 463 has given the following examples of impairment-related work expenses:

**Example 1.** You are blind. You must use a reader to do your work. You use the reader both during your regular working hours at your place of work and outside your regular working hours away from your place of work. The reader's services are only for your work. You can deduct your expenses for the reader as business expenses.

**Example 2.** You are deaf. You must use a sign language interpreter during meetings while you are at work. The interpreter's services are used only for your work. You can deduct your expenses for the interpreter as business expenses.

140.    In Counts 6, 8-9, 12-14, 18, 22, 24, 27, and 31-32, Castro took deductions and stated it was related to impairment-related work expenses but did not provide any explanation as to the basis for the figures entered for the deduction.

141.    As discussed elsewhere in this document, the victim-taxpayers in Counts 6, 8-9, 12-14, 18, 22, 24, 27, and 31-32, will each testify that they were not handicapped and did not suffer from a physical or mental disability that resulted in a functional limitation to their employment or which substantially limited one or more major life activities of such individual. In addition, they did not tell Castro or his employees that they had these

maladies. They do not recognize the figures Castro entered in the tax return for this deduction as being connected to any specific expense.

142. The government expects that Castro will contend, like he had in his filed Appendix to his proposed expert designation, that expenses related to prevention of any potential illness, such as strep throat, are deductible as impairment -related work expenses. Castro argues that any wellness or preventative medical expenses incurred by a taxpayer can be deducted under this section of the code. There is no basis for this in the Code or any Treasury Regulations, and this interpretation is directly contradicted by the examples provided in the IRS Publication 463.

143. Moreover, medical expense deductions are separately permitted and addressed under § 213 of the Code and are subject to a 7.5% adjusted gross income limitation. In other words, medical expenses that are deductible under § 213 of the Code are deductible as an itemized deduction on Schedule A of an individual's tax return only to the extent that the aggregate of such deductions exceeds 7.5% of the taxpayer's adjusted gross income. Treating all medical expenses, such as treatment for strep throat, as impairment-related work expenses, that are fully deductible on Schedule A would, among other problems, contradict and render meaningless Congress's limitation in § 213(a) of the Code on the deduction of medical expenses.

### vi. Charity and Advertising Expenses

144. For certain taxpayers, Castro classified certain charitable donations as advertising expenses and claimed a deduction for those expenses.

145.     Title 26 USC § 170(a) allows as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made in the taxable year.  A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary.

146.     Title 26 USC § 170(c) states that the term "charitable contributions" means a contribution or gift to or for the use of very specific entities/organizations and for specific purposes.

147.     Title 26 USC § 170(f)(8) states no deduction shall be allowed under (a) for any contribution of $250 or more unless the taxpayer substantiates the contribution by a contemporaneous written acknowledgement of the contribution by the donee organizations that meets certain requirements, including whether the donee organization provided any goods or services in consideration, in whole or in part, for any amount received.

148.     Title 26 USC § 162(a) allows a deduction for all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business.

149.     Title 26 USC § 162(b) specifically denies a deduction under (a) for any contribution or gift which would be allowable as a deduction under section 170 were it not for the percentage limitations, the dollar limitations, or the requirements as to time of payment set forth in such section.

150.     Generally, 26 USC § 162(a) allows business to deduct expenses that help them bring in new customers and keep existing ones.  These costs may include expenses for advertising and marketing.  *See* Treas. Reg. § 1.162-1(a); Rev. Rul. 92-80, 1992-39

I.R.B. 7; IRS Tax Tip 2021-159, October 27, 2021. To be deductible as a business expense under § 162(a) of the Code, the cost must be 1) an ordinary expense that is common and accepted in the industry and 2) a necessary expense that is helpful and appropriate for the trade or business. *Welch v. Helvering*, 290 U.S. 111, 113-14 (1933).

151. In his appendix to his expert designation, Castro appears to argue that if a "gift" (charitable donation) was made based upon "the anticipated benefit of an economic nature, it is not a gift" and can be reclassified as an advertising expense. Castro cites to an article from the magazine, *The Tax Adviser*, which notes that "[f]or the expense to be classified as an advertising expense, the business needs to substantiate that it received something in return (a direct benefit), so the cost can be classified as an 'ordinary and necessary business expense.'"

152. In Count 11, related to victims Christian and Ciara Karavangelos, Castro claimed a deduction of $4,161 in Schedule C "advertising" expenses.

153. Based on Castro's tax software (see Government Exhibit 25), which the government has reviewed and includes the underlying backup for each deduction, this amount ($4,161) consists of:

- $150 in "Advertising,"
- $1,935 identified as being related to "Charity Church,"
- $300 identified as being related to "Charity Kyle Stoughton,"
- $600 identified as being related to "Charity The Clark Family,"
- $480 identified as being related to "Charity Matt Navigato," [sic]
- $456 identified as being related to "Char, Maria (Compassion Intl))," and
- $240 identified as being related to "Charity, Z Radio."

The charitable contributions amount to $4,011 or 96% of the deduction.

154.     Christian Karavangelos would testify that he and his wife did have $150 in advertising expenses, and he provided that amount to Castro. Christian Karavangelos would testify that the other amounts (totaling $4,011) were solely charitable contributions that he and his wife made personally, as opposed to being made on behalf of their side business – Ciara Karavangelos's photography business – that had $8,100 in income, as identified on the Schedule C attached to Government Exhibit 146.

155.     Karavangelos would testify that he did not anticipate an economic benefit for the photography business by making the donations identified above and did not tell Castro or his employees he had such an anticipation. Further, Karavangelos would testify that he could not and did not provide any substantiation that the photography business received an economic benefit in return.

156.     Similarly, in Count 30, Castro claimed $300 in Schedule C advertising expenses for taxpayer Fabio Ramos. Based on Castro's tax software (*see* Government Exhibit 25), which the government has reviewed and includes the underlying backup for each deduction, this amount was identified as being related to "Uber." No other detail is provided. Ramos would testify that he did not advertise with Uber and did not tell Castro he advertised with Uber. He did not make any donations to Uber. Uber is a for-profit entity and therefore ineligible to receive charitable contributions.

**H. Specific Counts in the Indictment and Anticipated Testimony of Victims**

**i.   *Undercover Agent – "Angela Jackson" (Count 1)***

157.   Angela Johnson is an employee of the IRS, who served in an undercover capacity in this case and in her communications with Castro and his employees.  In her undercover capacity, she used the named "Angela Jackson" and will hereinafter be referred to as "Jackson."

158.   On February 1, 2018, Jackson contacted Castro & Company, LLC for assistance.  (*See* Government Exhibit 85.)  Jackson asked to meet with Castro in person and Castro's office responded that face-to-face meetings required a $5,000 retainer.  (*See* Government Exhibits 89 and 90.)

159.   On or about February 13, 2018, Jackson spoke with Castro over the telephone regarding Jackson's planned 2017 tax return.  This conversation was recorded.  (*See* Government Exhibits 93 (recording) and 94 (transcript of recording).)  During the conversation, Castro told Jackson that he could project the amount of the tax refund that Jackson would most likely obtain from another firm and then compare that figure with the refund that Castro would obtain for Jackson.   (*See id*.)  Castro stated that he would split the additional tax refund with Jackson.  (*See id*.)

160.   On or about February 14, 2018, Castro sent Jackson an email asking Jackson to upload certain documents to a designated website. (*See* Government Exhibit 95.) Jackson uploaded a W2 Form and a Form 1098-T, showing wages of $142,217.

161.    On or about March 2, 2018, at Castro's direction, a Castro employee interviewed Jackson over the telephone regarding any deductions.  This call was recorded.  (*See* Government Exhibits 100 (recording) and 101 (transcript of recording).)    The employee stated that Castro would make any decisions regarding what items would be included on the tax filing.  (*See id*.)  Jackson denied having any unreimbursed employee expenses, charitable donations, or other items that might cause deductions.  (*See id*.)  Castro's employee did not specifically identify any deductions that would apply to Jackson.  (*See id*.)

162.    On or about March 12, 2018, Castro provided Jackson with his tax analysis.  (*See* Government Exhibits 102 and 103.)  Castro explained that if Jackson used another tax preparer, Jackson would receive a refund of $373.  (*See* Government Exhibit 103.)  Castro stated if Jackson used his services, Jackson would receive a refund of $6,007, which would be split with Castro, after deducting the $373, resulting in a net refund of $3,008 for Jackson.  (*See id*.)  The tax proposal indicated that the return would include $29,339 in deductions but did not identify the specific deductions.  (*See id*.)  Castro did not provide Jackson with a draft of the tax return that generated the refund identified above or ask for her signature.

163.    On or about March 14, 2018, Jackson responded that "she was surprised with the result and would like you to file for me.  You are right that other places (H&R Block) have my refund under $400."  (*See* Government Exhibit 104.)

164.    Castro filed Jackson's tax return, which claimed $29,339 in fraudulent

deductions.  (*See* Government Exhibit 81.)  The itemized deductions included $2,400 in

employee expenses and $28,600 in "other" expenses that were listed as deductions.  (*See*

*id*.)  These issues are discussed in greater detail below.

###    a.    2017 Taxes for Angela Jackson (Count 1)

165.    Jackson has reviewed a 2017 Form 1040 that Castro filed on her behalf.  It

has been shown to her and is identified here as Government Exhibit 81.  It correctly states

the name, social security number and filing status that she provided to Castro & Co.  The

listed home address on the tax return is not the address she provided; instead, it was

Castro's address.

166.    On the attached Schedule A to Government Exhibit 81, the "unreimbursed

employee expenses" is listed as $2,400.  The worksheets attached to Government Exhibit

81 show that this amount was based on a claim that Jackson had purchased $2,400 in "work

tools," which had not been reimbursed.  In the interview with Castro & C employees,

Jackson specifically denied having any such expenses.  The following excerpts are from

the transcript of the recording between Jackson and the Castro & Co. employee on March

2, 2018:

```
13          ISHMAEL:   No?  Perfect.  There we go.  And for
14    work, anything as far as some equipment, gear,
15    instruments, or some tools, any of those?
16          AGENT A:   Nope.  They provide everything I
17    need.
18          ISHMAEL:   Perfect.  There we go.  And I'm
19    pretty sure since you work from home there's no
20    uniforms, correct?
21          AGENT A:   Right.


6          ISHMAEL:   No?  Perfect.  There we go.  And last
7    year did you possibly purchase anything as far as a
8    new office desk, an office chair, some office
9    furniture, anything like that?
10          AGENT A:   I did not, nope.
11          ISHMAEL:   Nope?  All right.  There we go.  And
12    what about office supplies, paper, pens, stationery,
13    things like that?
14          AGENT A:   No.  The limited things that I have,
15    my work pays for all of that.
16          ISHMAEL:   Perfect.  There we go.  And last year
17    did you possibly purchase yourself a new computer,
18    laptop, phone, or a tablet, any of that?
19          AGENT A:   Nope, I didn't.
20          ISHMAEL:   Nope?  All right.  And how about a
21    new printer, scanner, copier, fax machine?
22          AGENT A:   Nope.
23          ISHMAEL:   Nope?  Perfect.  And any software for
24    any computer, Microsoft Office, anything like that?
25          AGENT A:   No.  The renewals all came from work,
```

(*See* Government Exhibits 100 and 101.)  In fact, during this interview, the Castro & Co.

employee never asks what type of work Jackson was engaged in nor explained the concept

of "work tools."  (*See id*.)  Per the W-2 Jackson provided Castro & Co., she worked at

Oxford Capital Management, and in her interview, she explained that she worked from home but also traveled for work via airplane. Jackson specifically stated that "[m]y company pays for all of that" with respect to expenses she might incur as part of her duties. (*See id*.)

167. The defense has suggested in court filings that the $2,400 deduction for "work tools" was based on Jackson's personal cell phone bills and personal internet bills. In the interview with Castro & Co. employees the following exchanges took place:

```
2        ISHMAEL:  All right.  And now, what does your
3    monthly cell phone bill come out to?
4        AGENT A:   Let me think.  Somewhere around --
5    oh, gosh -- maybe -- I want to say, like, 120,
6    somewhere right around there.
7        ISHMAEL:   All right.  And is that paid by work
8    or is that on your end?
9        AGENT A:   So that I pay for.
10       ISHMAEL:   Okay.  Perfect.  There we go.  And
```

```
    ISHMAEL:   Perfect.  There we go.  And now what
does your monthly home Internet bill come out to?
    AGENT A:   So that is -- oh, no, I guess that is
different.  I was going to say that's included in my
cell phone, but no, that is -- that is, I believe,
around 80.
    ISHMAEL:   80?
    AGENT A:   Yeah.  I just have the basic package.
    ISHMAEL:   There we go.  And at any point last
```

(*See* Government Exhibits 100 and 101.) These amounts ($120 per month for cell phone and $80 per month for internet), when combined ($200 per month) and multiplied by 12

month equal $2,400. But Jackson did not tell Castro or his employees that she used her home internet or cell phone for any portion of work-related activities.

168.     On the attached Schedule A to Government Exhibit 81, the "other expenses" is listed as $28,600. On the attached Schedule A to Government Exhibit 81, the "other expenses" is listed as $28,600. According to the tax software used by Castro, this amount ($28,600) was based on $26,000 for an "Audi Q5 Expense Election" and $2,600 for "Workplace Goodwill Development." The following excerpt from the interview of Jackson by Castro & Co. provides the full context:

> ISHMAEL:   Okay.  And now, what is the make and model of the vehicle that you used in 2017?
>
> AGENT A:   Well, so I have an Audi Q5.
>
> ISHMAEL:   Hm-hmm.  There we go.  And do you happen to recall what the original purchase price of the Audi was?
>
> AGENT A:   Gosh, maybe around -- like, I want to say 27,000 maybe.
>
> ISHMAEL:   Okay.  There we go.  And now for work, what is the distance from your home to your place of work going one way?

> AGENT A:   Well, I actually travel a lot by
> plane, so otherwise, I just work at home.
>
> ISHMAEL:   Okay.  There we go.  Now, as far as
> for the, like, working -- you know, when you travel,
> is there anything that you have to pay for as far as
> like, maybe airline tickets or hotels, anything that
> isn't reimbursed?
>
> AGENT A:   Nope.  My company pays for all of
> that.
>
> ISHMAEL:   Okay.  Perfect.  There we go.  So is
> there ever any times that you possibly have to, you
> know, drive to, like, a local office or anything
> like that?
>
> AGENT A:   Nope, nothing is local.
>
> ISHMAEL:   Oh, perfect.

169.    In all communications regarding her 2017 taxes, Jackson never told Castro & Co. employees when she purchased the vehicle, how old it was, and she never provided any documentation related to this purchase.  She specifically stated she did not use her vehicle for work.  (*See* Government Exhibits 100 and 101.)

170.    Jackson did not review or sign the 2017 Form 1040 before it was filed with the IRS.  She did provide verbal approval for the filing of the taxes.

171.    Jackson would testify that the tax refund amount for her 2017 taxes is incorrect and was based on false items that Castro inserted in the tax returns, which she did not provide to Castro.

172.    On or about May 10, 2018, the IRS issued a tax refund of $6,007 to Jackson.  (*See* Government Exhibit 107.)   Castro received $2,999 for his services and Jackson received the remaining amount of $3,008.  (*See* Government Exhibits 81 and 107.)

173.    In addition, the government has prepared a chart that identifies the allocation of refunds between Castro and each of the clients listed in the Indictment.    (See Government Exhibit 56.)

### ii.    *Victims Paul and Alissa Clayton (Count 2)*

174.    Paul "Paulo" Clayton (hereinafter "Clayton") and Alissa Clayton are a married couple who lived and lives in Orlando, Florida.[4]

175.    Clayton currently works at Discovery Church as a worship pastor and has worked there for the past 16 years; his wife, Alissa Clayton currently teaches first grade at a private school and has worked as a teacher for the past 14 years.

176.    Clayton was referred to Castro by a co-worker, who mentioned that he worked with a tax attorney and received exceptional results.

177.    Clayton    contacted    Castro    via phone and has never met him in person.    He cannot recall who he spoke with initially on the phone at Castro & Co. Clayton stated that Castro's selling point was that he was a tax attorney and that they knew more about tax law than other tax preparation firms like H&R Block.



---

[4]    The government shared these summaries of anticipated testimony (as reflected in the instant Indictment) with the named witnesses in order to ensure accuracy.

178.     Clayton explained that the process to get his tax return prepared by Castro started with sending in his tax forms through an online portal called SmartVault.  Once the tax documents were uploaded, he would then schedule a phone interview.

179.     Clayton would testify that no one from Castro & Co. ever reviewed the tax returns with him before they were filed, and that he would not receive copies of his tax returns unless he specifically requested them.

180.     According to data contained on Castro tax software, produced by the defense, Castro accessed and worked on the tax return on March 12, 2018, and March 14, 2018, and personally filed the 2017 Jackson tax return with the IRS.  (*See* Government Exhibit 25.)

### a.  Clayton 2017 Taxes (Count 2)

181.     Clayton has reviewed a 2017 Form 1040 that Castro filed on his behalf.  It has been shown to him and is identified here as Government Exhibit 108.  It correctly states his and his wife's name, his child's name, and their social security numbers.  The listed home address on the tax return is not his address and it appeared to him to be Castro's address.  Clayton would testify that the use of this address caused his stimulus checks to be mailed to Castro.

182.     On the attached Schedule C to Government Exhibit 108, Paul Clayton's side business was as a musician with gross income of $5,370.  Clayton would testify that this reported income was incorrect.  Instead, Clayton's records, which he provided to Castro, showed that he earned $6,728 and never told Castro & Co. he had an income of $5,370.

183.    On the attached Schedule C to Government Exhibit 108, "depreciation" is listed as $20,000.    Based on worksheets attached in Government Exhibit 108, this relates to a specific vehicle – a VW GTI.  Clayton had owned the VW GTI since 2014.  Clayton would testify that that he did not have this depreciation expense and this deduction was false.  Clayton would testify that he did not provide any documentation to Castro or his employees regarding these expenses.

184.    Notably, Clayton's 2015 and 2016 returns, which were also prepared by Castro & Co. had reported that Clayton's cost for the same vehicle (the VW GTI) was $25,000 and had reported depreciation of this same vehicle in the amounts of $6,138 in 2015 and $3,765 in 2016.    When added to the $20,000 depreciation deduction claimed on Clayton's 2017 return, the combined depreciation deductions for each tax year for the vehicle was $29,903, which exceeded the $25,000 cost of the vehicle.  This is not permitted under tax law.

185.    On the attached Schedule C to Government Exhibit 108, "employee benefit program" is listed as $13,421.  According to Castro's software, this amount ($13,421) was based on $5,500 for "Childcare," $7,247 for "Medical," $454 for "Medical," and $220 for "Medical."  Clayton had no employees and did not know what this expense related to.  He did not provide any documentation to Castro or his employees regarding this deduction.

186.    On the attached Schedule C to Government Exhibit 108, "supplies" expenses are listed as $6,771.  According to Castro's software, this amount ($6,771) was based on $5,809 for "work tools" and $962 for "Educator Expenses."  Clayton does not know where

these numbers came from, and states that they are false. As noted above, these deductions appear on Schedule C, which is for Clayton's side music business. He would have had no "educator expenses" for this business. He According to Clayton's records, he had $2,752 in "supplies" expenses.

187. On the attached Schedule C to Government Exhibit 108, "travel" expenses are listed as $862. Clayton does not know where this number came from, and it is false. He did not have $862 in travel expenses for his side business as a musician. Clayton would testify that when he was hired by a third party to perform, they paid his travel expenses.

188. On the attached Schedule A to Government Exhibit 108, the "unreimbursed employee expenses" is listed as $6,999. Based on worksheets attached in Government Exhibit 108, this amount ($6,999) consists of $3,501 from Form 2106 (related to Alissa Clayton's vehicle expenses), $1,973 from Form 2106 (related to Paul Clayton's vehicle expenses), and $1,525 for depreciation of their personal vehicle. Clayton would testify that the amount of $6,999 for vehicle expenses was false. Although his wife did have some car repairs, it was not for a business use and the reported commuting miles were vastly overstated, even if such an expense were deductible (which it is not). Similarly, for Paul Clayton, he did not have this type of vehicle expense and would be reimbursed if he traveled by the entity or person that hired him. Clayton did not tell Castro & Co. he had unreimbursed employee expenses.

189. On the attached Schedule A to Government Exhibit 108, "other expenses" lists an amount of $5,290. Based on worksheets attached to Government Exhibit 108, this

amount ($5,290) consists of $4,490 for "work-related family supervision" and $800 for "workplace goodwill development." Clayton did not provide Castro or his employees with any documentary evidence related to these expenses, and he does not know what they represent. Clayton thinks his wife did have some continuing education expenses and that they had daycare expenses, but not in that amount.

190. Clayton did not review or sign the 2017 Form 1040 before it was filed with the IRS. Instead, via email, Castro indicated to him the amount of the refund that he would receive) and asked whether he wanted to proceed with filing the return. Clayton stated that he did want to proceed, and he received a refund of $6,385. Clayton indicated that Castro must have received the remaining $2,999 portion of the refund identified on Form 8888 as he did not recognize the account ending in 7539.

191. Clayton would testify that the tax refund amount that the IRS issued to him (through and to Castro) for his 2017 taxes is incorrect and was based on false items that Castro inserted in the tax returns and that they did not provide to Castro.

192. According to data contained on Castro tax software, produced by the defense, Castro accessed and worked (for at least 30 minutes) on the tax return on April 16, 2018, and April 17, 2018, and personally filed the Clayton 2017 tax return with the IRS. (*See* Government Exhibit 25.)

### iii. *Victims James Boggs and Frances Fifis-Boggs (Counts 3-5)*

193. James Boggs (hereinafter "Boggs") and Frances Fifis-Boggs (hereinafter "Fifis-Boggs") are a married couple lived and still live in Orlando, Florida.

194. For several years, Fifis-Boggs  worked as a pharmacy technician and buyer but currently works as a travel agent and real estate investor. Boggs works as a plumber.

195. Fifis-Boggs found out about Castro through her son, Christian Karavangelos (who is another named victim in the Indictment in Counts 9-11). Karavangelos stated that Castro ran a "Christian" company, and that Fifis-Boggs should try it out. Before Castro, Fifis-Boggs used TurboTax to complete her taxes. The difference in the refund amount that Fifis-Boggs received between TurboTax and Castro was significant.

196. Fifis-Boggs called Castro & Co., made an appointment, and completed the entire process over the phone, including the interview. Fifis-Boggs loaded certain documents, such as W-2's as well as a list of expenses from her personal records onto Castro's portal. That list of expenses has been identified and marked as Government Exhibit 119. Fifis-Boggs never met Castro or anyone from his firm in person.

197. Following her interview, Fifis-Boggs received an email and letter (discussed below) notifying her of the amount of her tax refund and was asked whether she would like to proceed to have her taxes filed. She did not receive a copy of the actual tax return or review it before it was submitted. Fifis-Boggs agreed to have Castro submit her taxes based on the calculated refund. Fifis-Boggs did not receive a copy of her filed tax return after it was filed, and it was very difficult to get a copy from Castro.

### a. Boggs and Fifis-Boggs 2017 Taxes (Count 3)

198.    On about March 5, 2018, Castro emailed and sent a letter to Fifis-Boggs and Boggs stating that they had performed a tax review for Fifis-Boggs and Boggs for 2017 and identified that their refund would be $4,861.  (*See* Government Exhibits 117 and 118.) Castro stated that had Fifis-Boggs and Boggs used another company, their refund would have been $149, meaning they received an extra $4,712 by using Castro.  (*See* Government Exhibit 118.)

199.    Fifis-Boggs has reviewed a 2017 Form 1040 that Castro filed on her behalf. It has been shown to her and is identified here as Government Exhibit 114.  It correctly states her and her husband's names and social security numbers.  The listed home address on the tax return is not her address and it appeared to her to be Castro's address.  Boggs would testify that the use of this address caused her stimulus checks to be mailed to Castro.

200.    On the attached Schedule C to Government Exhibit 114, Fifis-Boggs's business is correctly identified and the correct amount of gross income/sales is listed ($18,374).  But Fifis-Boggs did not recognize or understand why the amount for depreciation ($6,524) was listed because she did not have assets for her business that would be depreciated and certainly not in this amount.  Castro's software indicates that this amount ($6,524) actually relates to the depreciation of a Toyota Tunda, valued at $10,874. Fifis-Boggs would testify that she did not use this vehicle for business at a rate that would justify this amount of depreciation and did not discuss this issue with Castro or his employees.

201.    On the attached Schedule C to Government Exhibit 114, Fifis-Boggs's would testify that she did not recognize why $8,166 was listed for "employee benefit programs," because she did not have any employees and could not identify what this amount related to.  In the computer software, Castro identified this amount as being related to "health" but provides no additional detail.  Fifis-Boggs would testify that she did not provide any documentation or information to Castro or his employees to justify this deduction.

202.    On the attached Schedule C to Government Exhibit 114, Fifis-Boggs's would testify that she did not recognize why $7,598 was listed for "utilities."  In the computer software, Castro stated that this amount ($7,598) is comprised of $937 for "phone," $336 for "Ringcentral Fax," $2,087 for "cell phone," $684 for "AT&T Wifi," $841 for "Orange County," $2,713 for "Duke."  These numbers are reflected on the spreadsheet that Fifis-Boggs provided to Castro & Co. but she specifically notes on that spreadsheet that the amount for "orange County" and "Duke Energy" are for her entire home, and not for the percentage she used for her business.  (*See* Government Exhibit 119.)  Castro used the full amount in claiming the deduction.  (*See* Government Exhibit 114.)  Fifis-Boggs would testify that she did not use the entire residence for her business, only a portion.

203.    On the attached Schedule A to Government Exhibit 114, the "unreimbursed employee expenses" is listed as $8,315.  Based on worksheets attached in Government Exhibit 114, this amount ($8,315) consists of $277 related to "uniforms and protective clothing," $1,731 for "work tools," and $6,307 from Form 2106 (related to vehicle expenses).  Fifis-Boggs would testify that that the only unreimbursed expenses she would

have for her work would be "certification" expenses. She recalls her husband having certain expenses for one of his jobs in 2017. But these expenses are not listed on the expense spreadsheet that she provided to Castro, and she did not provide any documentation to Castro or his employees regarding these expenses.

204. Similarly, with respect to Form 2106, Fifis-Boggs did not provide Castro or his employees with any documentary evidence related to the identified vehicle expenses.

205. On the attached Schedule A to Government Exhibit 114, "other expenses" lists an amount of $14,153. Based on worksheets attached to Government Exhibit 114, this amount ($14,153) consists of $148 related to "continuing education," $55 for "professional exams and fees," and $13,950 for "depreciation." Fifis-Boggs stated that the amounts for "continuing education" and "professional exams and fees" appear to be correct. But Fifis-Boggs did not provide Castro or his employees with any documentary evidence related to depreciation. Fifis-Boggs would testify that she did not have a depreciation of this amount and did not purchase anything of a size that would justify such depreciation. To the extent Castro claims this related to a personal vehicle, depreciation for non-business use of a vehicle is not permitted under the tax law.

206. On the attached Schedule A to Government Exhibit 114, "other miscellaneous deductions" lists an amount of $9,015. Based on worksheets attached to Government Exhibit 114, this amount ($9,015) was for "impairment-related work expenses." The computer software utilized by Castro states that this amount ($9,015) is comprised of $8,166, $213, $231, and $405 with no descriptions provided. Fifis-Boggs

would testify that she did not provide Castro or his employees with any documentary evidence related to these claimed expenses. Fifis-Boggs would testify that neither she nor Boggs were impaired in 2017 and did not tell Castro or his employees that either one of them was impaired.

207. Fifis-Boggs did not review or sign the 2017 Form 1040 before it was filed with the IRS. Instead, via email, Castro indicated to her the amount of the refund that she would receive) and asked whether she wanted to proceed with filing the return. Fifis-Boggs stated that she did want to proceed, and she received a refund of $4,861. Fifis-Boggs indicated that Castro must have received the remaining $4,499 portion of the refund identified on Form 8888 as she did not recognize the account ending in 5976.

208. Fifis-Boggs would testify that the tax refund amount that the IRS issued to her (through and to Castro) for her 2017 taxes is incorrect and was based on false items that Castro inserted in the tax return and that she and her husband did not provide to Castro.

209. According to data contained on Castro tax software, produced by the defense, Castro accessed and worked (for at least 37 minutes) on the tax return on March 5, 2018, and March 7, 2018, and personally filed the Boggs and Fifi-Boggs 2017 tax return with the IRS. (*See* Government Exhibit 25.)

### b. Boggs and Fifis-Boggs 2018 Taxes (Count 4)

210. On about April 14, 2019, Castro emailed and sent a letter to Fifis-Boggs and Boggs stating that they had performed a tax review for Fifis-Boggs and Boggs for 2018 and identified that their refund would be $8,464. (*See* Government Exhibits 120 and 121.)

Castro stated that had Fifis-Boggs and Boggs used another company, their refund would have been $5,983, meaning they received an extra $2,481 by using Castro. (*See* Government Exhibit 121.)

211.    Fifis-Boggs has reviewed a 2018 Form 1040 that Castro filed on her behalf. It has been shown to her and is identified here as Government Exhibit 115.  It correctly states her and her husband's names and social security numbers.  The listed home address on the tax return is not her address and it appeared to her to be Castro's address.

212.    On the attached Schedule C to Government Exhibit 115, Fifis-Boggs's business is correctly identified and the correct amount of gross income/sales is listed ($16,401).   But Fifis-Boggs did not recognize or understand why the amount for depreciation ($30,711) was listed.  The attached form indicates that this amount related to a Toyota Tundra ($9,787) and a Kia Sorrento ($20,924).  Fifis-Boggs would testify that these automobiles were used for personal uses only and not business uses.

213.    On the attached Schedule C to Government Exhibit 115, Fifis-Boggs's would testify that she did not recognize why $8,622 was listed for "employee benefit programs," as she didn't have any employees and could not identify what this amount related to.  Fifis-Boggs would testify that she did not provide any documentation or information to Castro or his employees to justify this deduction.   Castro's software indicates that this amount ($8,622) consists of $4,889 for "Section 119 Interest," $203 for "Health," $813 for "Section 119 Health," and $2,717 for "Section 119 Energy."

214.     On the attached Schedule C to Government Exhibit 115, Fifis-Boggs's would testify that she did not recognize why $7,885 was listed for "office expenses." The computer software provided by Castro states that this amount ($7,885) consisted of: $51 for UPS, $121 for USPS, $156 for Adobe, $114 for Amazon, $1,134 for Business Phone, $336 for Ring Central Fax, $240 for Constant Contact, $267 for Fed Ex, $114 for ESET, $56 for Office Max, $300 for Chase Service Fee, $20 for Domain Name, $49 for Online Brochure Rack, $789 for Internet for Work, $2,434 for Phone Usage, and $1,705 for Work Computer. The work computer and Chase Service Fee are not proper office expenses and should have been categorized elsewhere.

215.     On the attached Schedule C to Government Exhibit 115, Fifis-Boggs's would testify that she did not recognize why $5,914 was listed for "taxes and licenses." The computer software for Castro states that this amount relates to "Real Estate." Fifis-Boggs stated that this amount was incorrect. Fifis-Boggs would testify that she did not provide any documentation or information to Castro or his employees to justify this deduction.

216.     Fifis-Boggs did not review or sign the 2018 Form 1040 before it was filed with the IRS. Instead, via email, Castro indicated to her the amount of the refund that she would receive and asked whether she wanted to proceed with filing the return. Fifis-Boggs stated that she did want to proceed, and she received a refund of $8,461. Fifis-Boggs indicated that Castro must have received the remaining $3,000 portion of the refund identified on Form 8888 as she did not recognize the account ending in 5976.

217.    Fifis-Boggs would testify that the tax refund amount that the IRS issued to her (through and to Castro) for her 2018 taxes is incorrect and was based on false items that Castro inserted in the tax returns and that they did not provide to Castro.

218.    According to data contained on Castro tax software, produced by the defense, Castro accessed and worked on the tax return on April 14, 2019, and April 15, 2019, and personally filed the Boggs and Fifi-Boggs 2018 tax return with the IRS.

### c.    Boggs and Fifis-Boggs 2019 Taxes (Count 5)

219.    On about April 14, 2020, Castro emailed and sent a letter to Fifis-Boggs and Boggs stating that they had performed a tax review for Fifis-Boggs and Boggs for 2019 and identified that their refund would be $9,449.  (*See* Government Exhibits 122 and 123.) Castro stated that had Fifis-Boggs and Boggs used another company, their refund would have been $8,108, meaning that they received an extra $1,341 by using Castro. (*See* Government Exhibits 123.)

220.    Fifis-Boggs has reviewed a 2019 Form 1040 that Castro filed on her behalf. It has been shown to her and is identified here as Government Exhibit 116.  It correctly states her and her husband's names and social security numbers.  The listed home address on the tax return is not her address and it appeared to her to be Castro's address.

221.    On the attached Schedule C to Government Exhibit 116 for her travel agent business, Fifis-Boggs's business is correctly identified and the correct amount of gross income/sales is listed ($13,071).  But Fifis-Boggs did not recognize or understand why the amount for "car and truck expenses" ($4,416) was listed.  Fifis-Boggs did not drive 10,000

for business in 2019 as indicated on the form. According to Castro's software, this amount ($4,416) consists of $520 for "Gasoline," $144 for "Oil change," $720 for "Parking fees," $763 for "Conference travel," $2,234 for "Auto Insurance," and $35 for "Annual Registration."

222.   On the attached Schedule C to Government Exhibit 116, Fifis-Boggs's would testify that she did not recognize why $8,908 was listed for "employee benefit programs," as she didn't have any employees and could not identify what this amount related to. Fifis-Boggs would testify that she did not provide any documentation or information to Castro or his employees to justify this deduction. According to Castro's software, this amount ($8,908) consists of $1,689 for "Rent Payment," $1,125 for "HOA," $1,795 for "Home Owner Insurance," $928 for "Utilities," $3,371 for "Duke Energy." The amount for Duke Energy was included both here and under "office expenses" meaning Castro claimed a false deduction for this amount twice. In addition, that amount ($3,371) reflects the entire amount she paid for her entire home, not the portion she used for her business.

223.   On the attached Schedule C to Government Exhibit 116, Fifis-Boggs's would testify that she did not recognize why $1,520 was listed for "interest" expense but believes this was her mortgage interest.

224.   On the attached Schedule C to Government Exhibit 116, Fifis-Boggs's would testify that she did not recognize why $8,812 was listed for "office expenses." Castro's software states that this amount ($8,812) consists of $93 for "UPS," $167 for "USPS, $76 for "Fedex," $156 for "Adobe," $114 for "Amazon," $336 for "Ring Central Fax," $180

for "Chase Service Fee," $20 for "Domain name," $49 for Online Brochure, $810 for "Internet for Work," $4,299 for "Home Office Expenses," $540 for "Cell phone," $27 for GoDaddy, $769 for Bizphone," $127 for "Office Max," $241 for "Vista Print," $810 for "Wifi." The amount for "home office expense" ($4,299) matches the sum of the amounts that Fifis-Boggs paid to Orange County Utilities and Duke Energy in 2019 and which are reflected on the spreadsheet that Fifis-Boggs provided to Castro & Co. but she specifically notes on that spreadsheet that the amount for "Orange County" and "Duke Energy" are for her entire home, and not for the percentage she used for her business. (*See* Government Exhibit 119.) Castro used the full amount in claiming the deduction. (*See* Government Exhibit 115.) Fifis-Boggs would testify that she did not use the entire residence for her business, only a portion.

225. On the attached Schedule C to Government Exhibit 116, Fifis-Boggs's would testify that she did not recognize why $4,008 was listed for "taxes and licenses." Fifis-Boggs stated that this amount was incorrect. Fifis-Boggs would testify that she did not provide any documentation or information to Castro or his employees to justify this deduction. In Castro's software, it identifies $1,000 of this amount as being related to "Real Estate."

226. On the attached Schedule C to Government Exhibit 116 for her real estate business, Fifis-Boggs's business is correctly identified and the correct amount of gross income/sales is listed ($0). But Fifis-Boggs did not recognize or understand why the amount for "car and truck expenses" ($4,089) was listed. Fifis-Boggs did not drive 10,000

for business in 2019 as indicated on the form. Castro's software states that this amount ($4,089) consists of $3,120 for "gas," $144 for "oil," $35 for "annual registration," $720 for "parking," and $70 for "vehicle registration."

227. On the attached Schedule C to Government Exhibit 116, Fifis-Boggs's would testify that she did not recognize why $6,048 was listed for "employee benefit programs," as she didn't have any employees and could not identify what this amount related to. Fifis-Boggs would testify that she did not provide any documentation or information to Castro or his employees to justify this deduction. Castro's software states that this amount ($6,048) consists of $3,456 for "12 DD #1" and $2,592 for "12 DD #2." Box 12 with a designation of DD relates to the total cost of what you and your employer paid for an employer-sponsored health coverage plan.

228. On the attached Schedule C to Government Exhibit 116, Fifis-Boggs's would testify that she did not recognize why $9,801 was listed for "office expenses." Castro's software stated that this amount ($9,801) consists of $82 for Google Suit, $595 for Website, $1,273 for Training and Education, $101 for UPS, $193 for Vistaprint, $950 for Prime Credit Solution, $173 for RE Classes, $28 for Office Max, $30 for Bagmasters, $144 for Uline, $113 for National Pen, $766 for Ipad Air, $1,377 for Ipad Pro, $114 for Quill, $168 for Staples, $366 for Biz Phone, and $2,592 for Cell phone. Although many of these expenses are listed on the information that Fifi-Boggs provided to Castro & Co, others, such as the $2,592 in cell phone expenses are not. In addition, several of these expenses

are more appropriately identified as startup costs and not deductible as office expenses, particularly when the business had $0 in income.

229.    Fifis-Boggs did not review the 2019 Form 1040 before it was filed with the IRS.  Instead, via email, Castro indicated to her the amount of the refund that she would receive and asked whether she wanted to proceed with filing the return.  Fifis-Boggs stated that she did want to proceed, and she received a refund of $9,948.  Fifis-Boggs indicated that Castro must have received the remaining $1,000 portion of the refund identified on Form 8888 as she did not recognize the account ending in 5976.  Fifis-Boggs did not sign the 2019 Form 1040.

230.    Fifis-Boggs would testify that the tax refund amount that the IRS issued to her (through and to Castro) for her 2019 taxes is incorrect and was based on false items that Castro inserted in the tax returns and that they did not provide to Castro.

231.    According to data contained on Castro tax software, produced by the defense, Castro accessed and worked on the tax return on March 31, 2019, and personally filed the Boggs and Fifi-Boggs 2019 tax return with the IRS.

### iv.    *Victim Linda Rivera (Counts 6-8)*

232.    Linda Rivera (hereinafter "Rivera") lives in Apopka, Florida.  Although married, she elected to file as a "head of household/single."

233.     Rivera graduated from high school and has 
worked in the medical claims industry for 30 years.  She
currently works for Advent Health and has worked there for 15
years handling medical claims.  Rivera also had a small
cupcake business on the side.  She ultimately lost money on the
business, due to the COVID pandemic.

234.     Rivera stated that Castro had been doing her
taxes for approximately four to five years.  Rivera recalls that she understood that Castro
was an attorney and she heard about him from her coworker who told her that she had good
results with Castro.  At that time, Rivera was doing her own returns but was not getting a
refund.

235.     Rivera recalls the process started with her calling Castro & Co. to schedule
an appointment and uploading her tax documents online to a "digi vault."  Rivera stated
that she would upload any tax-related documents that she received such as bank, insurance
and mortgage documents, to the "digi vault." She recalls it was always a different person
who called her every year for the appointment, but when she called Castro & Co, she tended
to speak with Alphonso Garza.

236.     She recalls that in these phone interviews, the employee would ask if she had
medical expenses, how far she drove, how much she spent on car repairs, and how much
she spent on gas.  When she would ask them why, she was told that she could claim these
expenses.  Rivera recalls the questions were mostly about car and medical expenses

because she was a diabetic. Rivera stated that she trusted them because Castro was an attorney, and he should know the law.

237. Rivera recalls she had to call Castro & Co. in 2020 to get her stimulus check. She only found out about her stimulus check because people she knew were asking her if she had received it.

238. Rivera never met anyone from Castro & Co. in person.

239. Rivera only used Castro & Co. for her tax preparation and stated that their fees were "ridiculous."

### a. Rivera's 2017 Taxes (Count 6)

240. Rivera has reviewed a 2017 Form 1040 that Castro filed on her behalf. It has been shown to her and is identified here as Government Exhibit 131. It correctly states her name, social security number, and filing status as single. The listed home address on the tax return is not her address and it appeared to her to be Castro's address.

241. On the attached Schedule A to Government Exhibit 131, the "unreimbursed employee expenses" is listed as $7,445. Based on worksheets attached in Government Exhibit 131, this amount was comprised of $600 for "uniforms and protective clothing," $3,460 for "work tools," and $3,385 from a Form 2106. Rivera stated that these expenses were false. She does not wear a uniform for work and does not have any work tools.

242. On the attached Schedule A to Government Exhibit 131, the "other expenses" is listed as $19,400. Based on worksheets attached in Government Exhibit 131, this amount was comprised of $2,600 in "workplace goodwill development," and $16,800

for "depreciation" related to her Hyundai Elantra  Rivera would testify that Rivera did not recognize, nor did she know what the "workplace goodwill development" expense represented.  Rivera did not recognize the amount for "Depreciation," nor did she recall telling Castro about this amount.

243.    On the attached Schedule A to Government Exhibit 131, "other expenses" lists an amount of $4,198.  Based on worksheets attached to Government Exhibit 131, this amount is for "impairment-related work expenses." Rivera would testify that she was not impaired at any time in 2017 and did not tell Castro she was impaired.   Rivera would testify that the deduction of impairment-related work expenses was false.

244.    Rivera did not review or sign the 2017 Form 1040 before it was filed with the IRS.  Instead, via email, Castro indicated to her the amount of the refund that she would receive and asked whether she wanted to proceed with filing the return.  Rivera agreed and she received a refund of $165 and she assumes Castro received the remaining $2,999 as Rivera did not recognize the account ending in 1797 as listed on Form 8888.

245.    Rivera would testify that the tax refund amount that the IRS issued to her (through and to Castro) for his 2017 taxes is incorrect and was based on false items that Castro inserted in the tax returns and that she did not provide to Castro.

246.    According to data contained on Castro tax software, produced by the defense, Castro accessed and worked on the tax return on March 21, 2018, and March 24, 2018, and personally filed the Rivera 2017 tax return with the IRS.  (*See* Government Exhibit 25.)

### b.    Rivera's 2018 Taxes (Count 7)

247.    Rivera has reviewed a 2018 Form 1040 that Castro filed on her behalf.  It has been shown to her and is identified here as Government Exhibit 132.  It correctly states her name, social security number, and filing status as single.  The listed home address on the tax return is not her address and it appeared to her to be Castro's address.

248.    On the attached Schedule A to Government Exhibit 132, the "unreimbursed employee expenses" is listed as $32,018.  Based on worksheets attached in Government Exhibit 132, this amount was from Form 2106.  This amount ($32,018 consists of $2,822 for vehicle expenses: gas, oil, repairs for the Hyundai Elantra, $1,560 for work-related meal expenses, $1,896 for phone usage,  $540 for home internet, and $25,200 for depreciation Hyundai Elantra. Notably, Castro had already claimed $16,800 in depreciation for the same car (the Hyundai Elantra) the year before.  Moreover, in 2018, this deduction was limited to a certain set of individuals: Armed Forces reservists, qualified performing artists, fee-basis state or local government officials, and employees with impairment-related work expenses.  Rivera would testify that she was not an Armed Forces reservist, qualified performing artist, fee-basis state or local government official, or an employee with impairment-related work expenses and never told Castro or his employees that she was.

249.    Rivera did not review or sign the 2018 Form 1040 before it was filed with the IRS.  Instead, via email, Castro indicated to her the amount of the refund that she would receive and asked whether she wanted to proceed with filing the return.  Rivera agreed and

she received a refund of $1,797 and she assumes Castro received the remaining $2,000 as Rivera did not recognize the account ending in 1797 as listed on Form 8888.

250.	Rivera would testify that the tax refund amount that the IRS issued to her (through and to Castro) for his 2018 taxes is incorrect and was based on false items that Castro inserted in the tax returns and that she did not provide to Castro.

251.	According to data contained on Castro tax software, produced by the defense, Castro accessed and worked on the tax return on March 21, 2019, and March 27, 2019, and personally filed the Rivera 2018 tax return with the IRS.  (*See* Government Exhibit 25.)

###	c.	Rivera's 2019 Taxes (Count 8)

252.	Rivera has reviewed a 2019 Form 1040 that Castro filed on her behalf.  It has been shown to her and is identified here as Government Exhibit 133.  It correctly states her name, social security number, and filing status as single.  The listed home address on the tax return is not her address and it appeared to her to be Castro's address.

253.	On the attached Schedule A to Government Exhibit 133, the "other itemized deductions" is listed as $3,434.  Based on worksheets attached in Government Exhibit 133, this amount was related to "impairment related work expenses." Rivera would testify that she was not impaired at any time in 2019 and did not tell Castro she was impaired.  Castro's software states that this amount ($3,434) consists of $1,626 for Premiums, $434 for Vision Expenses, $1,000 for Prescription Expenses, $190 for Dental Expenses, $150 for Medical Expenses, and $34 for medical miles. Rivera would testify that the deduction of impairment-related work expenses was false.

254.    Rivera has a very small side cupcake-making hobby that Castro deemed a business with $250 in gross receipts/sales.  Castro claimed a Schedule C deduction for "employee benefit program expenses" related to this "business" in the amount of $25,677.  This amount ($25,677) consisted of:

- $1,908 for "phone usage,"
- $540 for "internet,"
- $1,700 for a "computer,"
- $350 for a "kitchen mixer,"
- $13,427 for her "mortgage,"
- $3,192 for "water & electricity,"
- $50 for "tollway,"
- $1,300 for "vehicle cost-gas,"
- $250 for "vehicle cost-gas,"
- $478 for "vehicle cost-tires,"
- $2,406 for "vehicle cost-car insurance," and
- $76 for "vehicle cost – renewal."

Rivera had no employees in her cupcake business.  Many of these expenses, such as those for her mortgage, utilities, and vehicle represent the full amount of those expenses for her entire residence or vehicle, as opposed to the percentage of expenses related to her home or vehicle that she used solely for her "business."  Castro did not explain to Rivera that he would be claiming a deduction in this manner.  As discussed above in Section G(i), many of the items Castro includes in his claimed deductions for employee benefit employee expenses simply do not qualify as that type of expense.

255.    Rivera did not review or sign the 2019 Form 1040 before it was filed with the IRS.  Instead, via email, Castro indicated to her the amount of the refund that she would receive and asked whether she wanted to proceed with filing the return.  Rivera agreed and

she received a refund of $1,763 and she assumes Castro received the remaining $1,500 as Rivera did not recognize the account ending in 1797 as listed on Form 8888.

256. Rivera would testify that the tax refund amount that the IRS issued to her (through and to Castro) for his 2019 taxes is incorrect and was based on false items that Castro inserted in the tax returns and that she did not provide to Castro.

257. According to data contained on Castro tax software, produced by the defense, Castro accessed and worked on the tax return on March 12, 2019, and personally filed the Rivera 2019 tax return with the IRS. (*See* Government Exhibit 25.)

### v. *Victims Christian and Ciara Karavangelos (Counts 9-11)*

258. Christian Karavangelos (hereinafter "Karavangelos") and Ciara Karavangelos are a married couple who live in St. Cloud, Florida.

259. Karavangelos graduated from Valencia Community College with an associate's degree and from the University of Central Florida with bachelor's degree in Engineering. Karavangelos currently works as an engineer at Carollo Engineers and has worked there since September of 2019. Karavangelos's



wife, Ciara, is a stay-at-home mom but works part-time as a photographer. They both also had a small business in the past selling signs on Etsy for about a year or two.

260. Karavangelos stated that Castro & Co. handled his tax returns for approximately four years. Karavangelos recalls his youth pastor, David Cording, referred

him to Castro, and identified him as a tax lawyer who knew tax laws and itemized deductions. Karavangelos recalls reaching out to Castro by googling his information. He was then told to start an account in a client portal called "Smartvault," filled out a form, and then had an interview. He uploaded tax documents such as 1099, W-2's, and 1098's to Castro's portal.

261. Karavangelos recalls the tax interview was with a tax preparer and would last about 30 minutes to an hour. Karavangelos believes the interview was almost always with the same person, Alfonso Garza. Karavangelos recalls the tax interview discussion included anything related to financial forms, mileage and what Castro & Co. called a "good faith estimate" for driving his car to and from work, and other expenses.

262. Karavangelos would testify that if he had any additional mileage for work, and if the project allowed for it, he would be reimbursed by his company. Karavangelos would also testify that he also had a company credit card that would pay for certain expenses. The only out-of- pocket expenses he can think of were small desk supplies.

263. Following his interview, Karavangelos received an email and letter (discussed below) notifying him of the amount of his tax refund and was asked whether he would like to proceed to have their taxes filed. He did not receive a copy of the actual tax returns or review them before they were submitted. Karavangelos agreed to have Castro submit his taxes based on the calculated refund.

264. Karavangelos never met Castro in person.

### a.    Karavangelos 2017 Taxes (Count 9)

265.    On about March 23, 2018, Castro emailed and sent a letter to Karavangelos stating that they had performed a tax review for Karavangelos for 2017 and identified that their refund would be $2,498.  (*See* Government Exhibit 152.)  Castro stated that had Karavangelos used another company, their refund would have been $149, meaning they received an extra $1,674 by using Castro (after accounting for their fee). (*See id.*)

266.    Karavangelos has reviewed a 2017 Form 1040 that was filed on his behalf by Castro.  It has been shown to him and is identified here as Government Exhibit 144.  It correctly states his and his wife's names, his child's name, and social security numbers. The listed home address on the tax return is not his address and it appeared to him to be Castro's address.  Karavangelos would testify that the use of this address caused his stimulus checks to be mailed to Castro.

267.    On the attached Schedule C to Government Exhibit 144, Ciara's Karavangelos' side business was identified as an "online store" with gross receipts/sales of $1,736.  Ciara Karavangelos and Christian Karavangelos would testify that the amount listed for "insurance" on Schedule C, which is listed as $1,452 was not correct and they did not have any insurance expense for this side business.  Karavangelos stated that they did not provide this amount or any documentation representing this amount to Castro or his employees.  Karavangelos did keep a spreadsheet related to the expenses for that business and it does not list that expense.  (*See* Government Exhibit 151.)

268.     On the attached Schedule A to Government Exhibit 144, the "unreimbursed employee expenses" is listed as $6,765.  Based on worksheets attached in Government Exhibit 144, this amount ($6,765) consists of $2,050 related to "work tools" and $4,715 from Form 2106 (related to vehicle expenses).  Karavangelos would testify that that he had no "work tools" expenses.  Similarly, with respect to Form 2106, Karavangelos would testify that the amount of $4,715 for vehicle expenses was false.  He did not provide any documentation to Castro or his employees regarding these expenses.

269.     On the attached Schedule A to Government Exhibit 144, "other expenses" lists an amount of $2,252.  Based on worksheets attached to Government Exhibit 144, this amount ($2,252) consists of $1,452 for "deductible investment interest" and $800 for "depreciation."     Karavangelos did not provide Castro or his employees with any documentary evidence related to these expenses, and he does not know what they represent.  Karavangelos would testify that he had no investment property or stocks and only had a 401K.

270.     On the attached Schedule A to Government Exhibit 144, "other miscellaneous deductions" lists an amount of $14,508.  Based on worksheets attached to Government Exhibit 144, this amount ($14,508) was for "impairment-related work expenses."  Karavangelos did not provide Castro or his employees with any documentary evidence related to this claimed expense.  Karavangelos would testify that neither he nor his wife were impaired in 2017 and did not tell Castro or his employees that he or his wife were impaired.

271.     On the attached Schedule C to Government Exhibit 144, "insurance" lists an amount of $1,452.  Based on worksheets attached to Government Exhibit 144, this amount ($1,452) was for "deductible investment interest." Karavangelos did not provide Castro or his employees with any documentary evidence related to this claimed expense.  Moreover, this amount appears be deducted twice – both here and as a component of "other expenses," discussed above.

272.     Karavangelos did not review or sign the 2017 Form 1040 before it was filed with the IRS.  Instead, via email, Castro indicated to him the amount of the refund that he would receive and asked whether he wanted to proceed with filing the return. Karavangelos stated that he did want to proceed, and he received a refund of $4,172. Karavangelos indicated that Castro must have received the remaining $1,999 portion of the refund identified on Form 8888 as he did not recognize the account ending in 5036.

273.     Karavangelos would testify that the tax refund amount that the IRS issued to him (through and to Castro) for his 2017 taxes is incorrect and was based on false items that Castro inserted in the tax returns and that they did not provide to Castro.

274.     According to data contained on Castro tax software, produced by the defense, Castro accessed and worked on the tax return on March 23, 2018, and March 24, 2018, and personally filed the Karavangelos 2017 tax return with the IRS.  (*See* Government Exhibit 25.)

### b. Karavangelos 2018 Taxes (Count 10)

275. On about March 17, 2019, Castro emailed and sent a letter to Karavangelos stating that they had performed a tax review for Karavangelos for 2018 and identified that their refund would be $4,455. (*See* Government Exhibit 153.) Castro stated that had Karavangelos used another company, their refund would have been $3,317, meaning they received an extra $1,138 by using Castro. (*See id.*)

276. Karavangelos has reviewed a 2018 Form 1040 that was filed on his behalf by Castro. It has been shown to him and is identified here as Government Exhibit 145. It correctly states his and his wife's name, child's name, and social security numbers. The listed home address on the tax return is not his address and it appeared to his to be Castro's address.

277. On the attached Schedule C to Government Exhibit 145, Ciara's Karavangelos' side business was identified as "All Occasions Photography," with gross receipts/sales of $3,375. On the attached Schedule C to Government Exhibit 145, Karavangelos would testify that he did not recognize why $7,163 was listed for "employee benefit programs," as they didn't have any employees and could not identify what this amount related to. Karavangelos would testify that he did not provide any documentation or information to Castro or his employees to justify this deduction. Castro's software indicates that this amount ($7,163) consisted of $5,116 for "Mortgage," $500 for "Electricity," and $1,547 for "Medical." These appear to be personal expenses and not apportioned for the space that was used only for the photography business.

278.    On the attached Schedule C to Government Exhibit 145, Karavangelos would testify that he did not recognize why $2,140 was listed for "taxes and licenses." Karavangelos stated that this amount was incorrect.    Karavangelos would testify that he did not provide any documentation or information to Castro or his employees to justify this deduction.   Castro's software indicates that this amount ($2,140) related to "real estate taxes."  This appears to represent the full value of their real estate taxes.

279.    On the attached Schedule A to Government Exhibit 145, the "unreimbursed employee expenses" is listed as $8,705.   Castro's software shows that this consists of $1,513 for vehicle expenses - oil, gas, repairs; $6,542 for depreciation and $650 for tolls. These were solely business expenses, and this deduction was limited to individuals who were Armed Forces reservists, qualified performing artists, fee-basis state or local government officials, and employees with impairment-related work expenses. Karavangelos would testify that neither he nor his wife were any of these – they were not qualified performing artists, fee-basis state or local government officials, or employees with impairment-related work expenses.   Karavangelos would testify that he never told Castro or his employees that he or his wife were a qualified performing artist, fee-basis state or local government official, or an employee with impairment-related work expenses.

280.    On a different Form 2106, attached to Schedule A to Government Exhibit 145, the "unreimbursed employee expenses" is listed as $4,611 and is for Ciara Karavangelos.   This amount ($4,611) consists of $911 for vehicle expenses - oil, gas, repairs; and $3,700 for the depreciation of Toyota Corolla.  This vehicle was not used only

for business and these amounts do reflect a correct apportionment. Moreover, this deduction was limited to individuals who were Armed Forces reservists, qualified performing artists, fee-basis state or local government officials, and employees with impairment-related work expenses. Karavangelos would testify that neither he nor his wife were any of these – they were not qualified performing artists, fee-basis state or local government officials, or employees with impairment-related work expenses. Karavangelos would testify that he never told Castro or his employees that he or his wife were a qualified performing artist, fee-basis state or local government official, or an employee with impairment-related work expenses.

281. Karavangelos did not review or sign the 2018 Form 1040 before it was filed with the IRS. Instead, via email, Castro indicated to him the amount of the refund that he would receive and asked whether he wanted to proceed with filing the return. Karavangelos stated that he did want to proceed, and he received a refund of $4,454. Karavangelos indicated that Castro received the remaining $1,500 portion of the refund identified on Form 8888.

282. Karavangelos would testify that the tax refund amount that the IRS issued to him, (through and to Castro) for his 2018 taxes is incorrect and was based on false items that Castro inserted in the tax returns and that they did not provide to Castro.

283. According to data contained on Castro tax software, produced by the defense, Castro accessed and worked on the tax return (for over an hour) on March 17, 2019, and

March 26, 2019, and personally filed the Karavangelos 2018 tax return with the IRS.  (*See* Government Exhibit 25.)

### c.    Karavangelos 2019 Taxes (Count 11)

284.    On about April 2, 2020, Castro emailed and sent a letter to Karavangelos stating that they had performed a tax review for Karavangelos for 2019 and identified that their refund would be $7,754.  Castro stated that had Karavangelos used another company, their refund would have been $4,944, meaning they received an extra $2,810 by using Castro.

285.    Karavangelos has reviewed a 2019 Form 1040 that Castro filed on his behalf. It has been shown to him and is identified here as Government Exhibit 146.  It correctly states his and his wife's names, child's name, and social security numbers.  The listed home address on the tax return is not his address and it appeared to his to be Castro's address.

286.    On the attached Schedule C to Government Exhibit 146, Ciara's Karavangelos' side business was identified as "Striving Grace Photography," with gross receipts/sales of $8,100.

287.    Castro claimed a deduction of $4,161 in Schedule C "advertising" expenses. Based on Castro's tax software, which the government has reviewed and includes the underlying backup for each deduction, this amount ($4,161) consists of:

- $150 in "Advertising,"
- $1,935 identified as being related to "Charity Church,"
- $300 identified as being related to "Charity Kyle Stoughton,"
- $600 identified as being related to "Charity The Clark Family,"
- $480 identified as being related to "Charity Matt Navigato," [sic]

- $456 identified as being related to "Char, Maria (Compassion Intl)," and
- $240 identified as being related to "Charity, Z Radio."

The charitable contributions amount to $4,011 or 96% of the deduction. Karavangelos would testify that he did have $150 in advertising expenses, and he provided that amount to Castro. Karavangelos would testify that the other amounts ($4,011) were solely charitable contributions that he and his wife made personally, as opposed to being made on behalf of their side business – Ciara Karavangelos's photography business that had $8,100 in income, as identified on the Schedule C attached to Government Exhibit 146. Karavangelos would testify that he did not anticipate an economic benefit for the photography business by making the donations identified above and did not tell Castro or his employees he had such an anticipation. Further, Karavangelos would testify that he could not and did not provide any substantiation that the photography business received an economic benefit in return.

288. On the attached Schedule C to Government Exhibit 146, Karavangelos would testify that he did not recognize why $28,081 was listed for "employee benefit programs," as they did not have any employees and could not identify what this amount related to. Karavangelos would testify that he did not provide any documentation or information to Castro or his employees to justify this deduction. Castro's software shows that this amount ($28,081) consists of $1,224 in "Section 119 Mortgage," $2,193 in "Section 119 Electric," $835 in "Section 119 Water," $150 in "Section 119 HOA," $1,295 in "Section 119 Home Insurance," $15,424 in "12DD," $6,419 in "12 DD," and $140 in "Vision." Similarly, the

excel spreadsheet, which has been marked as Government 151, that was kept and produced by Karavangelos, does not show these expenses in this detail and specifically notes that "My wife does all of her editing from home. We have an office, approximately 200 sf, and our home is 1400 sf total."

289.    On the attached Schedule C to Government Exhibit 146, Karavangelos would testify that he did not recognize why $1,396 was listed for "insurance," expenses. Karavangelos would testify that he did not provide any documentation or information to Castro or his employees to justify this deduction and that there were no such expenses. Castro's software indicates that this amount relates to "homeowner's insurance." Similarly, the excel spreadsheet, which has been marked as Government 151, that was kept and produced by Karavangelos, does not show this expense.

290.    On the attached Schedule C to Government Exhibit 146, Karavangelos would testify that he did not recognize why $6,264 was listed for "interest," expenses. Karavangelos would testify that he did not provide any documentation or information to Castro or his employees to justify this deduction and that there were no such expenses. Similarly, the excel spreadsheet, which has been marked as Government 151, that was kept and produced by Karavangelos, does not show this expense.  Further, Karavangelos believes that this amount $6,264 was for the mortgage interest for his entire residence and that they did not use the entire residence for the photography business, as noted above.

291.    On the attached Schedule C to Government Exhibit 146, Karavangelos would testify that he did not recognize why $2,145 was listed for "other expenses," which

included $750 for "other expenses" and $1,395 for "mortgage insurance premiums." Karavangelos would testify that he did not provide any documentation or information to Castro or his employees to justify this deduction and these were not reasonable expenses.

292.     On the attached Schedule A to Government Exhibit 146, the "unreimbursed employee expenses" is listed as $17,400.  This amount consisted of $15,600 in depreciation (for a car purchased in 2013 and which was depreciated in prior years) and $840 in gas, oil, repairs for vehicle expenses and $960 for cell phone.  These were not expenses that related solely to the business.  Moreover, this deduction was limited to individuals who were Armed Forces reservists, qualified performing artists, fee-basis state or local government officials, and employees with impairment-related work expenses. Karavangelos would testify that neither he nor his wife were any of these – they were not qualified performing artists, fee-basis state or local government officials, or an employee with impairment-related work expenses.  Karavangelos would testify that he never told Castro or his employees that either he or his wife were so qualified.

293.     Karavangelos did not review the 2019 Form 1040 before it was filed with the IRS.  Instead, via email, Castro indicated to him the amount of the refund that he would receive and asked whether he wanted to proceed with filing the return.  Karavangelos stated that he did want to proceed, and he received a refund of $7,753.  Karavangelos indicated that Castro must have received the remaining $3,000 portion of the refund identified on Form 8888 as he did not recognize the account ending in 5036.  Karavangelos did not sign the 2018 Form 1040.

294.     Karavangelos would testify that the tax refund amount that the IRS issued to him (through and to Castro) for his 2019 taxes is incorrect and was based on false items that Castro inserted in the tax returns and that they did not provide to Castro.

295.     According to data contained on Castro tax software, produced by the defense, Castro accessed and worked on the tax return on March 31, 2019, and personally filed the Karavangelos 2019 tax return with the IRS.  (*See* Government Exhibit 25.)

### vi.     *Victims Randolph and Robin Ragsdale (Counts 12-14)*

296.     Randolph Ragsdale (hereinafter "Ragsdale") and Robin Ragsdale are a married couple who live in Orlando, Florida.

297.     Ragsdale     worked     as     an architectural     draftsman     and     is     currently employed with RLF Architects. Ragsdale has a two-year degree in Architectural Drafting.



298.     Ragsdale was referred to Castro by his daughter Betsy Sola and her husband, Javier, both of whom went to Castro first, possibly around 2015. Ragsdale believes his daughter heard about Castro through her friends from Discovery Church and that Castro may have also gone to the same church. Ragsdale recalled Betsy getting a refund back after using Castro's services and that he usually owed taxes every year before he started using Castro.  Since he was always paying taxes, he thought he could use some professional help so he could get a refund instead of owing every year.

299.    Ragsdale initially reached out to Castro via e-mail. The first step of the tax preparation process was to fill out a client information form and upload his tax documents to the "vault." After all the documents were uploaded to the "vault," Ragsdale signed up for a phone interview.

300.    After the phone interview, the taxes were prepared. Both Ragsdale and his wife typically attended the phone interview. After the phone interview Ragsdale received a proposal by email. Ragsdale did not recall seeing his tax returns being posted to the "vault" every year. At the end 2016, Ragsdale was in the process of purchasing a new home when the mortgage lender requested the previous year's tax return. Ragsdale reached out to Castro to get a copy of the 2016 tax return, which was then uploaded to the "vault." Castro claimed he (Castro) did not want his competitors to see how the returns were prepared.

301.    Ragsdale never really knew what the fees were, and he never saw his tax returns or had anyone review his tax returns with him before they were filed.

302.    Ragsdale does not recall meeting Castro or anyone from Castro & Co. in person and instead only communicated with them only over the phone.

### a.    Ragsdale 2017 Taxes (Count 12)

303.    Ragsdale has reviewed a 2017 Form 1040 that was filed on his and his wife's behalf by Castro. It has been shown to him and is identified here as Government Exhibit 171. It correctly states his name, his wife's name, their daughter's name, and their social

security numbers. The listed home address on the tax return is not their address and it appeared to him to be Castro's address.

304. On the attached Schedule A to Government Exhibit 171, the "unreimbursed employee expenses" is listed as $6,937. Based on worksheets attached in Government Exhibit 171, this amount was comprised of $3,092 for "work tools," $454 for "uniforms and protective clothing" and $3,391 from a Form 2106. Ragsdale stated that these expenses were false, and he did not provide any documentation to Castro or his employees regarding these expenses. Ragsdale would testify that he would only drive to and from work, did not have to buy a uniform, and did not have to purchase work tools that were unreimbursed.

305. On the attached Schedule A to Government Exhibit 171, the "other expenses" is listed as $8,265. Based on worksheets attached in Government Exhibit 171, this amount was comprised of $1,404 in "workplace goodwill development," $416 for "work-related family supervision," and $729 for "qualified deductible legal fees," and $5,716 for depreciation. Ragsdale would testify that he did not recognize, nor did he know what the "workplace goodwill development" expense represented. Ragsdale did not recognize the amount for "depreciation," nor did he recall telling Castro about this amount. Ragsdale would testify that the legal expenses related to legal fees for his daughter.

306. On the attached Schedule A to Government Exhibit 171, "other miscellaneous deductions" lists an amount of $4,373. Based on worksheets attached to Government Exhibit 171, this amount is for "impairment-related work expenses." Ragsdale would testify that neither he nor his wife were impaired at any time in 2017 and did not tell

Castro that either he or his wife were impaired. Ragsdale would testify that the deduction of impairment-related work expenses was false.

307. Ragsdale did not review or sign the 2017 Form 1040 before it was filed with the IRS. Instead, via email, Castro indicated to him the amount of the refund that they would receive and asked whether he wanted to proceed with filing the return. Ragsdale agreed. They received a refund of $133 and assumes Castro received the remaining $1,999 as Ragsdale did not recognize the account ending in 1382 as listed on Form 8888.

308. Ragsdale would testify that the tax refund amount that the IRS issued to him and his wife (through and to Castro) for his 2017 taxes is incorrect and was based on false items that Castro inserted in the tax returns and that he did not provide to Castro.

309. According to data contained on Castro tax software, produced by the defense, Castro accessed and worked on the tax return on March 6, 2018, and March 30, 2018, and personally filed the Ragsdale 2017 tax return with the IRS. (*See* Government Exhibit 25.)

**b.    Ragsdale 2018 Taxes (Count 13)**

310. Ragsdale has reviewed a 2018 Form 1040 that Castro filed on behalf of him and his wife. It has been shown to him and is identified here as Government Exhibit 172. It correctly states his name, his wife's name, their daughter's name, and their social security numbers. The listed home address on the tax return is not their address and it appeared to him to be Castro's address.

311. On the attached Schedule A to Government Exhibit 172, the "unreimbursed employee expenses" is listed as $26,416. This amount consists of $2,696 for vehicle

expenses for a Ford Escape - oil, gas, repairs; $6,500 for depreciation; $3,481 for childcare expenses, $51 for tolls, $6,967 for medical, $2,860 for work-related meal expenses, $179 for goodwill development, $880 for a work computer, $2,246 for phone usage, $25 for research expenses, $440 for home internet for work, $91 for postage. Many of these expenses were not deductible as they were merely personal living expenses. Moreover, this deduction was limited to individuals who were Armed Forces reservists, qualified performing artists, fee-basis state or local government officials, and employees with impairment-related work expenses. Ragsdale would testify that neither he nor his wife were any of these – they were not qualified performing artists, fee-basis state or local government officials, or employees with impairment-related work expenses. Ragsdale would testify that he never told Castro or his employees that he or his wife were a qualified performing artist, fee-basis state or local government official, or an employee with impairment-related work expenses. In addition, Ragsdale would testify that neither he nor his wife had unreimbursed employee expenses in 2018 in the amount of $26,416 and did not tell Castro or his employees that they had such expenses.

312. On the attached Schedule A to Government Exhibit 172, another "unreimbursed employee expenses" itemized deduction is listed as $9,594. This amount consists of $670 for vehicle expenses - oil, gas, repairs and $8,924 for depreciation for a Ford Escape. In 2018, this deduction was limited to individuals who were Armed Forces reservists, qualified performing artists, fee-basis state or local government officials, and employees with impairment-related work expenses. Ragsdale would testify that neither he

nor his wife were any of these – they were not qualified performing artists, fee-basis state or local government officials, or employees with impairment-related work expenses. Ragsdale would testify that he never told Castro or his employees that he or his wife were a qualified performing artist, fee-basis state or local government official, or an employee with impairment-related work expenses. In addition, Ragsdale would testify that neither he nor his wife had unreimbursed employee expenses in 2018 in the amount of $9,594 and did not tell Castro or his employees they had such expenses.

313. Ragsdale did not review or sign the 2018 Form 1040 before it was filed with the IRS. Instead, via email, Castro indicated to him the amount of the refund that they would receive and asked whether he wanted to proceed with filing the return. Ragsdale agreed and they received a refund of $628 and he assumes Castro received the remaining $3,500 as Ragsdale did not recognize the account ending in 1382 as listed on Form 8888.

314. Ragsdale would testify that the tax refund amount that the IRS issued to him and his wife (through and to Castro) for his 2018 taxes is incorrect and was based on false items that Castro inserted in the tax returns and that he did not provide to Castro.

315. According to data contained on Castro tax software, produced by the defense, Castro accessed and worked on the tax return on April 30, 2019, and May 10, 2019, and personally filed the Ragsdale 2018 tax return with the IRS. (*See* Government Exhibit 25.)

### c. Ragsdale 2019 Taxes (Count 14)

316. Ragsdale has reviewed a 2019 Form 1040 that Castro filed on his and his wife's behalf. It has been shown to him and is identified here as Government Exhibit 173.

It correctly states his name, his wife's name, their daughter's name, and their social security numbers. The listed home address on the tax return is not their address and it appeared to him to be Castro's address.

317. On the attached Schedule A to Government Exhibit 173, the "unreimbursed employee expenses" is listed as $8,560. This amount consists of $3,081 for vehicle expenses - oil gas, repairs, $4,293 for childcare expenses, $796 for phone usage, and $390 for dry cleaning. In 2019, this deduction was limited to individuals who were Armed Forces reservists, qualified performing artists, fee-basis state or local government officials, and employees with impairment-related work expenses. Ragsdale would testify that neither he nor his wife were any of these – they were not qualified performing artists, fee-basis state or local government officials, or employees with impairment-related work expenses. Ragsdale would testify that he never told Castro or his employees that he or his wife were a qualified performing artist, fee-basis state or local government official, or an employee with impairment-related work expenses. In addition, Ragsdale would testify that neither he nor his wife had unreimbursed employee expenses in 2019 in the amount of $8,560 and did not tell Castro or his employees they had such expenses.

318. On the attached Schedule A to Government Exhibit 173, another "unreimbursed employee expenses" itemized deduction is listed as $29,070. This amount consists of $1,280 for oil, gas repairs, $27,378 for depreciation; and $796 for phone usage. In 2019, this deduction was limited to individuals who were Armed Forces reservists, qualified performing artists, fee-basis state or local government officials, and employees

with impairment-related work expenses. Ragsdale would testify that neither he nor his wife were any of these – they were not qualified performing artists, fee-basis state or local government officials, or employees with impairment-related work expenses. Ragsdale would testify that he never told Castro or his employees that he or his wife were a qualified performing artist, fee-basis state or local government official, or an employee with impairment-related work expenses. In addition, Ragsdale would testify that neither he nor his wife had unreimbursed employee expenses in 2019 in the amount of $29,070 and did not tell Castro or his employees they had such expenses.

319. On the attached Schedule A to Government Exhibit 173, "other itemized deductions" lists an amount of $30,586. Based on worksheets attached to Government Exhibit 173, this amount is for "impairment-related work expenses." This amount consists of $28,360 for 12 Box DD, $190 for Vision, $400 for Medications, $140 for Dental, $1,496 for Medical Check. Ragsdale would testify that neither he nor his wife were impaired at any time in 2019 and did not tell Castro that neither he nor his wife were impaired. Ragsdale would testify that the deduction of impairment-related work expenses was false.

320. Ragsdale did not review or sign the 2019 Form 1040 before it was filed with the IRS. Instead, via email, Castro indicated to him the amount of the refund that they would receive and asked whether he wanted to proceed with filing the return. Ragsdale agreed and they received a refund of $3,254 and he assumes Castro received the remaining $6,000 as Ragsdale did not recognize the account ending in 1382 as listed on Form 8888.

321.     Ragsdale would testify that the tax refund amount that the IRS issued to him and his wife (through and to Castro) for his 2019 taxes is incorrect and was based on false items that Castro inserted in the tax returns and that he did not provide to Castro.

322.     According to data contained on Castro tax software, produced by the defense, Castro accessed and worked on the tax return on May 1, 2020, and personally filed the Ragsdale 2019 tax return with the IRS.  (*See* Government Exhibit 25.)

323.     Ragsdale stated that he got audited for his 2018 tax return. Ragsdale received the IRS Letter through Castro.  After reviewing the 2018 tax return with Castro, Ragsdale ended up owing additional taxes for the 2018 tax year.  Ragsdale was informed he owed approximately $8,512.80 on his 2018 tax return.   Ragsdale stated that he received the IRS Letter through Castro and got audited for his 2019 tax return as well. After the review of the 2019 tax return, Ragsdale was informed he owned approximately $14,945 on his 2019 tax return.

### vii.          *Victims Javier and Betsy Sola (Counts 15-17)*

324.     Javier Sola (hereinafter "Sola") and Betsy Sola are a married couple who live in Orlando, Florida.

325.     Sola has a Master of Theology from Dallas Theological Seminary and a Bachelor of Science in Biomedical Science (pre-med) from the University of South Florida. Javier currently works as a Pastor at Discovery Church, and previously served as a Pastor at Harvest Community Church and worked there for approximately two years.  Betsy had taken some college courses, but she did not have any background in accounting.

326.    Castro was recommended to Sola by his friend from church, Brian Quigley.

Quigley told Sola that Castro attended the 
Alafaya Campus of Discovery Church. Castro
represented himself as a tax attorney when he
spoke to Sola over the phone. The first two
years of the tax interviews were conducted by Castro.  Castro told Sola it was easier and
more efficient to do business over the phone.  Sola also communicated with Castro via
email regarding concerns or questions he had.  Sola believed at that time that Castro's
office was based out of Orlando.

327.    Sola recalled that the first step of the tax preparation process with Castro was
to upload tax documents such as W-2s, tax forms, investment statements, receipts from
church, gas receipts for work purposes, and house repair expenses to Castro's portal, which
was called SmartVault.  After all the documents were uploaded, Sola filled out the client
questionnaires followed by a phone interview. Sola did his first tax interview with Castro.

328.    After the phone interview, Sola received an email from Castro with his tax
refund information and associated fees with the refund; the fees were based on a percentage
of the tax refund.  After receiving the tax proposal via email, Sola had to confirm and accept
the proposal before he received a copy of his tax return.

329.    Sola confirmed neither Castro nor anyone at Castro & Co. reviewed his tax
returns with him. Sola and his wife compared the difference in tax refund they would get
back using Turbo Tax versus Castro. They went with Castro because the tax refund with

Castro was higher compared to Turbo Tax; Castro also claimed to offer free audit protection and would represent them if they ever got audited. Sola recalled someone from Castro & Co. telling him around 2015 that Castro oversees the preparation of all the tax returns.

### a. Sola 2017 Taxes (Count 15)

330. Sola has reviewed a 2017 Form 1040 that was filed on his (and his wife's) behalf by Castro. It has been shown to him and is identified here as Government Exhibit 204. It correctly states his and his wife's names, their children's names, and social security numbers. The listed home address on the tax return is not their address and it appeared to him to be Castro's address.

331. On the attached Schedule A to Government Exhibit 204, the "unreimbursed employee expenses" is listed as $4,484. Based on worksheets attached in Government Exhibit 204, this amount ($4,484) consists of $1,656 for "work tools" and $2,828 from Form 2106. Sola stated that these expenses were false, and he did not provide any documentation to Castro or his employees regarding these expenses. With respect to Form 2106, Sola did not provide Castro or his employees with any documentary evidence related to the identified vehicle expenses. Sola would testify that neither he nor his wife had any unreimbursed vehicle expenses.

332. On the attached Schedule A to Government Exhibit 204, "other expenses" lists an amount of $598. Based on worksheets attached to Government Exhibit 204, this amount ($598) included $131 for "qualified deductible legal fees." Sola would testify that

they did not have any expenses for qualified deductible legal fees. It also included $245 in Continuing Education and $222 for Professional Exams and License Fees.

333. On the attached Schedule C to Government Exhibit 204, it identifies Betsy Sola's side business as "Pastoral Work." Betsy Sola would testify that she was not a pastor but did perform some childcare work at the church. She also obtained her real estate license and had certain expenses related to that.

334. That Schedule C identified "car and truck" expenses totaled $4,040 and related to a Honda Civic. Javier Sola would testify that this vehicle was his car, and his wife did not use it for the claimed side business. Sola would also testify that they did not have expenses related to their car and trucks that were for work in this amount.

335. That Schedule C identified "depreciation" expenses totaled $1,632 and related to the same Honda Civic. Javier Sola would testify that this vehicle was his car, and his wife did not use it for business purposes. Sola would also testify that they did not have depreciation expenses related to their car and trucks that were for work in this amount.

336. On the attached Schedule C to Government Exhibit 204 Sola would testify that she did not recognize why $2,348 was listed for "employee benefit programs," as they didn't have any employees and could not identify what this amount related to. Sola would testify that he did not provide any documentation or information to Castro or his employees to justify this deduction. Castro's software indicated that this amount ($2,348) consisted of $1,700 in "Section 165," $408 in "Health Reimbursement," and $240 for "Health Reimbursement."

337. Sola did not review or sign the 2017 Form 1040 before it was filed with the IRS. Instead, via email, Castro indicated to him the amount of the refund that he would receive and asked whether he wanted to proceed with filing the return. Sola stated that he did want to proceed, and he received a refund of $6,267. Sola indicated that Castro must have received the remaining $1,499 portion of the refund identified on Form 8888 as he did not recognize the account ending in 6632.

338. Sola would testify that the tax refund amount that the IRS issued to him (through and to Castro) for his 2017 taxes is incorrect and was based on false items that Castro inserted in the tax returns and that they did not provide to Castro.

339. According to data contained on Castro tax software, produced by the defense, Castro accessed and worked on the tax return on February 7, 2018, and February 13, 2018, and personally filed the Sola 2017 tax return with the IRS. (*See* Government Exhibit 25.)

**b.  Sola 2018 Taxes (Count 16)**

340. Sola has reviewed a 2018 Form 1040 that was filed on his (and his wife's) behalf by Castro. It has been shown to him and is identified here as Government Exhibit 205. It correctly states his and his wife's names, their children's names, and social security numbers. The listed home address on the tax return is not their address and it appeared to him to be Castro's address.

341. On the attached Form 2106 to Government Exhibit 205, which was to be used to identify Employee Business Expenses, Castro listed $7,224 as the total employee business expenses. But that deduction was limited to a certain set of individuals: Armed

Forces reservists, qualified performing artists, fee-basis state or local government officials, and employees with impairment-related work expenses. Sola would testify that neither he nor his wife were an Armed Forces reservist, qualified performing artist, fee-basis state or local government official, or an employee with impairment-related work expenses and never told Castro or his employees that they were. The software states that this amount ($7,224) consists of $1,560 for work related meals, $550 for work phone, $936 for phone usage, $720 for home internet for work. Sola would testify that neither he nor his wife had the employee expenses that comprised that amount

342.    On the attached Schedule C to Government Exhibit 205, it identifies $7,842 in "interest" expenses. Sola would testify that this amount appears to represent the full value of mortgage interest on his residence. Sola would testify that his wife only worked out of a small portion of their residence.

343.    On the attached Schedule C to Government Exhibit 205, it identifies $918 in "other" expenses. Sola would testify that this figure ($918) appears to represent mortgage insurance premiums for the entire residence. Sola would testify that his wife only worked out of a small portion of their residence.

344.    Sola did not review or sign the 2018 Form 1040 before it was filed with the IRS. Instead, via email, Castro indicated to him the amount of the refund that he would receive and asked whether he wanted to proceed with filing the return. Sola stated that he did want to proceed, and he received a refund of $10,563. Sola indicated that Castro must

have received the remaining $1,000 portion of the refund identified on Form 8888 as he did not recognize the account ending in 6632.

345. Sola would testify that the tax refund amount that the IRS issued to him (through and to Castro) for his 2018 taxes is incorrect and was based on false items that Castro inserted in the tax returns and that they did not provide to Castro.

346. According to data contained on Castro tax software, produced by the defense, Castro accessed and worked on the tax return on February 26, 2019, and personally filed the Sola 2018 tax return with the IRS. (*See* Government Exhibit 25.)

      **c.**     **Sola 2019 Taxes (Count 17)**

347. Sola has reviewed a 2019 Form 1040 that Castro filed on behalf of him and his wife. It has been shown to him and is identified here as Government Exhibit 206. It correctly states his and his wife's names, their children's names, and social security numbers. The listed home address on the tax return is not their address and it appeared to him to be Castro's address. Sola would testify that stimulus checks went to Castro's office.

348. On the attached Form 2106 to Government Exhibit 206, which was to be used to identify unreimbursed employee business expenses, Castro listed $6,671 as the total employee business expenses. This amount consisted of $2,696 for vehicle expenses for a Ford Escape - oil, gas, repairs; $6,500 for depreciation; $3,481 for childcare expenses, $51 for tolls, $6,967 for medical, $2,860 for work-related meal expenses, $179 for goodwill development. But that deduction was limited to a certain set of individuals: Armed Forces reservists, qualified performing artists, fee-basis state or local government officials, and

employees with impairment-related work expenses. Sola would testify that neither he nor his wife were an Armed Forces reservist, qualified performing artist, fee-basis state or local government official, or an employee with impairment-related work expenses and never told Castro or his employees that they were. Sola noted that the portion of this that related specifically to vehicle expenses appeared to represent Sola's commuting miles.

349. On the attached Schedule C to Government Exhibit 206, for Betsy Sola's realtor business, Sola would testify that he did not recognize why $5,608 was listed for "employee benefit programs," as he did not have any employees and could not identify what this amount related to. Sola would testify that he did not provide any documentation or information to Castro or his employees to justify this deduction. Castro's software states that this amount ($5,608) consists of $420 for "Prescriptions," $2,800 for "Dependent Care," $240 for "Insurance Premium Kids," $1,728 for "Insurance Premiums H&W," and $420 for "Prescriptions."

350. On the attached Schedule C to Government Exhibit 206, for Betsy Sola's realtor business, Sola would testify that he did not recognize why $7,687 was listed for "interest," in relation for the realtor business. Sola would testify that he did not provide any documentation or information to Castro or his employees to justify this deduction. Sola would testify that this amount appears to represent the full value of mortgage interest on his residence. Sola would testify that his wife only worked out of a small portion of their residence. Sola kept a spreadsheet of all expenses for the real estate business, which she

provided to Castro & Co., and which has been marked as Government Exhibit 214, and these expenses are not listed there.

351.  On the attached Schedule C to Government Exhibit 206, for Betsy Sola's realtor business, Sola would testify that he did not recognize why $1,000 was listed for "legal and professional services."  Sola would testify that he did not provide any documentation or information to Castro or his employees to justify this deduction and they did not have these expenses for the realtor business.  Sola kept a spreadsheet of all expenses for the real estate business, which she provided to Castro & Co., and which has been marked as Government 214, and these expenses are not listed there.  Castro's software indicates that this expense was for "Castro."  Notably, Castro is not an attorney.

352.  On the attached Schedule C to Government Exhibit 206, for Betsy Sola's realtor business, Sola would testify that he did not recognize why $598 was listed for "repairs and maintenance" expenses.  Sola would testify that he did not provide any documentation or information to Castro or his employees to justify this deduction and they did not have these expenses for the realtor business.  Castro's software indicates that this amount ($598) consists of $200 for "oil changes" and $398 for "plumbing."  Sola kept a spreadsheet of all expenses for the real estate business, which she provided to Castro & Co., and which has been marked as Government Exhibit 214, and these expenses are not listed there.

353.  On the attached Schedule C to Government Exhibit 206, for Betsy Sola's realtor business, Sola would testify that he did not recognize why $2,916 was listed for

"taxes and licenses."  Sola would testify that he did not provide any documentation or information to Castro or his employees to justify this deduction and they did not have these expenses for the realtor business.  Sola believes this might be a figure that relates to his total real estate taxes.  Sola would testify that his wife only worked out of a small portion of their residence. Sola kept a spreadsheet of all expenses for the real estate business, which she provided to Castro & Co., and which has been marked as Government Exhibit 214, and these expenses are not listed there.

354.    On the attached Schedule C to Government Exhibit 206, for Betsy Sola's realtor business, Sola would testify that he did not recognize why $858 was listed for "utilities."  Sola would testify that he did not provide any documentation or information to Castro or his employees to justify this deduction and they did not have these expenses for the realtor business.  Sola would testify that his wife only worked out of a small portion of their residence. Sola kept a spreadsheet of all expenses for the real estate business, which she provided to Castro & Co., and which has been marked as Government Exhibit 214. These expenses are not listed there.

355.    On the attached Schedule C to Government Exhibit 206, for Betsy Sola's realtor business, Sola would testify that he did not recognize why $918 was listed for "other" expenses.  This amount ($918) was related to "mortgage insurance premiums." Sola would testify that he did not provide any documentation or information to Castro or his employees to justify this deduction and they did not have these expenses for the realtor business.  Castro's software states that this amount ($918) consists of $468 "phone usage

half," and $390 for "internet usage half." Sola kept a spreadsheet of all expenses for the real estate business, which she provided to Castro & Co., and which has been marked as Government 214. These expenses are not listed there.

356.     Sola did not review or sign the 2019 Form 1040 before it was filed with the IRS.  Instead, via email, Castro indicated to him the amount of the refund that he would receive and asked whether he wanted to proceed with filing the return.  Sola stated that he did want to proceed, and he received a refund of $6,867.  Sola indicated that Castro must have received the remaining $4,500 portion of the refund identified on Form 8888 as he did not recognize the account ending in 6632.

357.     Sola would testify that the tax refund amount that the IRS issued to him (through and to Castro) for his 2019 taxes is incorrect. Sola would testify that the refund amount was based on false items that Castro inserted in the tax returns, which the Solas did not provide to Castro.

358.     According to data contained on Castro tax software, produced by the defense, Castro accessed and worked on the tax return on March 4, 2020, and personally filed the Sola 2019 tax return with the IRS.  (*See* Government Exhibit 25.)

359.     The Solas referred their parents, Randolph and Robin Ragsdale to Castro.

### viii. *Victims Joseph and Kayla Zilinski (Counts 18-20)*

360.    Joseph Zilinski (hereinafter "Zilinski") and Kayla Zilinski are a married couple who lived in Orlando, Florida, and now lives in Davenport, Florida.

361.    Zilinski has a high school diploma, served in the United States Army for approximately four years, and has technical experience as a motorcycle mechanic.

 

362.    Zilinski currently works for an entity called Madison Logic, and previously worked for ADP Business Services as a benefits and talent HR solution specialist.   Prior to working at ADP, Zilinski worked at STIHL, a chainsaw manufacturer.   Zilinski has no background in accounting or tax.

363.    Kayla Zilinski currently works for One Password in tech services. Kayla Zilinski stated she has a general associate's degree and has no background in accounting or tax.   Prior to working for One Password, Kayla Zilinski worked for Campus Crusade for Christ.   Kayla Zilinski was involved with a multi-level marketing company for essential oils but was not heavily involved and did not make any money from it.

364.    Zilinski was referred to Castro by Christian and Ciara Karavangelos.   Zilinski confirmed he had visited Castro's website.   Zilinski had read the Google reviews on Castro & Co. and did not see anything suspicious.   Zilinski initially called Castro and set up a phone interview in 2018.

365.     Zilinski explained the tax preparation process as follows: Zilinski recalled it was a different person who conducted the phone interview every year. According to Zilinski, the questions during the phone interview were more detailed compared to other tax preparation services. Zilinski started the process with a phone interview, followed by uploading his documents to the "vault."

366.     Typical documents Zilinski uploaded to the "vault" were his mortgage statements, 1095C for health insurance, student loans and retirement contributions. Zilinski recalled the tax returns were kept in the "vault" and no one from Castro & Co. ever reviewed his returns with him.  He asked for a review of his tax returns because there were so many questions that were asked of him for business-related expenses, however, no one ever got back to him.

367.     After the phone interview, Zilinski received an email proposal.  Zilinski believed that Castro's fees were based on a percentage of the tax refund. Once Zilinski accepted the proposal, his tax return would get filed with the IRS.  The IRS would then send the refund to Castro and Castro would send the refund back to Zilinski. Zilinski recalled it was the same with his stimulus checks.

368.     When Zilinski found out the fees were about 80% of the tax refund, he started to question Castro.  Zilinski recalled asking what he could do differently on his W-4 so that he would not owe too much at the end of the year; he would rather pay up front.

369.     Zilinski stated that as the years passed there was fewer verbal communications, and they would only communicate through email. Zilinski initially

communicated with Castro over the phone but had also communicated with Castro through email.

370.    Zilinski has never met anyone from Castro's firm in person nor had he gone to any of their office locations.

### a.    Zilinski 2017 Taxes (Count 18)

371.    Zilinski has reviewed a 2017 Form 1040 that was filed on his (and his wife's) behalf by Castro. It has been shown to him and is identified here as Government Exhibit 224. It correctly states his and his wife's names and social security numbers. The listed home address on the tax return is not their address and it appeared to him to be Castro's address. Zilinski would testify that the use of this address caused him stimulus checks to be mailed to Castro.

372.    On the attached Schedule A to Government Exhibit 224, the "unreimbursed employee expenses" is listed as $9,219. Based on worksheets attached in Government Exhibit 224, this amount ($9,219) consists of $550 related to "uniforms and protective clothing," $2,820 for "work tools," and $4,498 from Form 2106 and $1,351 from another Form 2106 (related to vehicle expenses). Zilinski stated that these expenses were false, and he did not provide any documentation to Castro or his employees regarding these expenses. Zilinski stated that both he and his wife worked in "office" jobs and did not have any uniforms or work tools. Zilinski recalls that the Castro & Co. employee asked if they had to purchase any clothes for work and Zilinski responded that they had to purchase office-appropriate attire but did not suggest it was a uniform.

373. Similarly, with respect to Form 2106, Zilinski did not provide Castro or his employees with any documentary evidence related to the identified vehicle expenses. Zilinski would testify that neither he nor his wife had any unreimbursed vehicle expenses.

374. On the attached Schedule A to Government Exhibit 224, "other expenses" lists an amount of $17,750. Based on worksheets attached to Government Exhibit 224, this amount ($17,750) consists of $350 related to "workplace goodwill development" and $17,400 for "depreciation." Zilinski did not provide Castro or his employees with any documentary evidence related to depreciation or workplace goodwill development. Zilinski would testify that he did not have a depreciation of this amount and did not purchase anything of that size related to his or him wife's work. Zilinski stated that he had purchased a new car for that amount but only used the car for regular commuting to work and personal activities.

375. On the attached Schedule A to Government Exhibit 224, "other miscellaneous deductions" lists an amount of $1,518. Based on worksheets attached to Government Exhibit 224, this amount ($1,518) was for "impairment-related work expenses." Zilinski did not provide Castro or his employees with any documentary evidence related to these claimed expenses. Zilinski would testify that neither he nor Zilinski's wife were impaired in 2017 and did not tell Castro or his employees that either one of them was impaired.

376. Zilinski did not review or sign the 2017 Form 1040 before it was filed with the IRS. Instead, via email, Castro indicated to him the amount of the refund that he would

receive and asked whether he wanted to proceed with filing the return. Zilinski stated that he did want to proceed, and he received a refund of $362. Zilinski indicated that Castro must have received the remaining $1,499 portion of the refund identified on Form 8888 as he did not recognize the account ending in 8072.

377. Zilinski would testify that the tax refund amount that the IRS issued to him (through and to Castro) for his 2017 taxes is incorrect and was based on false items that Castro inserted in the tax returns and that they did not provide to Castro.

378. According to data contained on Castro tax software, produced by the defense, Castro accessed and worked on the tax return on March 18, 2018, and March 19, 2018, and personally filed the Zilinski 2017 tax return with the IRS. (*See* Government Exhibit 25.)

### b.     Zilinski 2018 Taxes (Count 19)

379. Zilinski has reviewed a 2018 Form 1040 that was filed on his (and his wife's) behalf by Castro. It has been shown to him and is identified here as Government Exhibit 225. It correctly states his and his wife's names and social security numbers. The listed home address on the tax return is not their address and it appeared to him to be Castro's address.

380. On the attached Form 2106 to Government Exhibit 225, which was to be used to identify Employee Business Expenses, Castro listed $13,302 as the total employee business expenses. This amount consisted of $1,218 for oil, gas, repairs for a Honda Civic; $1,416 for home internet, $1,668 for phone usage, and $9,000 for depreciation for the Honda Civic. But that deduction was limited to a certain set of individuals: Armed Forces

reservists, qualified performing artists, fee-basis state or local government officials, and employees with impairment-related work expenses. Zilinski would testify that neither he nor his wife were an Armed Forces reservist, qualified performing artist, fee-basis state or local government official, or an employee with impairment-related work expenses and never told Castro or his employees that they were. Moreover, Zilinski would testify that neither he nor his wife had the employee expenses that comprised that amount ($13,302).

381.    In another Form 2106, Castro listed $15,292 as the total employee business expenses. This amount consisted of $2,692 for vehicle expenses for Nissan Rogue and $12,600 for depreciation. Like above, this dedication was limited to a certain set of individuals: Armed Forces reservists, qualified performing artists, fee-basis state or local government officials, and employees with impairment-related work expenses. Zilinski would testify that neither he nor his wife were an Armed Forces reservist, qualified performing artist, fee-basis state or local government official, or an employee with impairment-related work expenses and never told Castro or his employees that they were. Moreover, Zilinski would testify that neither he nor his wife had the employee expenses that comprised that amount ($15,292).

382.    Zilinski did not review or sign the 2018 Form 1040 before it was filed with the IRS. Instead, via email, Castro indicated to him the amount of the refund that he would receive and asked whether he wanted to proceed with filing the return. Zilinski stated that he did want to proceed, and he received a refund of $637. Zilinski indicated that Castro

must have received the remaining $2,000 portion of the refund identified on Form 8888 as he did not recognize the account ending in 8072.

383.    Zilinski would testify that the tax refund amount that the IRS issued to him (through and to Castro) for his 2018 taxes is incorrect and was based on false items that Castro inserted in the tax returns and that they did not provide to Castro.

384.    According to data contained on Castro tax software, produced by the defense, Castro accessed and worked on the tax return on March 21, 2019, and March 26, 2019, and personally filed the Zilinski 2018 tax return with the IRS.  (*See* Government Exhibit 25.)

### c.    Zilinski 2019 Taxes (Count 20)

385.    Zilinski has reviewed a 2019 Form 1040 that was filed on his (and his wife's) behalf by Castro.  It has been shown to him and is identified here as Government Exhibit 226.  It correctly states his and his wife's names and social security numbers.  The listed home address on the tax return is not their address and it appeared to him to be Castro's address.

386.    On the attached Form 2106 to Government Exhibit 226, which was to be used to identify Employee Business Expenses, Castro listed $15,538 as the total employee business expenses.  This amount consisted of $1,746 for oil, gas, repairs for a Honda Fit; $852 for phone usage, $1,140 for home internet for work, $1,800 for tolls, and $10,000 for depreciation for a Honda Fit.  This deduction was limited to a certain set of individuals: Armed Forces reservists, qualified performing artists, fee-basis state or local government officials, and employees with impairment-related work expenses.  Zilinski would testify

that neither he nor his wife were an Armed Forces reservist, qualified performing artist, fee-basis state or local government official, or an employee with impairment-related work expenses and never told Castro or his employees that they were. Moreover, Zilinski would testify that neither he nor his wife had the employee expenses that comprised that amount ($15,538).

387.    In another Form 2106, Castro listed $15,653 as the total employee business expenses.  This amount consisted of $1,001 for gas, oil, repairs, $1,200 for MacBook Air, $852 for phone usage, and $12,600 for depreciation related to a Nissan Rogue.  This deduction was limited to a certain set of individuals: Armed Forces reservists, qualified performing artists, fee-basis state or local government officials, and employees with impairment-related work expenses.  Zilinski would testify that neither he nor his wife were an Armed Forces reservist, qualified performing artist, fee-basis state or local government official, or an employee with impairment-related work expenses and never told Castro or his employees that they were. Moreover, Zilinski would testify that neither he nor his wife had the employee expenses that comprised that amount ($15,653).

388.    Zilinski did not review or sign the 2019 Form 1040 before it was filed with the IRS.  Zilinski received a refund of $1,087.  Zilinski indicated that Castro must have received the remaining $2,000 portion of the refund identified on Form 8888 as he did not recognize the account ending in 8072.  Zilinski did not sign the 2018 Form 1040. Zilinski would testify that in 2019, Castro & Co. automatically filed his return without even obtaining his consent.    Zilinski only found out his return was filed when he suddenly

received his tax refund but had not given any prior consent. Zilinski called Castro to ask why his tax return was filed without his consent; Castro told him his tax return was filed by accident.

389.    Zilinski would testify that the tax refund amount that the IRS issued to him (through and to Castro) for his 2018 taxes is incorrect and was based on false items that Castro inserted in the tax returns and that they did not provide to Castro.

390.    According to data contained on Castro tax software, produced by the defense, Castro accessed and worked on the tax return on March 10, 2020, and March 11, 2020, and personally filed the Zilinski 2019 tax return with the IRS.  (*See* Government Exhibit 25.)

391.    In 2021, Zilinski's 2017 tax return got audited. Castro reached out to Zilinski when the person that worked on his audit was let go.  Castro told Zilinski he would look over the answers provided during the phone interview.  Zilinski recalled someone named "Catherine" sent him a Power of Attorney form and asked if he could sign and return it so that they can work on his audit.

392.    Zilinski had asked Castro to do a phone interview to amend his 2018 tax return because of the audit.  After the phone interview, Zilinski received an amended 2019 tax return, which was the wrong tax return. Zilinski had to answer some additional questions before he finally received his 2018 amended tax return.

### ix.    *Victims Joseph and Kelley Meyer (Count 21)*

393.    John Meyer (hereinafter "Meyer") and Kelley Meyer are a married couple who lived and still lives in St. Cloud, Florida.

394.    Meyer graduated from the University of Wisconsin with a Bachelor of Science in Fisheries Biology and briefly worked with Fish and Wildlife in Alaska. Meyer does not have a background in either tax or accounting.  Meyer currently works as a missionary with Campus Crusade for Christ  (CRU) and has been involved in a film project about Jesus for approximately the past twenty years.

395.    Meyer found out about Castro through David and Melissa Cording in 2015. David Cording was a Pastor at Discovery Church.  Meyer believes David Cording knew Castro because Castro attended his church.

396.    Meyer never met Castro in person and only communicated with Castro via phone, text messages and email.  Meyer only used Castro for tax preparation and did not use Castro for anything else.

397.    Meyer previously used Turbo Tax to prepare his tax returns and felt he may have missed out on some "discounts."  Meyer recalled he visited Castro's website and filled out the new client form with his information.  After filling out the new client form, Meyer received an email from Castro requesting documents to prepare his tax return.

398.    Meyer provided Castro an introduction document with details explaining his itemized deductions, car registration renewal, and status as a missionary which is subject to self-employment tax.  Other documents Meyer provided to Castro for his taxes were W-

2s, saving account interest (1099-INT), 1099-DIV, 1095-C, 1099-MISC, 1099-R, 1098 mortgage statements, his minister's housing allowance, and a list of charitable organizations and how much he donated to each.

399.    After uploading his documents, a member of Castro & Co. called to ask him questions.  Meyer recalled some of the questions were as follows: How many miles did you drive to and from work? How much did you spend on clothing, car maintenance, baby sitting, or other related expenses.  Meyer recalled he may have asked why they were asking these questions, but he never got an answer. The phone interviews were about 30 minutes long and it was always from someone with a Washington, DC area code.

400.    When Meyer asked how Castro always got higher refunds, he was told other firms are standardized and Castro was more personal, and that larger firms, like H&R block utilized uneducated individuals to complete taxes.  Meyer recalled the phone interviews were conducted with a different person every year.  Meyer never met Castro in person.

401.    After the phone interview, Meyer received an email from Castro. The email had his tax return refund amount along with a comparison of the amount he would receive filing with another company.  Meyer had the option to either agree or to check with another company, which was encouraged by Castro.  Meyer assumed Castro knew what he was doing so he always agreed.  After Meyer replied to this email giving Castro approval, he received an email that stated the IRS had accepted his return.  Meyer recalled he also got a copy of the final tax return after it was filed with the IRS.  The final tax return was initially provided as a password protected file via email and later provided through SmartVault.

402.    Meyer does not recall anyone from Castro & Co. having ever explained his tax returns to him.

403.    Meyer attempted to find out how Castro was paid.  Meyer communicated with Castro & Co. employees to ask about this issue and was told that Castro is paid by taking 40% of the difference between the refund Castro would obtain for the client vs. what the client would get at another firm.

### a.    Meyer 2017 Taxes (Count 21)

404.    Meyer has reviewed a 2017 Form 1040 that was filed on his behalf by Castro. It has been shown to him and is identified here as Government Exhibit 246.  It correctly states his name, wife's name, dependents, and social security number.  He was married with two children, who would qualify as dependents.  The listed home address on the tax return is not his address and it appeared to him to be Castro's address.

405.    On the attached Schedule A to Government Exhibit 246, the "unreimbursed employee expenses" is listed as $3,771.  Based on worksheets attached in Government Exhibit 246, this amount was from two different Form 2106s, related to vehicle expenses: $3,205 for a Nissan Murano and $566 for a Chevy Suburban.  During interviews with Castro & Co. employees, Meyer was asked about his mileage to work and back, the costs of car maintenance and repairs, and the costs of car registration each year.  Meyer kept detailed and meticulous records of this and would provide the employees with that information during his interview over the phone.  But Meyer would testify that he did not

have the unreimbursed employee expenses related to vehicles that comprised that amount of $3,771.

406.    On the attached Schedule A to Government Exhibit 246, the "other expenses" is listed as $7,516.  Based on worksheets attached in Government Exhibit 245, this amount was comprised of $120 in "workplace goodwill development," $1,156 for "deductible investment interest," and $6,240 for "depreciation."  Meyer would testify that Meyer did not recognize, nor did he know what the "workplace goodwill development" expense was for.  Meyer verified the "deductible investment interest" was probably correct.  Meyer did not recognize the amount for "depreciation," nor did he recall telling Castro about this amount.

407.    Meyer did not review or sign the 2017 Form 1040 before it was filed with the IRS.  Instead, via email, Castro indicated to him the amount of the refund that he would receive and asked whether he wanted to proceed with filing the return.  Meyer agreed and he received a refund of $12,770 and he assumes Castro received the remaining $6,499 as Meyer did not recognize the account ending in 8031 as listed on Form 8888.

408.    Meyer would testify that the tax refund amount that the IRS issued to him (through and to Castro) for his 2017 taxes is incorrect and was based on false items that Castro inserted in the tax returns and that they did not provide to Castro.

409.    According to data contained on Castro tax software, produced by the defense, Castro accessed and worked on the tax return on March 17, 2018, and March 24, 2018, and personally filed the Meyer 2017 tax return with the IRS.  (*See* Government Exhibit 25.)

410.    When Meyer's financial advisor had some questions about his 2017 tax return and wanted additional information on how much he paid in self-employment taxes, Meyer noticed his self-employment taxes was blank on his 2017 tax return.  Meyer emailed Castro and Co. employee Garza and called Castro around January of 2019 to inquire why he did not pay any self-employment taxes for 2017.  Meyer received an email from Castro around January 24, 2019, and a call from Castro explaining why no self-employment taxes were paid.  The email explained that the firm had changed their stance on missionary and self-employment taxes.

411.    After the call, Meyer received text messages from Castro with a link to a blog post explaining the exemption for self-employment taxes for missionaries.

412.    After having his 2017 taxes prepared by Castro, Meyer's conscience was bothered.  He proceeded to contact Tax 911 to have his 2017 tax return corrected.  After having his 2017 tax return amended, Meyer ended up paying back additional taxes to the IRS.

413.    Around February 2019, Castro was looking to pursue other CRU missionaries.  Meyer recalled CRU's attorneys emailing Castro telling him that he was wrong regarding the self-employment taxes for missionaries.  Castro replied angrily to CRU's attorneys and cc'd Meyer and his co-worker, Ryan, on the email.  Castro asked Meyer if he could use him as a reference, but Meyer demurred politely.

### x. *Victim Crystal Wells (Counts 22-24)*

414.   Crystal Ann Wells (hereinafter "Wells") is an individual who lives in Orlando, Florida.  Wells is not married.

415.   Wells does not have a college degree but did take some college courses related to nursing.  Wells became a patient care technician.  She  initially worked for Winnie Palmer Hospital for Women and Babies in Orlando, Florida, between 2012 and 2018 (identified as "Orlando Health" on her W-2's) and currently works for the Newmours Children's Health, another hospital in Orlando, Florida.  Wells has no background in tax or accounting.

416.   Wells' wages between 2017 and 2019 were between approximately $19,000 and $37,000.

417.   Wells became aware of Castro through her daughter, who she understood learned about Castro through friends at their church, Discovery Church.

418.   Wells visited the Castro & Co. website and learned about the services Castro offered.  Wells completed a three-page worksheet and scanned in and submitted her W-2 statements and submitted these documents to Castro & Co.  Shortly thereafter, she received an email setting up a phone interview with a Castro & Co. employee.  The phone interview took place and Wells was asked questions about items such as uniforms, car expenses, and her children.

419.   Wells never met Castro or anyone from his firm in person.

420. Following her interview, she received an email notifying her of the amount of her tax refund and was asked whether she would like to proceed to have her taxes filed. She did not receive a copy of the actual taxes or review them before they were submitted. Wells agreed to have Castro submit her taxes based on the calculated refund. Wells did not receive a copy of her filed taxes after they were filed.

421. Wells stopped using Castro for her taxes when she found out her daughter's mother-in-law was interviewed by law enforcement agents regarding Castro.

### a. Wells 2017 Taxes (Count 22)

422. Wells has reviewed a 2017 Form 1040 that was filed on her behalf by Castro. It has been shown to her and is identified here as Government Exhibit 256. It correctly states her name, social security number, and wages ($24,275), as well as alimony amounts ($15,000). The listed home address on the tax return is not her address and it appeared to her to be Castro's address.

423. On the attached Schedule A to Government Exhibit 256, the "unreimbursed employee expenses" is listed as $6,210. Based on worksheets attached in Government Exhibit 256, this amount ($6,210) consists of $500 related to "uniforms and protective clothing," $2,360 for "work tools," and $3,350 from Form 2106 (related to vehicle expenses). Wells would testify that, other than a small amount (approximately $200) for uniforms (hospital scrubs) she did not have any unreimbursed employee expenses and did not tell Castro or his employees that she had these expenses. Wells could not identify any "work tools" that she would have purchased in 2017 and would testify that if she needed

128

work tools, her employer (the hospital) would have purchased them or reimbursed her. Wells did not provide Castro or his employees with any documentary evidence related to the identified "work tools" expenses. Similarly, with respect to Form 2106, Wells did not provide Castro or his employees with any documentary evidence related to the identified vehicle expenses. Wells would testify that her employer would reimburse her for any miles she had to drive for work, beyond regular commuting miles. But she could not recall any such travel.

424. On the attached Schedule A to Government Exhibit 256, "other expenses" lists an amount of $15,150. Based on worksheets attached to Government Exhibit 256, this amount ($15,150) consists of $150 related to "workplace development" and $15,000 for "Chevy Malibu expenses election." Wells did not provide Castro or his employees with any documentary evidence related to these claimed expenses. Wells would testify that she did not have these expenses and that she bought her Chevy Malibu in 2010.

425. On the attached Schedule A to Government Exhibit 256, "other miscellaneous deductions" lists an amount of $4,820. Based on worksheets attached to Government Exhibit 256, this amount ($4,820) was for "impairment-related work expenses." Wells did not provide Castro or his employees with any documentary evidence related to these claimed expenses. Wells would testify that she was not impaired in 2017 and did not tell Castro or his employees that she was impaired.

426. Wells did not review and did not sign the 2017 Form 1040 before it was filed with the IRS. Instead, via email, Castro indicated to her the amount of the refund that she

would receive) and asked whether she wanted to proceed with filing the return. Wells stated that she did want to proceed, and she received a refund of $529. Wells indicated that Castro must have received the remaining $1,499 portion of the refund identified on Form 8888 as she did not recognize the account ending in 3116.

427. Wells would testify that the tax refund amount that the IRS issued to her (through and to Castro) for her 2017 taxes is incorrect and was based on false items that Castro inserted in the tax returns and that they did not provide to Castro.

428. According to data contained on Castro tax software, produced by the defense, Castro accessed and worked on the tax return on March 31, 2018, and April 6, 2018, and personally filed the Wells 2017 tax return with the IRS. (*See* Government Exhibit 25.)

### b. Wells 2018 Taxes (Count 23)

429. Wells has reviewed a 2018 Form 1040 that was filed on her behalf by Castro. It has been shown to her and is identified here as Government Exhibit 257. It correctly states her name, social security number, wages ($19,547), and alimony amount ($15,600). The listed home address on the tax return is not her address and it appeared to her to be Castro's address.

430. On the attached Form 2106 to Government Exhibit 257, "employee business expenses" are identified as $10,739. This amount consisted of $2,289 for vehicle expenses - oil, gas, repairs; $5,000 for depreciation, $350 for tolls, $200 for goodwill development, $1,680 for phone usage, $100 license expenses, $720 for home internet, $300 for work uniforms, and $100 for work shoes. As stated on the form, in 2018, these "certain business

expenses" could only be deducted by reservists, performing artists, and fee-basis government officials. Wells would testify that, in 2018, she was not a reservist, performing artist, or fee-basis government official. Wells would also testify that she was not impaired in 2018. Wells did not provide Castro or his employees with any information or documentation suggesting she qualified under these categories. In addition, Wells did not actually expend the funds indicated on the form for employee expenses.

431. Wells did not review the 2018 Form 1040 before it was filed with the IRS. Instead, via email, Castro indicated to her the amount of the refund that she would receive and asked whether she wanted to proceed with filing the return. Wells stated that she did want to proceed, and she received a refund of $19. Wells indicated that Castro must have received the remaining $500 portion of the refund identified on Form 8888 as she did not recognize the account ending in 3116. Wells did not sign the 2018 Form 1040.

432. Wells would testify that the tax refund amount that the IRS issued to her (through and to Castro) for her 2018 taxes is incorrect and was based on false items that Castro inserted in the tax returns and that they did not provide to Castro.

433. According to data contained on Castro tax software, produced by the defense, Castro accessed and worked on the tax return on March 29, 2019, and March 30, 2019, and personally filed the Wells 2018 tax return with the IRS. (*See* Government Exhibit 25.)

### c.    Wells 2019 Taxes (Count 24)

434. Wells has reviewed a 2019 Form 1040 that was filed on her behalf by Castro. It has been shown to her and is identified here as Government Exhibit 258. It correctly

states her name, social security number, and wages ($37,425). The listed home address on the tax return is not her address and it appeared to her to be Castro's address.

435. On the attached Form 2106 to Government Exhibit 258, "employee business expenses" are identified as $9,382. This amount consists of $6,622 for vehicle expenses - oil, gas, repairs for a Chevy Malibu; $800 for tolls, $1,560 for phone usage, and $400 for work uniforms. But as stated on the form, these "certain business expenses" could only be deducted by reservists, performing artists, and fee-basis government officials. Wells would testify that, in 2019, she was not a reservist, performing artist, or fee-basis government official. Wells would also testify that she was not impaired in 2019. Wells did not provide Castro or his employees with any information or documentation suggesting she qualified under these categories. In addition, Wells did not actually expend the funds indicated on the form for business expenses.

436. On the attached Schedule A to Government Exhibit 258, "other miscellaneous deductions" lists an amount of $7,203. Based on worksheets attached to Government Exhibit 258, this amount ($7,203) was for "impairment-related work expenses." Wells did not provide Castro or his employees with any documentary evidence related to these claimed expenses. Wells would testify that she was not impaired in 2019 and did not tell Castro or his employees that she was impaired.

437. Wells did not review or sign the 2019 Form 1040 before it was filed with the IRS. Instead, via email, Castro indicated to her the amount of the refund that she would receive and asked whether she wanted to proceed with filing the return. Wells stated that

she did want to proceed, and she received a refund of $1,213. Wells indicated that Castro must have received the remaining $1,000 portion of the refund identified on Form 8888 as she did not recognize the account ending in 3116.

438. Wells would testify that the tax refund amount that the IRS issued to her (through and to Castro) for her 2019 taxes is incorrect and was based on false items that Castro inserted in the tax returns, and that they did not provide to Castro.

439. According to data contained on Castro tax software, produced by the defense, Castro accessed and worked on the tax return on April 22, 2020, and personally filed the Wells 2019 tax return with the IRS. (*See* Government Exhibit 25.)

440. Wells would testify that her taxes were pretty straight-forward and that her stimulus checks went to Castro's offices.

### xi.  *Victims Brian and Kimberly Quigley (Count 25)*

441. Brian R. Quigley and Kimberly R. Quigley were and are a married couple who live in Orlando, Florida.

442. Brian Quigley graduated with an associate's degree in computer science from a community college in Ocala, Florida. Kimberly Quigley graduated from the University of Central Florida with a degree in Early Childhood Education. Neither have a background in accounting or tax.



443. During the relevant time period, Brian Quigley worked for Discovery Church in Orlando, Florida and worked there in an

information technology function. Discovery Church was the Quigley's only source of income.

444. Brian and Kimberly Quigley met the defendant, John Castro, around 2013 at a bible study group at the Alafaya campus of Discovery Church. Castro told the group at bible study that he was a tax attorney and went to school for and was knowledgeable in tax laws and was starting a business.

445. When Castro mentioned that he was starting his own tax preparation company, Kimberly Quigley started to use his services, around 2013 or 2014, to support Castro. Prior to using Castro, the Quigleys self-prepared their own tax returns.

446. The initial tax preparation process began with Castro asking the Quigleys questions over the phone. After the phone call with Castro, Quigley received an email from Castro with the refund amount asking if she wanted the return to be filed. Depending on whether she answered yes or no, Castro would file the return for her.

447. After the first year, Castro's associates began conducting the phone interviews instead of Castro. During one of the phone interviews with one of Castro's associates, Kimberly Quigley had asked if Castro reviewed their tax return, and she was told that Castro always reviews and sign their tax returns. Kimberly Quigley and Brian Quigley always did the phone interview together.

448. The Quigleys did not meet with Castro or his associates in person in preparing or finalizing tax returns.

449. One of the Quigleys' concerns with Castro was that Castro never gave them copies of her tax returns until Brian Quigley made specific requests for such copies.

450. The Quigleys stopped using Castro because Castro's fees were becoming exorbitant and because Brian Quigley's mother had a bad experience with Castro where she felt Castro had failed to assist her when she was audited by the IRS for something Castro had advised her to do.

### a. Quigley 2017 Taxes (Count 25)

451. The Quigleys have reviewed a 2017 Form 1040 that was filed on their behalf by Castro. It has been shown to them and is identified here as Government Exhibit 265. It correctly states their names, dependents, social security numbers, and income. The listed home address on the tax return is not their address and it appeared to them to be Castro's address.

452. On the attached Schedule A to Government Exhibit 265, the "unreimbursed employee expenses" is listed as $1,847. Based on worksheets attached in Government Exhibit 265, this amount ($1,847) consists of $120 for Office Supplies, $600 for Projector for Classroom), and $1,127 for Form 2106. The Quigleys do not understand why these amounts were included and did not provide those figures to Castro or his associates. More specifically, Brian Quigley could not identify any "work tools" that he would have purchased in 2017 and would testify that if he needed work tools, his employer (Discovery Church) would have purchased them or reimbursed him. The Quigleys did not provide Castro or his associates with any documentary evidence related to the identified "work

tools" expenses. Similarly, with respect to Form 2106, the Quigleys did not provide Castro or his associates with any documentary evidence related to the identified vehicle expenses. The Quigleys did not use Brian Quigley's vehicle 70% of the time for business purposes. Instead, they used it approximately 20% of the time for business purposes. Further, Brian Quigley would testify that he was provided a credit card by his employer where he could charge expenses related to work. Brian Quigley would testify that his employer would reimburse him for any miles he had to drive for work, beyond regular commuting miles.

453. On the attached Schedule A to Government Exhibit 265, "other expenses" lists an amount of $6,843. Based on worksheets attached to Government Exhibit 265, this amount ($6,843) consists of $104 related to "workplace development," $2,400 for "home expenses," $1,020 in "deductible interest," and $2,419 in "depreciation." The Quigleys did not provide Castro or his associates with any documentary evidence related to these expenses. More specifically, the Quigleys could not identify any asset that they purchased that would have been depreciated and did not identify any such assets to Castro or his associates. The Quigleys did not provide any records related to expenses for depreciation to Castro or his associates. The Quigleys did not tell Castro or his associates that they had "home office" expenses or that they even had home office. The Quigleys would testify that they did not work from home. The Quigleys did not provide any records related to expenses for a home office to Castro or his associates. The Quigleys were unclear what the $104 in "workplace goodwill development" represented but noted that Brian Quigley's employer provided him a work credit card that he could use for any types of work expenses

such as taking out a business associate for a business lunch. The Quigleys did not provide any records related to expenses for workplace goodwill development to Castro or his associates.

454. The Quigleys did not review and did not sign the 2017 Form 1040 before it was filed with the IRS. Instead, via email, Castro indicated to them the amount of the refund that they would receive (estimated to be $3,480) and asked whether they wanted to proceed with filing the return. The Quigleys stated that they did want to proceed, and they received a refund of $3,430. The Quigleys indicated that Castro must have received the remaining $749 portion of the refund identified on Form 8888 as they did not recognize the account ending on 5985.

455. The Quigleys would testify that the tax refund amount that the IRS issued to them (through and to Castro) for their 2017 taxes is incorrect and was based on false items that Castro inserted in the tax returns and that they did not provide to Castro.

456. According to data contained on Castro tax software, produced by the defense, Castro accessed and worked on the tax return (for 48 minutes) on February 7, 2018, and February 12, 2018, and personally filed the Quigleys 2017 tax return with the IRS. (*See* Government Exhibit 25.)

457. The Quigleys referred Javier and Betsy Sola to Castro.

458. The Quigleys referred Randolph and Robin Ragsdale to Castro.

xii. *Victims Michael and Mirjana Putica (Count 26)*

459. Michael Putica and Mirjana Putica were and are a married couple who live

in Ladera Ranch, California.  They have three children.

460.    Michael Putica has a bachelor's degree in commerce and a master's degree in finance.  He previously worked as the equivalent of a certified public accountant in Australia and has a background in accounting.  In or about 2018, the Puticas moved to the United States and Michael Putica worked in an executive level sales position with State Street Bank & Trust Company.

461.    In 2018, the Puticas utilized the accounting firm KPMG to prepare and file their taxes.  State Street Bank & Trust Company paid for this service as a company benefit in their first year of the Puticas' relocation to the United States.

462.    In 2019, Michael Putica sought out a new tax preparer and identified John Castro and his company, Castro & Co., through online searches.    In particular, Michael Putica was attracted to what appeared to be Castro's specialization with assisting Australian citizens working in the United States with their taxes.



463.    Michael Putica contacted Castro through Castro's website and was informed that he could receive a free quote regarding his taxes that was non-binding.  Michael Putica agreed because he saw no downside in obtaining a second opinion that was free of charge and non-binding.

464.    In or about October 2019, Michael Putica communicated with Castro & Co. employees Tiffany Hunt, Alphonso Garcia, and Alexander Dominguez Gomez.    The

Puticas never met Castro or any of his employees in person.

465. In or about March 2020, Castro & Co. employees performed a short interview of Michael Putica about the family's finances, and Michael Putica provided information in response, including certain documents through the Castro & Co. online portal. Michael Putica specifically recalls being asked what car he owned, which he thought was odd, as he had purchased the car himself, and it was not related to his business. Michael Putica specifically told Castro & Co. employees that his wife "doesn't use her car for work." Ultimately, after numerous emails, Michael Putica informed Castro & Co. employees that the original cost of his wife's vehicle was $38,000. As will be discussed later, Castro utilized this full amount for Schedule C depreciation purposes.

466. On April 14, 2020, Michael Putica received a tax proposal from Castro & Co. via email for the Puticas' 2019 taxes (that was dated April 11, 2020). The proposal stated that the taxes had been completed and the Puticas would receive a tax refund of $25,007. The proposal indicated that if the Puticas had used another firm, they would have owed $452 and would have received no refund. Castro specifically noted that "there is no obligation to continue with our firm unless and until you accept this proposal."

467. Upon a cursory review of the proposal, Michael Putica was concerned because of the high amount of fees being associated with the preparation ($7,980) and that he thought the refund amount ($32,987) was incorrect.

468. On the same day (April 14, 2022), Michael Putica responded to Castro by stating "[t]hanks for the details – I will review and come back with any questions." The

Puticas did not authorize the filing of the taxes. Instead, the Puticas sought a second opinion from another tax preparer.

469. On June 26, 2022, Michael Putica realized something was wrong when he received a check from Castro & Co. related to his 2019 tax refund. Notably, the Puticas received approximately $8,000 of the approximately $33,000 federal refund, with the remaining $25,000 going to Castro. Michael Putica immediately emailed Castro and asked Castro to contact him.

470. Castro called Michael Putica on or about July 1, 2020, and stated that his employees had confused another client with a similar name (apparently "Angela Putica") and confused it Mirjana Putica, authorizing the filing and submitted the return in error. Michael Putica doubted this excuse as his review of the tax return that had been filed showed that the return had been filed on or about April 14, 2020, the day after Castro had sent Putica his tax proposal and because the Putica name was uncommon.

471. Michael Putica immediately reviewed the tax filing and noticed several suspicious items. For example, Micheal Putica did not understand why there were deductions related to both of the Putica vehicles. Michael Putica communicated with Castro on July 3, 2020, and questioned him about these deductions and Castro explained that such deductions were allowed in the United States.

472. Michael Putica sought a second opinion on the taxes that Castro had filed on behalf of the Puticas. That consultation confirmed to Michael Putica that several of the positions taken by Castro were inconsistent with U.S. tax law.

473. Concerned about his own liability, Michael Putica contacted Castro and asked what could be done since the Puticas did not agree with what Castro had done. Castro advised Michael Putica that Castro could reverse the return in the IRS system. Castro again sought a second opinion on this advice and was told that Castro's advice on this issue was incorrect and that a tax filing could not simply be "reversed."

474. On July 4, 2020, Michael Putica contacted Castro and stated that "I have completed a review of my taxes your firm completed . . . and I do not want my taxes filed by your firm. I do not accept your proposal and do not want to have my taxes filed with you this year. Please confirm you will cancel the submission for my 2019 taxes which you submitted without my concern and please confirm they can be removed from the IRS and CA. I would like this immediately actioned. For avoidance of doubt, please cease any further work on my returns. Please delete all my tax and income related details that you may have on file that I have provided to you, including on the client portal."

475. Later that same day (on July 4, 2020), Castro responded that he "could electronically submit an amended return removing all of our work product."

476. On July 5, 2020, Castro communicated to the Puticas that the amended filing would result in the Puticas owing the IRS $31,374.

477. On July 6, 2020, Michael Putica responded asking for an explanation of Castro's calculations.

478. Castro responded on July 29, 2020, noting that "there are some legal positions we include without taking them into account for fee-calculation purposes. Those

would need to be removed."

479.    In July 2020, the Puticas submitted a "Tax Return Preparer Fraud or Misconduct Affidavit," known as Form 14157-A to the IRS, describing what had occurred with respect to Castro and their taxes, as discussed above.

480.    Using a different tax preparer, the Puticas filed amended 2019 taxes on July 8, 2020, resulting in a lower refund amount of $10,056.

481.    In December 2020, Castro emailed Michael Putica and informed him, among other things, that Castro's software had a "glitch that resulted in an improper $5,800 mileage deduction."

### a.    Puticas 2019 Taxes (Count 26)

482.    The Puticas have reviewed a 2019 Form 1040 that was filed on their behalf (without their permission) by Castro.  It has been shown to them and is identified here as Government Exhibit 282.   It correctly states their names, dependents, social security numbers, and income.  The listed home address on the tax return – 121 South Orange 15th, Orlando, Florida – is not the Puticas' address and they have never been to Florida.

483.    The email address listed on the return – mdputica@gmailer.com – is not an email address controlled by either of the Puticas or known to them.  The phone number listed on the return – 202-792-6600 – is not a phone number that the Puticas recognize or is connected to them.

484.    Michael Putica has never owned or operated a business.  Mirjana Putica was homemaker but taught piano lessons at her home on the side.

485.   The Puticas have reviewed the Schedule C attached to the tax return. Although it is correct that Mirjana Putica was a piano tutor and made $6,840 in income in 2019 as a piano tutor, they would each testify that she did not have $6,340 in "car and truck" expenses associated with piano tutoring.  Mirjana Putica only tutored from her home and did not travel as part of her piano tutoring.  Castro's software indicated that this amount ($6,340) consisted of $3,000 in "gas," $240 for "oil change," $900 for "tire cost," and $2,200 for "total car insurance." This insurance amount appeared to represent the full value of the insurance they purchased for that vehicle in 2019.

486.   The Puticas also observed $38,000 that was listed as "'depreciation" on her Schedule C and would testify that this would have not been correct as Mirjana Putica did not use her personal vehicle for any tutoring duties and that $38,000 would have represented the full value of her vehicle, a 2018 Mazda CX-9.

487.   The Puticas also observed $36,576 was listed in relation to Schedule C "employee benefit programs" expenses.  The Puticas stated they did not have such expenses.  They had no employees.  The Puticas would testify that that the amount ($36,576) appeared to represent the full value of mortgage payments, among other things, they made in 2019 for the entire home and do not understand why those would be deducted when Mirjana Putica only used a small portion of her home for piano tutoring.  Castro's software stated that this amount ($36,576) consisted of $913 in "Section 119 Loan Mandated Homeowner," $4,268 in "Section 119 Mortgage Principle," $2,800 for "Section 119 Lodging HOA," $500 for "Vision," $6,972 for "Medical Check Ups Routines," $4,536

for "Section 119 Utilities," $16,587 for "12 DD."

488. The Puticas also observed $905 was listed for Schedule C "office" expenses. Castro's software stated that this amount consisted of $600 for "Cell Phone," $250 for "Newspapers," $55 for "from Business Spreadsheet." The Puticas would testify that, other than $55 and a portion of her cell phone bill, these expenses were not correct business expenses for Mirjana Putica's Schedule C business.

489. The Puticas also observed $31,797 for Schedule C "supplies" expenses. This amount represented the full value of Mirjana Putica's piano. This should have been added as an asset and they full amount of depreciation was not permitted under tax law.

490. The Puticas also observed $13,682 for Schedule C "taxes and licenses" expenses. Michael Putica would testify that this number seems similar to the amount he paid in local real estate taxes for his entire residence. Michael Putica would testify that he never told Castro or any employee of Castro & Co. that he used his home for business purposes and that Mirjana Putica only utilized a small portion of the residence for piano tutoring.

491. The Puticas have reviewed the Schedule E attached to the tax return. The property referenced on the Schedule E is a property owned by the Puticas and that they dd have rental income as listed on the Schedule E. The Puticas would testify that they did not have $5,800 in Schedule E "auto and travel" expenses related to this property and instead that number ($5,800) represents the costs associated with the entire family traveling to Australia. This was not a proper deduction.

492. The Puticas observed that their tax return listed $47,160 in unreimbursed employee expenses as listed on Form 2106, which was attached to the 2019 tax return. The Puticas observed that the bulk of that figure emanated from a $46,200 entry that was related to Michael Putica's vehicle. Michael Putica primarily used the vehicle to travel to and from work. He may have had occasional business travel related to that vehicle but not 70% of the time.

493. The Puticas did not sign or authorize the 2019 Form 1040.

494. The Puticas would testify that the tax refund amount that the IRS issued to them (through and to Castro) for their 2019 taxes was incorrect and was based on false items that Castro inserted in the tax returns and that they did not provide to Castro.

495. According to data contained on Castro tax software, produced by the defense, Castro accessed and worked on the tax return on April 7, 2020, and personally filed the Putica 2019 tax return with the IRS. (*See* Government Exhibit 25.)

*xiii.* *Victims Michael and Angelita Natt (Count 27)*

496. Michael Natt (hereinafter "Natt") and Angelita Natt are a married couple who previously lived in Arlington, Texas and now live in Fort Worth, Texas.

497. Natt graduated from Sydney University in Australia with a Bachelor of Science in Mathematics and Math Statistics. Natt had no background or knowledge regarding United States taxation of foreign investment accounts. Natt worked for American Airlines and various spinoff entities. In May, 2002, Natt decided to return to Australia to take care of his mother who was going through a difficult time following the

death of Natt's father. Natt then lived and worked in Australia until 2009 during which time he was employed by two Australian companies.

498.	In 2012 Natt was also offered a position in the U.S. with Hewlett Packard for whom he worked until 2017 in an information technology role.

499.	Because of the issues related to his Australian superannuation accounts and the lack of clear direction as to how they should be handled under U.S. tax law, Natt did some further research in 2017 looking specifically for a U.S.-based attorney with experience handling US resident clients that had these accounts and thus could assist him. This search located Castro as a seemingly viable candidate. After conferring, Natt hired Castro to provide him with a "tax opinion letter" regarding the issue in exchange for $4,000. Natt would testify that his agreement with Castro included Castro's promise that he (Castro) would handle all Australian superannuation account tax matters on Natt's behalf including paying any tax liability if there were ever any issues with the IRS related to this issue.

500.	Castro filed the Natts 2017 tax return taxes without the Natt's permission. This is documented in emails between the Natts and Castro's office.  Natt did not become aware that Castro had filed the Natts' 2017 taxes until he received a refund check even though he had filed an extension and paid estimated taxes of $4,975; had never agreed for Castro to file the return either verbally or in writing; had never given Castro power of attorney; and had never received a copy of the return that Castro submitted prior to its processing by the IRS. He immediately reached out to Castro to find out why this had

occurred.

501.    When Natt reviewed the 2017 taxes prepared and filed by Castro, he observed multiple items under Itemized Deductions that were incorrect or "dubious." Natt prepared an extended memo that he sent to Castro, asking for clarification regarding these issues.   After a period of time, Castro responded to Natt but Natt did not find those answers persuasive or compelling.  He subsequently prepared a revised version of the memo which he sent to Castro and to which he assumed Castro would respond again. Natt wanted further discussion on these items and, if still uncomfortable, the complete removal of the Itemized Deductions in favor of taking the standard deduction in an amended return to be filed by Castro

502.    Castro never responded to Natt's second attempt for clarification of his concerns. Natt attempted, on multiple occasions, to receive answers from Castro via email and telephone calls all of which were ignored.  Castro ordered that Natt be "terminated" as a client in violation of the contractual letter of engagement and ordered his employees to "block" his email.  Natt would testify that he felt as though he was treated unprofessionally and unethically and felt as though he was treated like "dirt."  Natt ultimately filed the Amended 2017 taxes, without the aid of Castro or his employees.

503.    Natt never met with Castro in person.  When Castro and his employees refused to communicate with him, Natt and his wife traveled to Washington, D.C. in an attempt to confront Castro and get answers.  Upon arrival at the building in which Castro maintains his Washington office, the Natts were unable to meet with Castro because Castro

had instructed the building security officers to deny them access which they did in an unnecessary and excessively rude manner. Natt had carried with him a Breach of Contract letter which he planned to give to Castro if his issues could not be resolved and if he refused to fix the 2017 tax issue, he had created for the Natts. Natt requested the security officers to at least give a copy of this letter to Castro but this request was denied. Castro subsequently claimed that he had filed a complaint with the DC police against Natt for harassment. Natt contacted the DC police to verify this but received no answer. He never heard anything further on this.

504.    Even though he never authorized Castro to file taxes on his behalf, Natt did send Castro, under the understanding they were required for his annual tax review, copies of the documents required to prepare the Natt's 2017 return and discussed them in a teleconference with one of his employees. During that call, it was clear that Castro & Co wanted to prepare the return. Natt believes that in these interviews, the Castro employee was "fishing" for deductions and was suggesting items for which Natt knew he had no backup supporting documentation. Natt subsequently decided not to use Castro & Co services for tax return preparation.

505.    In fact, because Natt did not hire Castro to file his 2017 taxes and did not think Castro would do so without permission. Natt subsequently prepared and submitted an amended 2017 return himself given Castro had already taken $2,000 in payment from Natt's IRS account after receiving a refund from the unauthorized 2017 return filing and Natt did not want to incur the additional expense of hiring another accountant.

### a. Natt 2017 Taxes (Count 27)

506. Natt has reviewed the 2017 tax return that was filed on his behalf by Castro, and which has been marked as Government Exhibit 297. Natt verified that his name, his wife's name, social security numbers, and filing status were correct. Natt would testify that the address used on the taxes was not his and appeared to represent Castro's address.

507. On Schedule A, attached to the 2017 taxes filed by Castro on behalf of Natt, "unreimbursed employee expenses" was listed as totaling $6,251. This amount ($6,251) was comprised of $1,040 for "uniforms and protective clothing," $2,360 for "work tools" and $2,851 from Form 2106 (related to vehicle expenses). Natt stated that these expenses were apparently based on estimated numbers that had been partly discussed in the original tax interview for which Natt felt he could not provide acceptable documentation to substantiate to Castro, or his employees to support these claimed deductions although he provided best initial estimates that needed to be further researched for some items. Natt would testify that he felt very uncomfortable with including these deductions in the 2017 return due to the lack of accurate supporting documentation. Natt would also testify that after having been audited in 2012 he was extremely careful to ensure future returns would only include numbers for items for which he could provide such supporting documentation and could not be challenged. The Natts usually take the standard deduction.

508. On Schedule A, attached to the 2017 taxes filed by Castro on behalf of Natt, "other expenses" was listed as totaling $15,648. This amount ($15,648) was comprised of $1,248 for "workplace goodwill development" and $14,000 for depreciation. Natt stated

that these expenses were false, that he did not tell Castro or his employees that he had these expenses and did not provide documentation or information to Castro or his employees to support these claimed deductions.

509.    On Schedule A, attached to the 2017 taxes filed by Castro on behalf of Natt, "miscellaneous" deductions were listed as totaling $2,400 and related to "impairment-related work expenses."  Natt would testify that neither he nor his wife were impaired and did not tell Castro or his employees that either of them were impaired.  Natt stated that these expenses were false, that he did not tell Castro or his employees that he had these expenses and did not provide documentation or information to Castro or his employees to support these claimed deductions.

510.    Natt did not review or sign the 2017 Form 1040 before it was filed with the IRS.  Castro received a refund check in the amount of $5,090 and sent a check to Natt for $3090. Natt indicated that Castro took the $2,000 from the refund as his tax preparation fee.

511.    Natt would testify that the tax refund amount that the IRS issued to him (through Castro) for his 2017 taxes is incorrect and was based on a number of false items that Castro inserted as Itemized Deductions in the tax return and that he did not provide to Castro.

512.    Natt would testify that the 2017 tax return submitted by Castro to the IRS on behalf of the Natts was "totally wrong."  The Natts were thus forced to file the amended return themselves as a result of the actions Castro took and also filed a Form 14157-A, Tax

Return Prepared Fraud or Misconduct Affidavit.

    *xiv.*        ***Victim Ahmad Lampkin (Counts 28-29)***

    513.    Ahmad Lampkin (hereinafter "Lampkin") is a single man who lives in Washington, D.C.

    514.    Lampkin is a U.S. Army veteran with eight years of service. Lampkin served in Iraq, Haiti, and Honduras. Lampkin was honorably discharged from the military in 2006 and was the recipient of a Purple Heart. He graduated from Hendricks College with a four-year degree in Political Science. Lampkin has no tax experience. Lampkin works for the Office  of Veteran Affairs as a Congressional Affairs Officer and has been there for over 10 years.

    515.    Lampkin previously used H&R Block and Turbo Tax to prepare his tax returns. Lampkin was introduced to Castro by an ex-girlfriend. Lampkin's co-worker had also used Castro and Lampkin later found out Castro had cashed her stimulus check.

    516.    Lampkin recalls a friend forwarding Castro's email address to Lampkin. Lampkin called Castro, uploaded his tax documents, was set up for a telephonic interview with a tax preparer, and then waited for the return to process. Lampkin received an email with the tax refund amount that was to be refunded to him.

    517.    Lampkin stated that he still owed money to the Department of Education for college loans, so he never expected to get any of his tax refund. Lampkin's understanding

was that Castro would get paid from a portion of the tax refund and Lampkin's portion of the refund would go to the Department of Education through a garnishment program.

518.    Lampkin initially thought Castro was based in D.C. because he had a D.C. office address and a D.C. phone number.  It was not until three years later that he found out Castro & Co. was based out of Florida when he tried to go to Castro's office (in D.C.), because Castro was not returning his calls, and Lampkin found out it was a virtual office.

519.    Lampkin had a phone conversation with the office assistant (name unknown) and all other communications were usually through e-mails. Lampkin stated that both Castro and the office assistant were rude, crude, and unprofessional.

520.    Lampkin first found out he had a lien on his taxes due to a bad check written to the IRS when trying to buy a house.  Lampkin initially thought he wrote the bad check but later found out it was Castro who wrote the bad check to the IRS.

521.    Lampkin stated he used Castro because he would always get a refund and it was fast; H&R Block was crowded, and it was hard to get an appointment.

### a.    Lampkin 2017 Taxes (Count 28)

522.    Lampkin has reviewed a 2017 Form 1040 that was filed on his behalf by Castro.  It has been shown to him and is identified here as Government Exhibit 326.  It correctly states his name, social security number, and filing status as single.  The listed home address on the tax return is not his address and it appeared to him to be Castro's address.

523.     On the attached Schedule A to Government Exhibit 326, the "unreimbursed employee expenses" is listed as $9,666.  Based on worksheets attached in Government Exhibit 326, this amount was comprised of $1,280 for "work tools," $5,460 for "uniforms and protective clothing" and $426 for "union and professional dues," and $2,500 from a Form 2106.  Lampkin stated that these expenses were false, and he did not provide any documentation to Castro or his employees regarding these expenses.  Lampkin would testify that he worked in an office and did not have a uniform and did not have any work tools.  With respect to Form 2106, which relates to vehicle expenses, Lampkin would testify that he did not have a vehicle in 2017.

524.     On the attached Schedule A to Government Exhibit 326, the "other expenses" is listed as $1,700.  Based on worksheets attached in Government Exhibit 326, this amount was comprised of $1,000 in "workplace goodwill development," $500 for "continuing education," and $200 for "contract labor."  Lampkin would testify that he did not recognize, nor did he know what why these amounts were listed for these categories, and these were all false and he never told Castro or his employee he had these expenses.

525.     On the attached Schedule A to Government Exhibit 326, "other miscellaneous deductions" lists an amount of $9,141.  Based on worksheets attached to Government Exhibit 326, this amount is for "impairment-related work expenses." Lampkin would testify that he was impaired at any time in 2017 and did not tell Castro that he was impaired.  Lampkin would testify that the deduction of impairment-related work expenses was false.

526. Lampkin did not review or sign the 2017 Form 1040 before it was filed with the IRS. As Lampkin understands it, the entirety of his refund ($6,755) was garnished by the IRS, and he did not receive any portion of it and neither did Castro.

527. When Castro did not receive his portion of the refund, he contacted Lampkin and threatened to withdraw the filing, saying "[w]e need you to settle our fees, or we have to withdraw our filings, which result in you owing thousands to the IRS." (See Exhibit 343.) Between September 2018 and March 2019, Lampkin took efforts to try to ensure that any debt he owed Castro was paid.

528. On March 5, 2018, Castro, in communications with is staff, stated with respect to Lampkin, "[w]e'll eventually get our back owed fees. It took me three years [with another client] but last year we seized something like $8k, so it's eventually worth it." (*See* Exhibit 342.) As discussed below, this is exactly what Castro did.

529. Lampkin would testify that the tax refund amount for his 2017 taxes is incorrect and was based on false items that Castro inserted in the tax returns and that he did not provide to Castro.

530. According to data contained on Castro tax software, produced by the defense, Castro accessed and worked on the tax return on March 21, 2018, and March 24, 2018, and personally filed the Lampkin 2017 tax return with the IRS. (*See* Government Exhibit 25.)

### b. Lampkin 2018 Taxes (Count 29)

531. Lampkin has reviewed a 2018 Form 1040 that was filed on his behalf by Castro. It has been shown to him and is identified here as Government Exhibit 328. It

correctly states his name, social security number, and filing status. The listed home address on the tax return is not his address and it appeared to him to be Castro's address.

532. On the attached Schedule A to Government Exhibit 328, "gifts to charity" is listed as $7,520. Lampkin would testify that he did not make $7,520 in donations to charity in 2018 and did not tell Castro or Castro employees that he had that amount of gifts to charity. In the 2018 Annual Tax Interview Packet that Lampkin completed in conjunction with Castro's employees, he did not provide that amount or identified charitable contributions in that amount.

533. On the attached Schedule A to Government Exhibit 328 the "unreimbursed employee expenses" is listed as $90,725. It is unclear from the software what this amount consists of. This deduction was limited to individuals who were Armed Forces reservists, qualified performing artists, fee-basis state or local government officials, and employees with impairment-related work expenses. Lampkin would testify that he was not any of these – he was not a qualified performing artist, fee-basis state or local government official, or employee with impairment-related work expenses. Lampkin would testify that he never told Castro or his employees that he was a qualified performing artist, fee-basis state or local government official, or an employee with impairment-related work expenses. In addition, Lampkin would testify that he did not have unreimbursed employee expenses in 2019 in the amount of $90,725 and did not tell Castro or his employees he had such expenses.

534.    On May 31, 2019, Castro sent Lampkin a threatening email stating, "you've stolen our services year-after-year with false promises to pay.  We will be contacting the IRS to withdraw all years filed. . . . [and] you're a deadbeat." (*See* Government Exhibit 347.)

535.    In that same month, Castro filed Lampkin's 2018 taxes without Lampkins' approval or any communications with Lampkin.  The IRS issued a refund in the amount of $18,000.18 which was sent to Castro via a check in the mail.  Lampkin was not aware that his taxes had been filed or the refund was issued.  Castro deposited the check and did not remit any of the money to Lampkin, keeping the full 2018 refund.

536.    In late May and into June 2019, Lampkin realized that taxes had been filed without his approval.  Lampkin contacted Castro & Co. and inquired about unapproved transactions and why an address, other than Lampkin's, was being used and also sought to confirm that any debt he owed Castro had been paid.

537.    On June 25, 2018, Castro responded to Lampkin, via email, stating "I think you fail to realize we're a multi-million-dollar law firm . . . I've instructed the Office manager to issue a change of address and return all funds to the IRS and DC Tax Department.  We've initiated the process to withdraw all of our work-product, which we own.  You will owe the IRS $32,972 plus interest, and you will owe DC $10,026.  You will owe $42,998 in total.  You are terminated.  You are not our client.  We will shred any and all letters that arrive to our office addressed to you.  You owe our firm $0 and we have

collected $0 for four years of work. We're blocking all of your email addresses and phone numbers. Call the IRS to square things away." (*See* Government Exhibit 351.)

538. Castro then filed an amended return on behalf of Lampkin, removing the claimed and false deductions, resulting in Lampkin owing the IRS a significant amount of money, which Castro had already deposited and kept. Lampkin was not aware these amended returns were filed and did not approve them. When informed about the filing of the amended tax returns, Lampkin would testify that "this is scary," "I am in awe, just in shock" and "I wouldn't have known he filed this if you hadn't sent it to me."

539. In July 2019, Lampkin filed a Form 14157 and 14039 explaining that he had been a victim. (*See* Government Exhibits 330-332.)

540. In November 2019, based on Lampkin's assertion that he had been a victim of Castro, the IRS issued a check to Lampkin in the amount of $18,000.18.

541. There is no evidence that Castro ever repaid the IRS or Lampkin the $18,000.18 he received for Lampkin's 2018 refund.

542. In August 2021, Lampkin made a payment to the IRS in the amount of $21,760.84.

543. Lampkin would testify that the tax refund amount that the IRS issued to him (through and to Castro) for his 2019 taxes is incorrect and was based on false items that Castro inserted in the tax returns and that he did not provide to Castro.

*xv.*     ***Victim Fabio Tozeto Ramos (Count 30)***

544.     Fabio Tozeto Ramos (hereinafter "Ramos") lives in Seattle, Washington.

545.     Ramos is originally from Brazil but moved to Australia in 2003 and lived there until 2018.  Ramos has a Master's degree and PhD and worked as a professor in Computer Science in Sydney, Australia. In 2018, Ramos moved to the United States to work for Nvdia as a research scientist.  Although married, Castro filed Ramos' taxes as a single individual because of certain issues related to their status in the United States.   Ramos' wife is not currently employed but previously worked as a pharmacist.



546.     Ramos first found out about Castro and his company, Castro & Co., through the internet, as a result of specific issues related to individuals who previously lived in Australia but now live in the United States.  Castro was a self-proclaimed expert on those specific issues and advertised himself as such.

547.     Ramos first contacted Castro & Co. in early July 2020 and uploaded documents to the Castro & Co. portal.  Ramos was then in contact with a Castro & Co. employee and provided that employee with certain information.  Shortly thereafter, on July 10, 2020, Ramos received a tax proposal from Castro & Co.  The proposal stated that Ramos' refund would be $13,609. The proposal stated that if Ramos used another firm, his refund would have been $5,948, meaning Ramos would receive an extra $7,661 by using Castro.  The tax proposal stated that Castro would receive a fee of $7,999 for their work in

preparing the taxes. Based on the tax proposal, several deductions were based on listing Ramos's dependents. As noted later, the completed taxes did not include dependents.

548. Without seeing the tax return, Ramos accepted the proposal and authorized Castro to file his taxes.

549. On or about July 30, 2020, Castro filed Ramos' tax returns, but they were far different than what had been set forth in the tax proposal. Castro & Co. did not tell Ramos they had filed the tax return or alert him to the changes.

550. On August 10, 2020, Ramos emailed Castro & Co. to determine the status of the filing of his taxes. He was told that "the return is already in the queue to get filed. It will be filed this week." (*See* Government Exhibit 370.) This was untrue.

551. On September 2, 2020, Ramos requested a copy of his tax returns. A Castro & Co. employee stated that "[a]t the moment your tax return has not cleared the IRS, and our system will not allow us to print it till its been cleared." This was untrue.

552. On or about September 21, 2020, Ramos went to the IRS website to check the status of his tax return and found out that his return had been filed. He noticed that the tax return submitted was very different than what had been laid out in the tax proposal he received on July 10, 2020, and that his refund had been routed to a different bank account.

553. On October 1, 2020, Ramos contacted Castro and Castro & Co. employees. They told Ramos that they had to change certain items and that Ramos would receive his portion of the refund when it cleared. They stated that the refund that had already been issued simply covered the fees.

554.	Eventually, Ramos was able to obtain a copy of the return that Castro had filed on his behalf, which is discussed in greater detail below.  Ramos noticed that several deductions were incorrect and false.  Ramos attempted to contact Castro on multiple occasions, with little success.

555.	Ramos continued to ask multiple questions and went so far as to contact a different tax attorney and CPA to assist him with his taxes. He was advised to contact the Taxpayer Advocate Service to correct the false return filed by Castro.

556.	Ramos filed a police report against Castro for theft.

557.	Ramos was contacted by Castro & Co. in December 2020 and was provided with amended tax returns prepared by Castro & Co.  In reviewing these prepared amended returns, Ramos noticed that there were false deductions.  Ramos decided to not have Castro file the amended return.

558.	Ramos submitted a corrected return on his own around January 2021.

559.	Ramos recalls he never met anyone from Castro & Co. in person and never had substantive phone conversations about the return once it was generated.

	a.	**Ramos 2019 Taxes (Count 30)**

560.	Ramos has reviewed a 2019 Form 1040 that was filed on his behalf by Castro. It has been shown to him and is identified here as Government Exhibit 354.  It correctly states his name and social security number.  The tax return states that he was single – this is incorrect.  He was married with two children, who would qualify as dependents.  The

listed home address on the tax return is not his address and it appeared to him to be Castro's address.

561.	On the attached Schedule A to Government Exhibit 354, the "unreimbursed employee expenses" is listed as $9,350. Based on worksheets attached in Government Exhibit 354 and the software used by Castro, this amount consisted of $200 from Form 2106 and $9,150 for an "Amendment." It is unclear what is meant by Amendment. Ramos stated that these expenses were false, and he did not provide any documentation to Castro or his employees regarding these expenses. In addition, that deduction was limited to a certain set of individuals: Armed Forces reservists, qualified performing artists, fee-basis state or local government officials, and employees with impairment-related work expenses. Ramos would testify that was not an Armed Forces reservist, qualified performing artist, fee-basis state or local government official, or an employee with impairment-related work expenses and never told Castro or his employees that he was. Moreover, Ramos would testify that he did not have the employee expenses that comprised that amount ($9,350).

562.	On the attached Schedule C to Government Exhibit 354, it identifies a side business for Ramos as "Consultancy in Machine Learning" with gross receipts of $1,404. Ramos stated he would have had minimal expenses, like office supplies, travel, his computer, and internet usage.

563.	That Schedule C identified "advertising" expenses totaled $300. Ramos would testify that he did not have any advertising expenses and did not tell Castro or his

employees that he did. Castro's software identifies this expense as being related to "Uber." Ramos did not advertise with Uber.

564.     That Schedule C identified "car and truck" expenses totaled $4,540.  Ramos would testify that he did not use his vehicle for business purposes to the amount claimed. Castro' software states that this amount consists of $2,080 for "gas," $60 for "gas," $2,000 for "auto insurance," $400 for "annual registration, safety."

565.     That Schedule C identified "depreciation" expenses totaled $21,000.  Ramos would testify he did not have depreciation expenses related to his car and trucks that were for work in this amount.  This vehicle, a Toyota Sienna, was not used 70% of the time for business purposes.

566.     On the attached Schedule C to Government Exhibit 354, Ramos would testify that he did not recognize why $33,132 was listed for "employee benefit programs," as he didn't have any employees and could not identify what this amount related to.  Ramos would testify that he did not provide any documentation or information to Castro, or his employees, to justify this deduction.   Castro's software states that this amount ($33,132) consists of $24,592 for "Box 12 DD," $4,000 for "Rent, Mortgage," $2,340 for "Section 119 Work Related Meals," $300 for "Out of Pocket Medications," $200 for "Dental," $1,700 for "other medical."

567.     Ramos did not sign or review the 2019 Form 1040 before it was filed with the IRS.  Instead, via email, Castro indicated to him the amount of the refund that he would receive and asked whether he wanted to proceed with filing the return.  Ramos stated that

he did want to proceed, but he did not receive the refund that was promised. Instead, a refund of $8,001 was issued to Castro and Co. and they kept that refund. Castro and Co. Promised to file amended return, this time resulting a proposed refund of $13,974, which was mailed to Ramos.

568. Ramos would testify that the tax refund amount that the IRS issued to him (through and to Castro) for his 2019 taxes is incorrect and was based on false items that Castro inserted in the tax returns and that they did not provide to Castro.

569. According to data contained on Castro tax software, produced by the defense, Castro accessed and worked on the tax return on July 14, 2020, July 27, 2020, and July 30, 2020, and personally filed the Ramos 2019 tax return with the IRS. (*See* Government Exhibit 25.)

*xvi.* *Victims Federico and Justine Turatti (Counts 31-33)*

570. Federico Turatti (hereinafter "Turatti") and Justine Turatti are a married couple who live in Potomac, Maryland.

571. Turatti was originally born in Italy, lived in Australia between 1980 and 2011, but obtained his U.S. citizenship in December 2020. Justine Turatti obtained her U.S. citizenship in Jul 2021.

 

572. Turatti graduated with a chemistry degree from the University of Wollongong in Australia and obtained his PhD from the same school. He also received an MBA from the University of Queensland in Australia.

573. Turatti currently works for Toyota Motor North America and has since 2017. His previous employer was Rio Tinto where he worked from 2008 through 2017, both in Australia and in United States. Turatti stated he had a small consulting business named Capstone Value. He started Capstone Value (Capstone) in 2018 and closed the business in 2021.

574. Turatti formed Capstone to provide management advice to small manufacturing companies. He set up a website and paid a domain fee. Capstone operated with a couple of computers, an iPad, and a phone. Capstone did not incur legal fees. Turatti would testify that his wife, who was listed as an employee of Capstone, did not actively work for Capstone. She did not have a title with the company. According to Turatti, Castro suggested identifying a family member as an employee.

575. During Turatti's employment with Rio Tinto, they provided and paid for tax accountant service which handled his FBAR reporting and tax preparation. In 201, Rio Tinto switched the firm it used to provide these services. The new firm took a different position with respect to the reporting of Turatti's "Australian Superannuation," an Australian retirement account. With the prospective change in reporting, he realized he potentially faced a significant tax liability (approx. $64,000). Uncertain about this change, Turatti did extensive internet research, and he came across Castro's legal opinion online

which claimed Superannuation is not taxable. Castro's website listed his contact information.

576.    Turatti recalled reaching out to Castro via phone and discussing Superannuation. Castro clearly knew about Superannuation and its tax implication. Castro stated he has had multiple Australian clients who are in same situation. Turatti believed that Castro was a competent tax professional with relevant expertise, and he had no reason to believe otherwise until he was contacted by IRS Special Agents on March 24, 2021.

577.    Turatti hired Castro to write a tax opinion and prepare his tax returns. The tax opinion treated the Australian Superannuation as nontaxable based on U.S. and Australia Tax Treaty; based on this opinion Turatti's income tax liability was reduced by approximately $64,000.

578.    Turatti uploaded his tax documents (W-2, bank form, donation receipts, biographical information etc.) to cloud drive called "smart vault" every year. He also gave Castro & Co. a summary of his business income and expenses for the year.

579.    Castro & Co. set up an hour-long phone interview with Turatti. He talked to various employees over the years. He believed he talked to Castro only the first year. During the interview, they discussed professional society, work related expenses (like clothing and shoes), travel expenses, car expenses, depreciation on assets, and home office.

580.    Turatti never met Castro in person. Castro provided a letter of proposal and tax proposal via email.

581.    Turatti's tax returns were electronically filed. No one from Castro & Co. reviewed the return with him.

582.    Turatti's refunds were direct deposited. His stimulus checks were sent to Castro & Co., so he received a check from Castro's business bank account.

583.    Turatti told Castro & Co. that his employer, Toyota, pays all expenses related to travel.  He uses a corporate credit card.

### a.    Turatti 2017 Taxes (Count 31)

584.    On February 25, 2019, Castro emailed Turatti with his tax proposal and stated that they projected his out-of-pocket expense, including taxes and fees, would  be $5,681.  (*See* Government Exhibit 402 at 3.)

585.    Turatti has reviewed a 2017 Form 1040 that was filed on his behalf by Castro. It has been shown to him and is identified here as Government Exhibit 387.  It correctly states his name, wife's name, social security numbers, and dependents.  The listed home address on the tax return is not his address and it appeared to him to be Castro's address.

586.    On the attached Schedule A to Government Exhibit 387, the "unreimbursed employee expenses" is listed as $8,482.  Based on worksheets attached in Government Exhibit 387, this amount ($8,482) consists of $3,500 related to "work tools," $2,980 for "uniforms and protective clothing," and $2,002 from Form 2106 (related to vehicle expenses).  Turatti would testify that he did not have any of these expenses for work and would further testify, now seeing what was reported, that these deductions are false.  Turatti works as an executive for Toyota and does not have a uniform or work tools.  It is correct

that Turatti told Castro he has to buy dress suits for work and spent $2,380 on those suits not $2,980. But now seeing what was reported, Turatti would testify that this was not a uniform and the expense is not deductible.

587.    With respect to vehicle expenses for work, Turatti leases a car from Toyota and he received a car allowance to cover the lease. Turatti would only have to cover windshield damage or excessive tire damage. Turatti did not have those expenses in 2017.

588.    On the attached Schedule A to Government Exhibit 387, "other expenses" lists an amount of $37,502. Based on worksheets attached to Government Exhibit 387, this amount ($37,502) consists of $500 for "casualty and theft loss" and $37,002 for "impairment-related work expenses." Turatti would testify that he was not impaired at any time in 2017 and did not tell Castro he was impaired. Castro's software provides additional details, stating that the impairment amount ($37,002) consists of $300 for "medications," $600 for "doctors," $500 for "vision related," $11,600 for "insurance," $3,012 for "health," $20,346 for "more health." Turatti would testify, now seeing what was reported, that the deduction of impairment-related work expenses was false.

589.    Turatti did not review or sign the 2017 Form 1040 before it was filed with the IRS. Instead, via email, Castro indicated to him the amount of the refund that he would receive and asked whether he wanted to proceed with filing the return. Turatti stated that he did want to proceed and received and was issued a refund of $13,859, of which he received $3,860 and Castro kept $9,999.

590.	Turatti would testify, now seeing what was reported, that the tax refund amount that the IRS issued to him (through and to Castro) for his 2017 taxes is incorrect and was based on false items that Castro inserted in the tax returns and that they did not provide to Castro.

591.	According to data contained on Castro tax software, produced by the defense, Castro accessed and worked (for 46 minutes) on the tax return on February 25, 2018, February 26, 2018, and February 28, 2018, and personally filed the Turatti 2017 tax return with the IRS.  (*See* Government Exhibit 25.)

###	b.	Turatti 2018 Taxes (Count 32)

592.	Turatti has reviewed a 2018 Form 1040 that was filed on his behalf by Castro. It has been shown to him and is identified here as Government Exhibit 388.  It correctly states his name, wife's name, social security numbers, and dependents.  The listed home address on the tax return is not his address and it appeared to him to be Castro's address.

593.	As noted above, Turatti had a side consultancy business, Capstone.  Turatti would testify that he never made any income from Capstone.  He made genuine attempts to make money through Capstone but his responsibilities with Toyota prevented him from having the time needed to focus on it.

594.	On the attached Schedule C to Government Exhibit 388, Turatti would testify that he did not understand why $98,519 was listed for "employee benefit programs," as he didn't have any employees actively working and could not identify how this amount related to Capstone.  Turatti  would  testify  that  he  did  not  provide  any  documentation  or

information to Castro or his employees that could be used to justify this deduction. Castro's software states that this amount ($98,519) consists of $45,600 in "mortgage payments," $1,000 in "medical impairment," $500 in "dependent care," $3,400 in "electricity," $960 in "water," $1,800 in "gas," $11,275 in "Section 119 Lodging Taxes," $5,331 in "medical reimbursement."

595.    Turatti did not review or sign the 2018 Form 1040 before it was filed with the IRS. Instead, via email, Castro indicated to him the amount of the refund that he would receive and asked whether he wanted to proceed with filing the return. Turatti stated that he did want to proceed, and was issued a refund of $36,883 of which he received $15,883 and Castro kept $21,000.

596.    Turatti would testify, now seeing what was reported that the tax refund amount that the IRS issued to him (through and to Castro) for his 2018 taxes is incorrect and was based on false items that Castro inserted in the tax returns and that they did not provide to Castro.

597.    According to data contained on Castro tax software, produced by the defense, Castro accessed and worked on the tax return on March 3, 2019, and March 14, 2019, and personally filed the Turatti 2018 tax return with the IRS. (*See* Government Exhibit 25.)

### c.    Turatti 2019 Taxes (Count 33)

598.    Turatti has reviewed a 2019 Form 1040 that was filed on his behalf by Castro. It has been shown to him and is identified here as Government Exhibit 389. It correctly

states his name, wife's name, social security numbers, and dependents. The listed home address on the tax return is not his address and it appeared to him to be Castro's address.

599.    On the attached Schedule C to Government Exhibit 389, Turatti would testify that he did not understand why $116,480 was listed for "employee benefit programs," as he didn't have any employees actively working for Capstone and could not identify how this amount related to Capstone. Turatti would testify that he did not provide any documentation or information to Castro that could be used or his employees to justify this deduction. Castro's software states that that this amount ($116,480) consists of $63,207 for "mortgage," $21,142 for "Box 12 DD," $26,105 for "Medical," $200 for "vision," $2,225 for "Section 119 Homeowners Insurance," $3,600 for "Section 119 "utilities."

600.    On the attached Schedule C to Government Exhibit 389, Turatti would testify that he did not understand why $15,544 was listed for "interest," as he did not have interest expenses related to Capstone. This amount appears to represent the total mortgage interest he paid for his residence in 2019, as shown on the Form 1098 that he uploaded to the "smart vault." Turatti would testify that he did not utilize the entirety of his residence for his work with Capstone and instead only used a small portion. Turatti would testify that he did not provide any documentation or information to Castro or his employees that could be used to justify this deduction.

601.    On the attached Schedule C to Government Exhibit 389, Turatti would testify that he did not understand why $21,000 was listed for "legal and professional services," as he did not have these expenses related to Capstone. Castro's software noted that these

legal fees related to "Castro." This amount appears to represent the total fee paid to Castro in 2018. Turatti would testify that he did not provide any documentation or information to Castro or his employees that could be used to justify this deduction. Notably, Castro is not an attorney.

602. On the attached Schedule C to Government Exhibit 389, Turatti would testify that he did not understand why $11,262 was listed for "taxes and licenses," as he did not have these expenses related to Capstone. Turatti would testify that he did not provide any documentation or information to Castro or his employees that could be used to justify this deduction.

603. Turatti did not review or sign the 2019 Form 1040 before it was filed with the IRS. Instead, via email, Castro indicated to him the amount of the refund that he would receive and asked whether he wanted to proceed with filing the return. Turatti stated that he did want to proceed, and he was issued a refund of $45,106, of which he received $37,723 and Castro kept $7,383.

604. Turatti would testify, now seeing what was reported, that the tax refund amount that the IRS issued to him (through and to Castro) for his 2019 taxes is incorrect and was based on false items that Castro inserted in the tax returns and that they did not provide to Castro.

605. Turatti learned he was being audited for calendar year 2019 by Maryland's Comptroller when Catherine Magnan, Castro's General Counsel, emailed him a copy of the notice. Turatti signed a Power of Attorney in order to have Catherine Magnan (General

Counsel) represent him in the matter. Turatti did not know what the issue was but he scanned and emailed requested records to Castro & Co. for the audit. Castro & Co. submitted a response to Maryland's Comptroller without providing Turatti an opportunity to review it.

606.     According to data contained on Castro tax software, produced by the defense, Castro accessed and worked (for 57 minutes) on the tax return on March 22, 2020, and personally filed the Turatti 2019 tax return with the IRS. (*See* Government Exhibit 25.)

## I.     Castro Emails to Investigators

607.     In January 2022, Castro began to send a series of emails to IRS Special Agent Tuan Ma and AUSA Chauncey Bratt (MDFL) in an attempt to explain away his behavior. (*See generally* Government Exhibits 31-41.) (Bratt was originally assigned to this matter).

608.     For example, on January 5, 2022, Castro told Special Agent Ma that, in relation to Alfonso Garza's 2018 taxes, he now realized that deduction he took related to vehicle -related expenses were "incorrect" and that he "certainly [has] to own that mistake." (*See* Government Exhibit 31.)

609.     Later that same day (January 5, 2022), Castro sent a long email attempting to justify why he called himself an attorney, despite never having passed the bar or having been licensed within any state. (*See* Government Exhibit 32.) Castro claimed that he "purposefully chose to forego state licensing and instead pursued federal licensing." (*Id*.) he further argues that part of the reason he did not disclose his fee structure and calculations

to clients is because it was "trade secret." (*See id*. at 3.)  He then threatens to take egal action Special Agent Ma.  (*See id*. at 4.)

610.    Two days later, Castro emailed Special Agent Ma and AUSA Bratt, notifying them that he had filed a civil complaint against Special Agent Ma and others in the Northern District of Texas and stated "I truly wish this could have been avoided.  Have a nice weekend." (*See* Government Exhibit 34.)

611.    On January 12, 2022, Castro sent an email to Special Agent Ma and AUSA Bratt stating, among other things that "I didn't bust my butt in law school and get two law degrees just to break the law.  I could have avoided all of those years of stress and $300k in student loans if I was just going to break the law.  I'm innovative with my interpretations and assertive in their application.  That's me being a tax nerd, not a tax criminal." (*See* Government Exhibit 36.)

612.    On January 17, 2022, Castro sent an email to Special Agent Ma and AUSA Bratt defending his Section 119 positions. (*See* Government Exhibit 38.)  But even in hat email, Castro admits mistakes and confirms he will be changing the way in which he questions clients and claims such deductions in the future.  (*See id*.)  He then argues that the appropriate remedy is a civil suit and that a "criminal investigation is not the appropriate manner for resolving intellectual disputes on legal interpretation." *(See id*. at 6.)  He then states "with all due respect, neither one of you has a strong tax background" (despite Special Agent Ma's years of tax work) and "I'm pretty sure you agree that I'm arrogant,

cocky, rude to clients, and condescending at times. But I am not a criminal" and "'it's clear that I was previously horrendous at process and procedure." (*See id*.)

613. On January 18, 2022, Castro emailed Special Agent Ma, AUSA Bratt, and others regarding his explanation for the "Section 62(a)(2)(A) mishap" and that "we are a business, we made a mistake, we have owned that mistake rather than trying to cover it up as most probably would." (*See* Government Exhibit 39.) In that same email, Castro suggests that the genesis of the investigation in to him was because he tried to disclose certain sensitive information to the government. (*See id*. at 2, stating "I reported the criminal wrongdoing of an untouchable, and as a result, I became the subject of a retaliatory conspiracy. That's not right, but it's understandable and fine; laws don't apply to the CIA.") Castro ends the email by stating "I want to out this behind me. I'm more interested in my software and political future than this mess." (*Id*.)

## J.     Total Losses

614. IRS revenue agents have reviewed the evidence in this case, including the statements of victim-taxpayers, interview of those victim-taxpayers, and the relevant evidence, including documents provided by victim-taxpayers and communications between Castro and victim-taxpayers.

615. The IRS revenue agents then performed an analysis of what each victim taxpayers' taxes should have been had the law been followed by Castro and determined the difference between that figure and the refunds obtained a result of Castro's fraudulent conduct.

616.    The following chart identifies those figures:

| | | | Tax Loss from False Returns | | | | |
|---|---|---|---|---|---|---|---|
| Count | Year | Form | Client | Apprpriate Tax / (Refund) | Misc. Adjustments * | Castro Obtained Tax / (Refund) | Tax Loss to Govt. |
| 2 | 2017 | 1040 | Paul & Alissa Clayton | 493.00 | - | 8,001.00 | 7,508.00 |
| 3 | 2017 | 1040 | Frances Fifis-Boggs & James Boggs | 6,046.00 | - | 13,751.00 | 7,705.00 |
| 4 | 2018 | 1040 | Frances Fifis-Boggs & James Boggs | 5,094.00 | - | 13,561.00 | 8,467.00 |
| 5 | 2019 | 1040 | Frances Fifis-Boggs & James Boggs | 3,347.00 | - | 8,531.00 | 5,184.00 |
| 6 | 2017 | 1040 | Linda Rivera | 3,235.00 | - | 7,470.00 | 4,235.00 |
| 7 | 2018 | 1040 | Linda Rivera | - | - | 4,492.00 | 4,492.00 |
| 8 | 2019 | 1040 | Linda Rivera | - | - | 3,649.00 | 3,649.00 |
| 9 | 2017 | 1040 | Christian & Ciara Karavangelos | - | (277.00) | 1,239.00 | 1,516.00 |
| 10 | 2018 | 1040 | Christian & Ciara Karavangelos | - | (1,813.00) | 866.00 | 2,679.00 |
| 11 | 2019 | 1040 | Christian & Ciara Karavangelos | - | (4,926.00) | 1,599.00 | 6,525.00 |
| 12 | 2017 | 1040 | Randolph & Robin Ragsdale | 12,209.00 | - | 17,100.00 | 4,891.00 |
| 13 | 2018 | 1040 | Randolph & Robin Ragsdale | 7,420.00 | - | 14,519.00 | 7,099.00 |
| 14 | 2019 | 1040 | Randolph & Robin Ragsdale | 4,057.00 | - | 15,752.00 | 11,695.00 |
| 15 | 2017 | 1040 | Javier & Betsy Sola | - | (1,812.00) | - | 1,812.00 |
| 16 | 2018 | 1040 | Javier & Betsy Sola | - | (948.00) | | 948.00 |
| 17 | 2019 | 1040 | Javier & Betsy Sola | - | (3,940.00) | 283.00 | 4,223.00 |
| 18 | 2017 | 1040 | Joseph & Kayla Zilinski | 3,976.00 | - | 6,744.00 | 2,768.00 |
| 19 | 2018 | 1040 | Joseph & Kayla Zilinski | 2,774.00 | - | 6,258.00 | 3,484.00 |
| 20 | 2019 | 1040 | Joseph & Kayla Zilinski | 1,936.00 | - | 5,729.00 | 3,793.00 |
| 21 | 2017 | 1040 | John & Kelley Meyer | - | (625.00) | 14,940.00 | 15,565.00 |
| 22 | 2017 | 1040 | Crystal Wells | 773.00 | - | 3,145.00 | 2,372.00 |
| 23 | 2018 | 1040 | Crystal Wells | 1,211.00 | - | 2,585.00 | 1,374.00 |
| 24 | 2019 | 1040 | Crystal Wells | 1,363.00 | - | 3,493.00 | 2,130.00 |
| 25 | 2017 | 1040 | Kimberly & Brian Quigley | - | (816.00) | - | 816.00 |
| 26 | 2019 | 1040 | Michael & Mirjana Putica | 22,518.00 | - | 65,796.00 | 43,278.00 |
| 27 | 2017 | 1040 | Michael & Angelita Natt | 16,610.00 | - | 20,445.00 | 3,835.00 |
| 28 | 2017 | 1040 | Ahmad Lampkin | 12,645.00 | - | 17,270.00 | 4,625.00 |
| 29 | 2018 | 1040 | Ahmad Lampkin | - | - | 17,312.00 | 17,312.00 |
| 30 | 2019 | 1040 | Fabio Ramos | 42,046.00 | | 65,445.00 | 23,399.00 |
| 31 | 2017 | 1040 | Federico & Justine Turatti | 101,199.00 | | 114,325.00 | 13,126.00 |
| 32 | 2018 | 1040 | Federico & Justine Turatti | 21,863.00 | | 43,793.00 | 21,930.00 |
| 33 | 2019 | 1040 | Federico & Justine Turatti | 15,915.00 | | 50,723.00 | 34,808.00 |
| | | | Total Tax Loss to the Government: | | | | 277,243.00 |

**Notes:** *Adjustments were made for the Earned income credit, Additional child tax credit

617.    These counts, however, represent only a fraction and an illustration of the fraud committed by Castro. By performing an analysis of Castro's total number of clients and the average amount tax loss per client from the chart above, investigators have been able to reasonably extrapolate loss figures. That analysis show losses of over $15.5 million.

**K. Summary Application of Facts to the Law**

618.    Applying the facts in summary form to the elements:

***First*: That the defendant aided in, assisted in, procured, counseled, or advised the preparation or presentation of a return arising under or in connection with any matter arising under the internal revenue laws;**

619.    Castro personally submitted each of the tax returns referred to in the Indictment to the IRS. The government anticipates proving this fact through the testimony of Castro employees, his clients, and the records contained within Castro's tax software. (*See* Government Exhibit 25.) Each of the returns listed in the Indictment were filed with the IRS, as reflected in the official IRS tax transcripts. (*See* Government Exhibits 107, 113, 128-130, 141-143, 168-170, 201-203, 221-223, 243-245, 255, 262-264, 281, 296, 325, 352-353, 386, 405-407.)

***Second*: That this return falsely or fraudulently stated the items identified in the indictment for each count;**

620.    The Indictment alleges multiple false or fraudulent items with respect to unreimbursed employee expenses, Schedule C employee benefit programs, depreciation, child care, impairment related work expenses, charitable donations, or other Schedule C deductions. (*See* Dkt. No. 3.) Each of those false or fraudulent items is discussed above, showing its falsity. (*See* ¶¶ 151-600 above.)

***Third*: That the defendant knew that the statement in the return was false or fraudulent;**

621.    All of the evidence shows that Castro tightly managed Castro & Co. and made all final decisions regarding the deductions claimed in each tax return he filed. As

Castro well knew, the deductions applied here were novel, contrary to settled law, and each deduction was Castro approved. None were based on client requests, consultation, or conferral. Castro took information gleaned from clients and improperly recategorized or redefined it to achieve his objective – a significantly higher refund, of which he would take a percentage. Castro employees and clients routinely questioned these positions, only to be shouted down or threatened by Castro. In some instances, clients sought outside advice, which was uniformly contrary to the positions taken by Castro.

***Fourth*: That the false or fraudulent statement was material; and**

622. Each of the deductions identified in the Indictment caused an alteration to occur with respect to the refund generated, in that, the refunds issued by the IRS were higher than they would have been had the returns been true and accurate. The materiality of these deductions is explicitly discussed in the "Criminal Tax Computations" in Government Exhibits 66-80.

***Fifth:* That the defendant aided in, assisted in, procured, counseled, advised, the preparation or presentation of this false or fraudulent statement willfully, that is, with intent to violate a known legal duty.**

623. Castro willfully violated a known legal duty. The evidence shows that he had a law degree from the University of New Mexico and an LLM from Georgetown, where he specialized in tax law. His first two jobs following graduation were in law firms, in which he focused on tax law.

624. Castro misled people into believing he was a lawyer, even though he never passed the bar. In 2016, the Florida bar admonished Castro for holding himself as an

attorney, when he was not one. For years, he has routinely taken unreasonable legal positions, leading Judge Pittman labeling him a vexatious litigator, noting Castro's inappropriate behavior in numerous other cases.

625. In connection with the preparation of the false and fraudulent returns, he refused to show clients their tax returns, failed to obtain client signatures on their returns, and concealed the filed returns from them, under the guise that they contained trade secrets. When clients asked questions, challenged Castro, or disagreed with deductions claimed on their behalf (that they found out about), Castro lashed out vindictively, threatening them with action that would result in financial ruin. In other cases, Castro simply took unauthorized action, causing victims financial and emotional pain. Similarly, when investigators began to inquire into his activities, he filed law suits or claimed that the investigation was politically motivated.

626. In managing Castro & Co., Castro's behavior shows that he knew his conduct was illegal. For example, he advised his employees, with respect to Schedule C businesses as follows: "I'm gonna be pissed if this is blank. Cross examine the client! Don't give up. Keep digging. FIND A FREAKIN BUSINESS. Something; anything." (*See* Government Exhibit 259.)

627. In other instances, he has admitted multiple errors, blaming the failures on technology. For example, the government anticipates Castro will claim that deductions related to depreciation, which are clearly in violation of the law, were simply the result of faulty software, but that software was a standard one used in the industry. These mistakes

were not isolated and rather obvious, particularly to someone with the tax background that Castro boasts.

628. The manner in which Castro obtained his income was contrary to proper tax preparation practice. Instead of charging a set fee, Castro split tax refunds, providing an incentive to him to obtain higher payouts from the IRS. Castro hid his method from calculating his fees from clients and took advantage of less educated or sophisticated clients.

629. The items charged in the Indictment are deductions that are far afield from the Code, the Regulations, and the Instructions. Castro's appendix to his proposed expert report, which the government understands will reflect the positions he plans to take at trial, represent nothing more than disagreements with the law.

630. Castro's willfulness is likewise shown in that his positions are simply disagreements with the tax laws with respect to each of the items in the Indictment.

631. Finally, with each client, Castro sent a tax proposal to them that identified the amount of refund they would get from another tax preparer like H&R Block and what the refund would be if they used Castro. (*See e.g.*, Government Exhibit 103.) This was proof that Castro knew exactly what the refund should have been had he followed the law.

## L. Conclusion

632. Based on the facts and law described above, Castro is guilty of aiding and assisting in the preparation and presentation of a false and fraudulent return for each count listed in the Indictment.

Respectfully submitted,

LEIGHA SIMONTON
UNITED STATES ATTORNEY

/s/  P.J. Meitl
P.J. Meitl
Assistant United States Attorney
D.C. Bar No. 502391
801 Cherry Street, 17th Floor
Fort Worth, Texas 76102
Telephone:  817.252.5272
E-mail: philip.meitl@usdoj.gov

/s/  Nancy Larson
Nancy E. Larson
Assistant United States Attorney
D.C. Bar No. 430780
801 Cherry Street, 17th Floor
Fort Worth, Texas 76102
Telephone:  817.252.5200
E-mail: nancy.larson@usdoj.gov

## CERTIFICATE OF SERVICE

On May 6, 2024, I electronically submitted the following document via the ECF system and delivered a hard copy to chambers.

/s/ P.J. Meitl
P.J. Meitl
Assistant United States Attorney