# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIMINAL ACTION NO. |
| | ) | |
| Plaintiff, | ) | 4:24-CR-00001-Y-1 |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN ANTHONY CASTRO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S TRIAL MEMORANDUM

Defendant John Anthony Castro submits the following trial memorandum for the Court's consideration in advance of the bench trial set for May 20, 2024.

### Background

John Castro graduated from law school from the University of New Mexico in 2012, and graduated from the University of Georgetown Law Center's masters in tax program the following year.  Mr. Castro operated a virtual tax return preparation company under the name of Castro & Company, initially from Orlando, Florida, and later from Mansfield, Texas. The indictment alleges that 33 tax returns prepared by Mr. Castro for tax years 2017 through 2019 contain intentionally false claims for refunds.

Mr. Castro's defense to the accusation that he intentionally filed false returns on behalf of his clients is two-fold. First, some of the deductions, as will be specified in greater detail at trial, were simple mistakes, and in no way evince an intent to willfully violate the law.  Some resulted from information that he relied upon and that was provided to him by employees who performed intake processes; some resulted from software errors and misunderstandings that can be

demonstrated; and some resulted from his own unintentional oversights and unintentional errors made by his firm's staff.

Second, the other deductions at issue are based on tax-reporting positions that, while not based upon majority-held views or "conventional wisdom" in the tax community, were "novel" or "out of the box" positions that Mr. Castro believed, in good faith, satisfied the "reasonable basis" standard of tax reporting—a standard applicable to tax-return positions. "'Reasonable basis' has been viewed as having a 10-20% likelihood of success if challenged,"[1] and is viewed as a higher threshold than the "realistic possibility" standard. The Congressional Joint Committee on Taxation has indicated that, "If a taxpayer takes a position contrary to a rule or regulation, the taxpayer is not treated as disregarding the rule or regulation if the position has a realistic possibility [which is lower than reasonable basis] of being sustained on its merits."[2]

The positions taken by Mr. Castro that are at issue would likely be characterized by some, perhaps many, in the tax community as "aggressive." To be sure, however, the reporting positions were not "tax protestor" positions—nothing of the sort. Rather, they were based on Mr. Castro's detailed (if erroneous) interpretation of the text of the applicable statutes, utilizing canons of construction that he believed to be relevant to their interpretation. And if there was a relevant tax regulation that was inconsistent with his textual interpretation of a statute that he believed to be unambiguous, Mr. Castro generally concluded that, based on trends in the case law relating to administrative regulations, the textual-based interpretation provided a legally permissible basis

---

[1] Robert G. Woodward, Tax Opinions, 2010 ABA Tax-CLE 0923078 ¶ III.B (Sept. 2010), Westlaw, 2010 WL 4607769.
[2] STUDY OF PRESENT-LAW PENALTY AND INTEREST PROVISIONS AS REQUIRED BY SECTION 3801 OF THE INTERNAL REVENUE SERVICE RESTRUCTURING AND REFORM ACT OF 1998 (INCLUDING PROVISIONS RELATING TO CORPORATE TAX SHELTERS), Vol. 1, Joint Committee on Taxation, p. 162 (July 22, 1999).

(one that was often combined with other sources of authority or analysis as well) to take a contrary position to the extra-textual position set out in the tax regulations.

His interpretations may very well have been incorrect.  But if so, they were not willful violations of the law.  His approach—again, likely to be characterized as "aggressive" by some— was not borne out of an intention to violate the law, but instead by either a belief that his position was correct or out of a good-faith effort to impact the law where he believed that a Treasury regulation had potentially been abrogated.  Indeed, often it was borne out of a combination of the two.

 Mr. Castro's good-faith belief in the reporting positions was publicly evidenced. Nearly every reporting position at issue was the subject of either contemporaneous blog posts or YouTube videos published on his firm's website that publicly set out his analysis, rationale, and believed level of authority for the position.  Many of the reporting positions were also expressly disclosed in multi-page detail on a formal disclosure form attached to tax returns at issue—a disclosure form that is designed to inform the Internal Revenue Service ("IRS") when a taxpayer is relying on a novel legal theory within the return, a position that may seek a change in the law,  or even a theory that the preparer believes the IRS will likely disagree with.  While not attached to every return and every reporting position, the presence of a formal or informal disclosure of a particular reporting position is highly relevant to the willfulness inquiry:  The defense submits that one who willfully violates the law through the use of a tax-reporting position typically does not formally alert the IRS to the position or the fact that it (the IRS) may disagree with the position.

This trial will hinge on the element of "willfulness," which requires an intentional violation of a known legal duty.  There are admittedly errors, and there are admittedly tax reporting positions

that the IRS disagrees with.  What is ultimately in contention, however, is whether those errors or reporting positions (assuming they are wrong), were *willful* violations of the tax laws.

Facts bearing on the presence or absence of willfulness will be central.  For example, the fact that Mr. Castro published the tax positions at issue and his rationale and legal analysis behind them for the whole world to see (including the IRS), rather than hiding them from the IRS; publicly informed his audience that some such positions were novel or unconventional, and that the IRS may even disagree with them; and expressly disclosed many of those positions on tax returns, all evidence a lack of a willful violation of the law.  The fact that he changed some positions over time to make a taxpayer's qualification for them more stringent after a staff member indicated that they had come to believe that the original position was a misinterpretation also evidences a lack of a willful violation.  The fact that he modified language in a client-facing questionnaire to ensure that clients were not incorrectly indicating that they qualified for a deduction at issue after it was brought to his attention that some clients may have unknowingly (to him or the client) indicated that they qualified for the deduction when they actually did not, all evidences a lack of willfulness.

Mr. Castro admits that the reporting positions at issue were novel or against the majority views in the tax community.  He acknowledges that the use of those positions generated larger returns for his clients than they would have received without them.  Indeed, when his firm prepared a return for his clients, it sent the clients a proposal letter stating the refund amount that the taxpayer should expect to receive pursuant to a conventionally prepared return and compared that with the amount that the taxpayer should expect to receive through his firm's preparation of the return.  That amount was often substantially more.  His firm encouraged those clients to seek a second opinion from other (wholly unaffiliated) tax firms of their choice.  The proposal provided that his firm's fee would be contingent: It would receive no fee on the portion of the return that it

believed a conventional firm would garner, but would receive 50 percent of the amount of the refund that Mr. Castro secured for the client in excess of that amount.  Mr. Castro would provide the taxpayer with a copy of the return after it was filed. Mr. Castro also agreed with the client to defend the return if challenged by the IRS.

Mr. Castro's firm derived the figures and information used to complete the returns based on a telephone interview with the taxpayer. His employees used an interview script to gather the necessary information to complete the returns. That information was entered into the firm's systems and ultimately Mr. Castro and the firm relied upon the data as entered.

The taxpayer, during the interview, likely did not know exactly how the information that they provided would be categorized or used to complete the return. In other words, although there was abundant information on Mr. Castro's website explaining his legal theories, the application of those theories was generally not explained to the taxpayer either during the interview process or when the completed tax return was sent to the taxpayer.

In the end, Mr. Castro may, at times, have been arrogant, untactful, or even rude.  Certainly the Court will see instances of interactions—taken from the subset of his client base that the government has selected—that check all of those boxes.  But as the Court is aware, he is not on trial for those things.  He is on trial for allegedly willfully filing tax returns on a fraudulent basis. The evidence will support conclusions that some tax returns at issue contained errors and that some of the tax positions at issue were incorrect, or were at least likely not correct.  But the evidence will not support the only conclusion that is ultimately at issue: that he willfully filed tax returns on a fraudulent basis.

### Mr. Castro's Legal Theories

Because Mr. Castro's legal theories are so relevant to the ultimate issue, namely whether the government can prove beyond a reasonable doubt that Mr. Castro intended to defraud the IRS, this memorandum will explain them in outline form here.[3] The reporting positions at issue in this case are, for ease of reference, set forth below:

- Section 62(a)(2)(A) Unreimbursed Employee Expenses;

- Section 119 Employer-Provided Lodging and Meals Benefit;

- Work-Connected Temporary Impairment Prevention Expenses;

- Deduction of Vehicles;

- Deduction of Commuting Expenses Incurred in Carrying on the Trade or Business of an employee Providing Services ("Commuting Expense");

- Child Care as an Expense Incurred In Order to Work ("Child Care Expense");

- Mortgage-Mandated Homeowners' Insurance is Substituted Mortgage Insurance ("Homeowners' Insurance Deduction");

- Categorizing Certain Charitable Contributions that Give Rise to Advertising Benefits as Marketing Expenses (Rather than as Charitable Deductions)

### The Significance of the *Home Concrete* Decision

Many of the relevant legal theories on which Mr. Castro relies are based on his belief that the text of the relevant IRS Code provision is inconsistent with otherwise applicable treasury regulations.  More specifically, Mr. Castro based some positions at issue on the premise—and his good-faith belief—that contemporary Supreme Court case law such as *U.S. v. Home Concrete & Supply, LLC* and its progeny reflected a trend in favor of diminished deference to administrative

---

[3] The undersigned understands that what is stated in this memorandum does not constitute evidence and is not intended to serve in lieu of Mr. Castro's testimony. The defense intends to call Mr. Castro as a witness at trial. This explanation of Mr. Castro's legal positions hopefully will serve as an aid to all parties and expedite his testimony at trial.

regulations—a trend in authority that, he believed, abrogated (or arguably provided the basis for a good-faith argument/position for the abrogation or change in the law) of dated Treasury regulations and case law relying upon those regulations.  Where he believed that this trend provided the basis for a position that the otherwise-applicable regulation was abrogated or called into question, Mr. Castro largely relied upon a purely text-based interpretation of the statute—which, for the positions at issue in this case, largely provided for a more taxpayer-friendly reading and tax result than the conventional interpretation.

By way of background, in *Chevron U.S.A. Inc., v. Natural Resources Defense Council*, 467 U.S. 837 (1984), the Supreme Court upheld an Environmental Protection Agency Regulation although it was contrary to a prior EPA position.  The Court announced what has come to be known as the *Chevron* "two step" rule: First, one looks to whether Congress addressed the issue.  If the statutory language addresses the issue and is not ambiguous, the inquiry comes to an end—the agency has no authority to deviate from the statute.  If, however, the statutory language is ambiguous or does not address the issue, then one employs the second step: Determine whether the agency's interpretation is a permissible one.[4]

In 2010, in *Intermountain v. C.I.R.*, 134 T.C. 211 (2010), the U.S. Tax Court held that if a court rules that a statute is unambiguous, it forecloses Treasury's ability to promulgate contrary regulations. In 2012, the U.S. Court of Appeals for the Federal Circuit, in *Dominion Res., Inc. v. U.S.*, 681 F.3d 1313 (Fed. Cir. 2012), ruled that regulations cannot exceed the unambiguously expressed intent of Congress.

In 2012 the U.S. Supreme Court held, in *U.S. v. Home Concrete & Supply, LLC*, that a properly promulgated regulation that contradicted the plain meaning of a statutory term was invalid

---

[4] *Chevron*, 467 U.S. at 843.

as a matter of law.[5]   In that case, the IRS made assessments that were outside of the generally applicable statute of limitations for tax assessments, but within the extended statute of limitations that would have been applicable, under the applicable statutory text, if the taxpayer had "omit[ed]" a substantial amount from income.   Relying upon a promulgated regulation, the IRS maintained that the taxpayer's overstatement of its basis in an asset that it sold (which caused less gain to be reported on the sale of the asset) constituted an "omission" within the meaning of the regulation, which provided a more expansive scope.   The U.S. Supreme Court, however, disagreed with the IRS, and held that "omission" and "overstatement" were not only irreconcilable, but direct opposites; "omission," it advised, is something left out, whereas "overstatement" connotes something added in.   Because the regulation contradicted the plain meaning of a term in the statute, it was deemed to be invalid as a matter of law.

Mr. Castro interpreted the *Home Concrete* case to evidence a trend in the case law scaling back *Chevron* deference, particularly where a regulation conflicts with the plain meaning of a statute. Indeed, in keeping with this trend, in *Relentless, Inc. v. Department of Commerce*, 22-1219, the U.S. Supreme Court has granted a writ of certiorari and is again considering limiting or abrogating the doctrine of *Chevron* judicial deference.

---

[5] *See U.S. v. Home Concrete & Supply, LLC*, 132 S. Ct. 1836 (2012).

## SECTION 62(A)(2)(A)[6]

The section 62(a)(2)(A) deduction for unreimbursed employee expenses involves several underlying interpretive issues, including a threshold question of whether the deduction is a "miscellaneous itemized deduction" that is disallowed under section 67(b) and (g).[7]

That initial inquiry begins by defining gross income. Gross Income is statutorily defined in section 61, as all income "from whatever source derived" with due regard to Part II (§§ 71-91), *Items Specifically Included in Gross Income*, and Part III (§§ 101-140), *Items Specifically Excluded in Gross Income*. Once gross income is calculated, it is reported on a taxpayer's U.S. individual income tax return as "Total Income."

After total gross income is calculated, one next determines "Adjusted Gross Income," which is defined and calculated in accordance with Section 62 titled "Adjusted Gross Income Defined." Section 62(a) states "For purposes of this subtitle [Subtitle A, *Income Taxes*], the term "adjusted gross income" means, in the case of an individual, gross income minus the following deductions:" These enumerated deductions are not "itemized deductions." Because these deductions adjust and reduce *Gross Income* to calculate "*Adjusted Gross Income*," these are informally referred to as "*Above-the-Line Deductions*" since they are calculated "above the line" for "adjusted gross income.

Section 62(a) lists deductions that are taken from gross income to arrive at adjusted gross income; section 62(a)(2)(A) is one of those deductions (i.e., it is taken to arrive at adjusted gross income). Note that Section 67(b) defines "miscellaneous itemized deductions" as follows: "For purposes of this section, the term 'miscellaneous itemized deductions' means the *itemized*

---

[6] Referred on the Count Matrix below as Sec. 62
[7] Section 67(g) states that "no miscellaneous itemized deduction shall be allowed for any taxable year beginning after December 31, 2017, and before January 1, 2026," which, for individuals, is tax years 2018-2025.

*deductions* other than" those listed therein.[8]  Section 63(d), in turn, defines "itemized deductions" as "the deductions allowable under this chapter *other than* the deductions allowable *in arriving at* adjusted gross income."  The deduction under Section 62(a)(2)(A), which is deducted in arriving at adjusted gross income, is, therefore, not an "itemized deduction" and, therefore, is not a "miscellaneous itemized deduction."

Nonetheless, the government (and its previously disclosed expert) disagrees with this interpretation and maintains that the Section 62(a)(2)(A) unreimbursed employee expense is a miscellaneous itemized deduction and is, therefore, suspended under section 67(g).  Section 62(a)(2) lists five subsections, (A)-(E), that cover various trade expense deductions for employees. Subsection (A) thereof identifies the deductible expenses in Part VI, which covers Sections 161-199A as being applicable to all employees, allowing the deduction of "expenses paid or incurred by the taxpayer, in connection with the performance by him of services as an employee, under a reimbursement or other expense allowance arrangement with his employer."

In tax years 2017 through 2019, Mr. Castro interpreted the provision to be applicable to taxpayers who incurred expenses in carrying out their employment so long as there was an understanding that the employer had a reimbursement or other expense allowance arrangement generally.  Mr. Castro believed that this expense deduction was available when the employer did not, in fact, reimburse the employee for the expense.  Mr. Castro believed his position to be consistent with the text of the statute and with court precedent, such as *Plante v. U.S.*, in which the court held that "as long as the law allows deductions of ordinary and necessary expenses incurred in carrying on any trade or business, an employee should not be penalized in being precluded from

---

[8] (Emphasis added).

the allowance of a deduction because his employer does not reimburse him."[9]  The *Plante* decision emphasizes that such a rule "follow[s] what seems to be the weight of authority,"[10] indicating that there is arguably "substantial authority" for the proposition.

Notably, Castro often disclosed this position on the tax returns on which it was taken by filing a Form 8275 and explaining the position and the rationale that he believed supported it.

### Section 119 Employer-Provided Lodging and Meals Benefit[11]

Another tax-reporting position that is in dispute is the application of Section 119, which provides a deduction for certain meals and lodging furnished for the convenience of an employer, to self-employed individuals.

Generally, anything of value transferred from an employer to an employee is considered taxable income. It is generally deductible by the employer under Section 162, and, unless excluded from gross income, it is taxable to the employee.  Section 119, Meals or Lodging Furnished for the Convenience of the Employer, provides for certain deductible benefits that an employer may offer to its employees and, nonetheless, allows the employee to exclude the value of that benefit from gross income.

Section 119(a)(2) states "There shall be excluded from gross income of an employee the value of any meals or lodging furnished to him, his spouse, or any of his dependents by or on behalf of his employer for the convenience of the employer, but only if... in the case of lodging, the employee is required to accept such lodging on the business premises of his employer as a condition of his employment."

---

[9] *Plante v. U.S.*, 226 F. Supp. 314, 317 (D.N.H. 1963) ("Therefore, following what seems to be the weight of authority, I conclude that the better and more equitable rule is that an employee may deduct non-reimbursed payments made by himself in satisfaction of liabilities incurred while carrying on his employer's business, whether this be considered as carrying on his own business in earning his salary or as carrying on the business of his employer, or both.").
[10] *Id.*
[11] Referred on the Count Matrix below as Sec. 119

The IRS takes the position that this benefit is not applicable to self-employed individuals. Cite. In *Armstrong v. Phinney*, 394 F.2d 661, 662 (5th Cir. 1968), however, the Fifth Circuit held that under the Internal Revenue Code of 1954 is it legally possible for a partner to be an employee of his partnership for purposes of section 119.

Based on this authority Mr. Castro contends that self-employed individual may deduct the cost of their room and board under section 119 where the self-employed person conducts their business from home, much like an employee may exclude room and board provided to them where that room and board is part of the business's premises. In the self-employed context, the business owner is functioning in two capacities: as the employer and as the employee.

The application of Section 119 to self-employed individuals—that is, the treatment of a self-employed person as an employer and employee for such purposes—is consistent with certain other provisions of the Internal Revenue Code, where self-employed individuals are treated as both an employer and employee. For instance, section 401(c)(1) provides that "[t]he term 'employee' includes, for any taxable year, an individual who is a self-employed individual for such taxable year." This definition, utilized in the statutory provision governing qualified pensions, employee profit-sharing agreements, and employee stock bonus plans, demonstrates the treatment of self-employed persons as both employee and employer in other contexts. Buttressed by the *Armstrong v. Phinney* decision, Mr. Castro believed in good faith that there was at least a reasonable basis for the reporting position that such lodging fell under section 119's exclusion.

Mr. Castro also notes that the significance he has placed on *Armstrong* is consistent with numerous scholarly treatises. In citing to *Armstrong*, Mertens Law of Federal Income Taxation, states, "It has been held that meals and lodging provided to a 5% partner who was treated as an

employee by the partnership may qualify for the [Section 119] exclusion."[12] In citing to *Armstrong*, McGaffey Legal Forms with Tax Analysis states, a self-employed "partner may be eligible under § 119 to exclude from gross income meals or lodging furnished for the convenience of the employer."[13]  Edwin T. Hood's Federal Taxation of Close Corporations states, "sole proprietors and partners lack employee status because a sole proprietorship or a partnership is not viewed as an entity separate and distinct from the sole proprietor or the partners, and consequently, no entity exists that employs the proprietor or partners…But see Armstrong v. Phinney."[14]

### Work-Connected Temporary Impairment Prevention Expenses[15]

Another tax-reporting position in dispute is the reporting position that a taxpayer may deduct preventive healthcare expenses, such as insurance premiums and preventive healthcare expenses, as an "impairment-related work expense" that allows employees to work without concern of contracting or spreading illness.

Section 67(b)(1)-(12) identifies a dozen statutorily recognized itemized deductions used to calculate and arrive at "taxable income." If an itemized deduction is not expressly covered by one of the twelve enumerated statutory itemized deductions, it defaults to the status of a "miscellaneous itemized deduction." Section 67(g) states that "no miscellaneous itemized deduction shall be allowed for any taxable year beginning after December 31, 2017, and before January 1, 2026," which, for individuals, is tax years 2018-2025.

Section 67(b)(5) and (6) are not miscellaneous itemized deductions because they are specifically listed in section 67(b).  Section 67(b)(5) refers generally to medical expenses covered by Section 213.  Section 67(b)(6) refers more specifically to "impairment-related work expenses."

---

[12] Meals and Lodging Furnished to Employees, 1 Mertens Law of Fed. Income Tax'n § 7:200.
[13] 4 McGaffey Leg. Fms. with Tax Analysis § 19:23.
[14] Status as Employee, 1 Federal Taxation of Close Corporations § 2:17.
[15] In the Count Matrix below "Impair"

Although both are below-the-line deductions (below the AGI line) used to calculate taxable income, general medical expenses are potentially subject to additional thresholds under Section 213. Currently published IRS guidance recognizes that where such expenses are incurred to allow a taxpayer to be able to work, a taxpayer may take a Section 67(b)(6) deduction or a Section 213 deduction (though, of course, the taxpayer may not duplicate).[16]

"Impairment-related work expenses," however, are governed only by a brief statutory description at Section 67(d)(1)-(2), which states "For purposes of this section, the term 'impairment-related work expenses' means expenses of a handicapped individual (as defined in section 190(b)(3)) for … expenses in connection with such place of employment which are necessary for such individual to be able to work, and with respect to which a deduction is allowable under section 162 (determined without regard to this section)."

The term "handicapped individual" is statutorily defined at Section 190(b)(3). It states that the term "handicapped individual" means "any individual who has a physical or mental disability (including, but not limited to, blindness or deafness) which for such individual constitutes or results in a functional limitation to employment, or who has any physical or mental impairment (including, but not limited to, a sight or hearing impairment) which substantially limits one or more major life activities of such individual." Disability is not defined in the Code or Treasury Regulations. Other sources, however, provide insight on its potential scope. The World Health Organization, for example, notes that health conditions such as depression can give rise to "disability,"[17] and adopts the definition that "[d]isability is an umbrella term for impairments,

---

[16] Deducting Medical Expenses: A Little Different For People with Disabilities, IRS, available at https://www.irs.gov/pub/irs-utl/oc_october_medical_expenses_for_pwd_v7.pdf ("If you have a disability, you can take a business deduction for expenses that are necessary for you to be able to work. If you take a business deduction for these impairment-related work expenses, they are not subject to the 7.5 percent limit that applies to medical expenses.")

[17] See https://www.who.int/health-topics/disability#tab=tab_1.

activity limitations and participation restrictions. It denotes the negative aspects of the interaction between a person's health condition(s) and that individual's contextual factors (environmental and personal factors)."[18]   Given the WHO's global role with respect to healthcare, its definition arguably provides a commonly understood definition or scope of the term.

Treasury Regulation § 1.190-2(a)(3)(ii) explains that handicapped includes a "physical or mental impairment… which substantially limits one or more of such individual's major life activities, such as performing manual tasks, walking, speaking, breathing, learning, or working." These regulations do not specify whether these impairments must be permanent or whether they may be temporary in nature.

Mr. Castro contends that a "handicapped individual" should include any person who experienced a short-term inability to work due to any illness or inability to speak due to common illness, that might, for example limit an individual's ability to speak.

Mr. Castro also contends preventive healthcare is necessary for employees to work without concern of contracting or spreading illness. Preventive health care is generally encompassed within the IRS's general interpretation of medical care expenses, which it provides "must be primarily to alleviate *or prevent* a physical or mental disability or illness"[19]   and recognizes that, for example, "amounts paid for personal protective equipment, such as masks, hand sanitizer and sanitizing wipes, for the primary purpose of preventing the spread of the Coronavirus Disease 2019 (COVID-19 PPE) are treated as amounts paid for medical care under § 213(d) of the Internal Revenue Code (Code)."[20]   This interpretation also parallels other IRS guidance in the disability context, providing

---

[18]    The ICF: An Overview, published by the U.S. CDC, available at https://www.cdc.gov/nchs/data/icd/icfoverview_finalforwho10sept.pdf
[19] IRS Publication 502 (2023), Medical and Dental Expenses.
[20] Announcement 2021-7, Amounts Paid for Certain Personal Protective Equipment Treated as Medical Expenses, available at https://www.irs.gov/pub/irs-drop/a-21-07.pdf.

that "[q]ualified disability expenses include those for education, housing, transportation, employment training and support, assistive technology, personal support services, health, **prevention and wellness**, financial management, administrative services, legal fees, expenses for oversight and monitoring, and funeral and burial expenses."[21]   Mr. Castro thus contends that preventive healthcare expenses, such as insurance premiums and preventive healthcare expenses, are deductible "above the line" expenses.

---

[21] IRS Publication 907, Tax Highlights for Persons with Disabilities, available at https://www.irs.gov/publications/p907 (emphasis added).

### Depreciation is not mandatory[22]

Another tax-reporting position at issue is whether a taxpayer is required to "capitalize" and depreciate, over time, the cost of certain assets used in their trade or business or, alternatively, whether those assets may be deducted in full at one time (rather than over time).

Section 167 of the Internal Revenue Code states that "[t]here *shall be allowed* as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including reasonable allowance for obsolescence) of property used in the trade or business or of property held for the production of income."

Mr. Castro contends that this section of the Code provides that a taxpayer shall be allowed to depreciate certain property, but because the statute does not require depreciation, the taxpayer generally has the option to expense the cost of an asset used in a trade or business immediately as an "above the line ordinary" expense, rather than being required to "capitalize" the cost and depreciate it over time—so long as the asset is not an asset described in section 263, which otherwise generally requires capitalization of certain assets.

Section 263, which is titled "Capital expenditures," provides that "[n]o deduction shall be allowed for… [a]ny amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate."  The cost of an asset that falls under the scope of section 263 is generally required to be capitalized and deducted over time.

Mr. Castro believed, in good faith, that the statutory language in section 263 did not expressly cover vehicles and certain other assets at issue.  Rather, he believed that they fell under section 162, which generally applies where section 263 does not and states that there "shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable

---

[22] In the Count Matrix Below "Deprec."

year in carrying on any trade or business." Thus, in some instances, Mr. Castro maintained the tax-reporting position that a taxpayer may fully "expense" certain vehicles and other assets used in a taxpayer's trade or business. If, however, a taxpayer preferred to spread the deduction over a period of time, the taxpayer would have the right to depreciate the asset over time.

In addition, the Internal Revenue Code provides for other provisions that allow for the deduction of amounts paid for vehicles. Section 179, for example, authorizes the deduction of amounts spent on vehicles purchased to use in a trade or business, with certain limitations applicable to passenger vehicles, usually referred to as "luxury vehicles." Such deductions were generally limited to $10,000 with respect to 2018. Section 168(k) provides another example, wherein Congress, as part of the 2017 Tax Cuts & Jobs Act, enacted a "bonus depreciation" allowance, generally allowing for a deduction up to $16,400 (in 2018) pursuant to section 168(k) where a taxpayer placed a qualified vehicle into service in a trade or business. A taxpayer who qualified under section 168(k) would likely qualify for a section 179 deduction as well,

Notably, when a taxpayer deducts the cost of an asset, the taxpayer must likewise reduce the "basis" of that asset by an equivalent amount.[23] If a taxpayer later sells or disposes of that asset, the taxpayer may then be required to recognize a taxable gain—a reality that generally becomes more likely where the cost has been deducted over a short period of time.[24] The taxable gain, which is "ordinary income" to the extent of amounts previously deducted from its basis, is equal to the amount realized on the sale of the asset minus the "basis" of the asset.[25] Thus, where a taxpayer has deducted the cost of a vehicle or other asset, the taxpayer will later likely be subject to a taxable gain on the disposition of that vehicle.

---

[23] I.R.C. § 1014.
[24] I.R.C. § 1000.
[25] I.R.C. § 1245.

### Commuting[26]

Section 162(a)(2) states, "There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including… traveling expenses… while away from home in the pursuit of a trade."

Section 262 states that "no deduction shall be allowed for personal… expenses." Mr. Castro contends, however, that when a person commutes to work, the cost of commuting should be treated as an "ordinary business expense" because he or she is incurring the expense of traveling in the pursuit of a trade or business.

Mr. Castro is and was aware that in *C.I.R. v. Flowers*, 326 U.S. 465, 469 (1946), the Court held that the statute would be "read in light of the interpretation given it by" then-existing Treasury regulations. He, however, believed that the 2012 Supreme Court case of *Home Concrete*, effectively abrogated the Supreme Court's earlier decision in *Flowers*, given that the plain text of the statute could arguably be read to allow for the deduction of such expenses because they were incurred in carrying on the taxpayer's trade or business. He published this position and belief online contemporaneously with the tax returns at issue.

He also contends that the plain statutory text enacted by Congress at Section 280F(d)(6)(B) (enacted in 1984) expressly provides that "qualified business use means any use in a trade or business of the taxpayer." Against the fact that under the tax law an employee is considered to be engaged in the trade or business of performing services as an employee,[27] Mr. Castro held a belief that there was a good-faith reporting position that the taxpayer's use of a vehicle in carrying on their trade or business satisfies the "any use" standard and, therefore, allowed for deductibility. He believed that because Congress did not carve-out an exception for commuting and this was

---

[26] Referenced in the Count Matrix Below as "Commut."
[27] E.g., Treas. Reg. § 1.199A-5(a) ("the trade or business of performing services as an employee").

enacted in 1984 after the 1946 *Flowers* case, Congress arguably nullified the impact of the *Flowers* case.

Mr. Castro accounted for commuting by determining a vehicle's "business use percentage," which was obtained by an employee.  If precise mileage was unknown, his firm employed a good faith estimate.

### Charitable Contribution with Subjective Pecuniary Interest is a Business Advertising Expense[28]

Section 170(c) defines a charitable contribution as a "contribution" or "gift" to a charitable entity.  A gift has been defined by the U.S. Supreme Court as stemming from "detached and disinterested generosity."[29]  The U.S. Supreme Court has also explained that "if the payment proceeds primarily from… the incentive of anticipated benefit of an economic nature, it is not a gift."[30]

Mr. Castro contends that if a taxpayer primarily anticipated a marketing, promotional, or business benefit from a charitable contribution, there is reasonable basis to reclassify the charitable contribution as an advertising expense, which is an "above the line" business expense deduction. He believes that his position was consistent with IRS authorities, including Revenue Ruling 67-246, which provides that "where consideration in the form of admissions or other privileges or benefits is received in connection with payments by [the taxpayer] . . . the presumption is that the payments are not gifts."  Indeed, other authorities have noted this reporting position, including the following contemporaneous description, which is from The Tax Advisor, an AICPA publication, regarding the common scenario involving the recharacterization of a charitable contribution as an advertising expense:

---

[28]Referred to in the Count Matrix Below as "Chr Mtg"
[29] C.I.R. v. Lo Bue, 351 U.S. 243, 246 (1956).
[30] C.I.R., v. Duberstein, 363 U.S. 278, 285 (1960).

***Advertising and marketing expense***: Under certain conditions, a business may deduct what would appear to be a charitable contribution as an advertising and marketing expense. For the expense to be classified as an advertising expense, the business needs to substantiate that it received something in return (a direct benefit), so the cost can be classified as an "ordinary and necessary business expense." If the business just has its name and logo published, the IRS does not consider that to be a "substantial return benefit" and does not consider it to be a deductible advertising expense. Instead, it would be more beneficial for the business to follow the guidance provided under IRS Publication 598, *Tax on Unrelated Business Income of Exempt Organizations*, of what constitutes an advertising expense, which includes (1) messages containing qualitative or comparative language, price information, or other indications of savings or value; (2) an endorsement; and (3) inducements to purchase, sell, or use the products or services. When these attributes are in place, the business would likely be able to deduct the fair market value (FMV) of its total contribution as a marketing expense.[31]

---

[31] *Recommendations for Charitable Contributions Made by Businesses*, The Tax Advisor, AICPA, Oct. 1, 2017 (available at https://www.thetaxadviser.com/issues/2017/oct/charitable-contributions-businesses.html).

### Child Care is An Ordinary and Necessary Expense[32]

Under Section 262, Congress declared that "*Except as otherwise expressly provided in this chapter* [including Section 162 Ordinary and Necessary Business Expense], no deduction shall be allowed for personal, living, or family expenses."  Section 262 is, therefore, subordinate to other sections that may permit the deductibility of "personal, living, or family expenses" that fall within their scope, including Section 162.

Mr. Castro contends that childcare expenses that are necessary to allow a taxpayer to work should not be treated as disallowed "personal, living, or family expenses," but rather as ordinary and necessary expenses incurred in carrying on the taxpayer's trade or business, which are deductible under Section 162.  As Samantha Trussell of George Mason University's Antonin Scalia Law School has explained, "The working wife was a new phenomenon in 1939 (when the courts first held childcare expenses should be treated as personal expenses) with most families consisting of the single working father. However, the same cannot be said today, as most families consist of dual-earner couples due to necessity. It has been eighty years since [this] was decided and society and families have changed drastically since then. Therefore, this case should no longer control what is an ordinary and necessary business expense."[33]

In short, the working mother is an "ordinary" phenomenon in today's society and childcare is "necessary" if both parents work.[34]  In other words, the actual text of the relevant code provision provision—when combined with the shifts in social behavior that have resulted in the "working

---

[32] Referred to on the Count Matrix Below as "Childcare"
[33] Samantha Trussell, Stuck in the Fifties, 15 J.L. Econ. & Pol'y 257, 276 (2020).
[34] *Id*. at 277.

mother" being the "norm"[35]—supports a reading that such expenditures should be deductible as ordinary business expenses.

---

[35] Indeed, as Trussel correctly notes, the *Smith* court "held that the working wife was not an ordinary phenomenon, but this is no longer true today. In 2013, 69.9% of women were working mothers with children under the age of eighteen."  *Id.*

### Mortgage-Mandated Homeowners' Insurance is Substituted Mortgage Insurance[36]

Another tax position at issue is the deduction of mortgage-mandated homeowner's insurance, based upon the theory that it is a surrogate for mortgage insurance (which, there is no dispute, is generally deductible) and the cost thereof (because it is mandated by a lending institution), is in substance a cost of borrowing, much like interest on the mortgage (which, there is no dispute, is generally deductible).

Section 163(h)(3)(E) states, "Premiums paid or accrued for qualified mortgage insurance by a taxpayer during the taxable year in connection with acquisition indebtedness with respect to a qualified residence of the taxpayer shall be treated for purposes of this section as interest which is qualified residence interest."

Section 163(h)(4)(E)(ii) defines "qualified mortgage insurance" to be "private mortgage insurance (as defined by section 2 of the Homeowners Protection Act of 1998 (12 U.S.C. 4901), as in effect on the date of the enactment of this subparagraph)."

12 U.S.C. § 4901(13) defines "private mortgage insurance" as "mortgage insurance other than mortgage insurance made available under the National Housing Act, Title 38, or Title V of the Housing Act of 1949."

Lender-mandated homeowners' insurance is a surrogate for mortgage insurance. The rationale for affording mortgage insurance the characterization of "interest" (which is deductible) is that the mortgage insurance is a cost to the homeowner of purchasing and financing the house—that is, it is a component of the lender-mandated cost to borrow funds to purchase the house.  Much the same, lender-mandated homeowner's insurance is a lender-mandated cost to borrow funds to purchase and finance the house.  This parallel

---

[36] Referenced in the Count Matrix Below as "163(h)(3)

rationale underscores the substance of the insurance, which in tax law governs treatment rather than the "form."

Mr. Castro contends that the plain meaning and functional meaning of the terms provides a good-faith reporting position that when financial institutions mandate homeowner's insurance to secure repayment of the mortgage, they are, in effect, contractually mandating homeowners' insurance in the mortgage loan such that the cost of the homeowners insurance should be deductible.

### Software Errors[37]

Several of the items that comprise specific allegations within some of the counts are traceable to computer coding errors by Wolters Kluwer's CCH ProSystems FX Tax software that the Castro firm used while processing returns during the relevant tax years. One such error was that the software would take a Schedule E Asset Coded "L" for "Land," and misidentify a code "L" for leased vehicle.

In the case of taxpayer Michael Putica, for example, the software calculated that there were 10,000 business miles attributable to the "land" and deducted it at 58 cents per mile, which resulted in a $5,800 deduction error.

In addition, unknown to the employees at the Castro firm, the software did not transmit all "details" in relation to a claimed deduction to the IRS with the electronically submitted return.

Also, the asset details did not cross-link in sections for depreciation. Specifically, Mr. Castro believed that numbered assets entered in "fields" within the software application "communicated" with one another.  For example, if "Asset 1" is input and identified as being 70%

---

[37] In Count Matrix Below, referred to as Softwar Error

business use in one section, then Mr. Castro believed the "Asset 1" expenses in a separate section were automatically adjusted to account for the 70% limitation.

Most importantly, because this was a systematic error that repeated many times, the software allows users to set certain defaults for income tax returns.  Generally, however, when actual data is entered, the data entered was believed to override the system defaults. For example, the firm often entered a 70% default work-use percentage of a vehicle. However, on many returns, this entry overrode percentages that the taxpayer specifically provided, whether the reported business use by the taxpayer was lower or higher.

## IRS Rules Governing the Assertion of Legal Positions within a Return

The defense contends that if a tax reporting position at issue objectively satisfied the "reasonable basis" or "substantial authority" positions described below (based upon the law and legal authorities, and applying the rule of lenity with respect to any ambiguities), then Mr. Castro cannot be convicted with respect to a count based upon that reporting position because, as a matter of law, he could not "willfully" violate the law with respect to that reporting position.  That is, the Court need not even reach Mr. Castro's subjective belief in the position if the position objectively satisfies a reporting standard that is sanctioned by the Internal Revenue Code.  (To be sure, these reporting standards are also relevant to the subjective inquiry with respect to the "willfulness" element, and necessarily color that willfulness element.).

For civil tax purposes, a tax preparer may take a legal position in the course of preparing a tax return so long as the position has a "reasonable basis" and may ensure that the taxpayer avoids exposure to civil tax penalties if the reporting position is disclosed.  Disclosure is not necessary to avoid penalty exposure if the position is supported by "substantial authority"—a standard that is described below.  As the Congressional Joint Committee on Taxation, in summarizing the law in

this context, has previously stated: **"If a taxpayer takes a position contrary to a rule or regulation, the taxpayer is not treated as disregarding the rule or regulation if the position has a realistic possibility of being sustained on its merits."**[38]   "'[R]easonable basis' is a lower level of authority than the "realistic possibility" standard. . . ."[39]

Although the "reasonable basis" standard is somewhat vague, authorities have tended to quantify the standard as generally ranging from a 10-to-30-percent change of being upheld: "'Reasonable basis' has been viewed as having a 10-20% likelihood of success if challenged."[40]

If, on the other hand, a position has "substantial authority" to support it, there is no requirement to explain or disclose the reporting position in a separate attachment or form (IRS form 8275) accompanying the return in order to obtain a defense to civil penalty exposure. Indeed, under Treasury Regulations, where substantial authority exists, the position is deemed proper for such purposes, even if the IRS disagrees with it: "If there is substantial authority for the tax treatment of an item, the item is treated as if it were shown properly on the return."[41]

The "substantial authority" standard is "less stringent than the more likely than not standard,"[42] meaning that substantial authority does not require that a reporting position even be likely to be upheld. There may be substantial authority for more than one position with respect to

---

[38] STUDY OF PRESENT-LAW PENALTY AND INTEREST PROVISIONS AS REQUIRED BY SECTION 3801 OF THE INTERNAL REVENUE SERVICE RESTRUCTURING AND REFORM ACT OF 1998 (INCLUDING PROVISIONS RELATING TO CORPORATE TAX SHELTERS), Vol. 1, Joint Committee on Taxation, p. 162 (July 22, 1999).
[39] AICPA Finalizes New Standards on Tax Positions, The Tax Advisor (citing AICPA Statements on Standards for Tax Services, Section 1.1, paragraph 5(b), (c).
[40] Robert G. Woodward, Tax Opinions, 2010 ABA Tax-CLE 0923078 ¶ III.B (Sept. 2010), Westlaw, 2010 WL 4607769.
[41] Treas. Reg. § 1.6662-4(d)(1).
[42] Treas. Reg. § 1.6662-4(d)(2).

the same item.[43] And a tax preparer "may [even] have substantial authority for a position that is supported *only* by a well-reasoned construction of the applicable statutory provision."[44]

If a tax preparer's legal position has less than "substantial authority," a tax preparer may assert a position that merely has a "reasonable basis" and may ensure avoidance of exposure to civil penalties for that position by alerting the IRS to the position on Form 8275, which accompanies the tax return. Under Treasury Regulations, "[i]f a return position is reasonably based on one or more of the authorities set forth in § 1.6662–4(d)(3)(iii) (taking into account the relevance and persuasiveness of the authorities, and subsequent developments), the return position will generally satisfy the reasonable basis standard even though it may not satisfy the substantial authority standard as defined in § 1.6662–4(d)(2)."[45]

Moreover, "[n]o penalty under section 6621(b)(1) may be imposed on any portion of an underpayment that is attributable to a… position contrary to a rule or regulation if the position is disclosed… and, in case of a position contrary to a regulation, the position represents a good faith challenge to the validity of the regulation."[46]

## **Willfulness**

If the Court were to conclude that Mr. Castro did not have a reasonable basis for any of the reporting positions taken with respect to the returns underlying the 33 counts of the indictment, the Court would then need to analyze whether the "willful" mens rea was present.  Conviction of an offense under 26 U.S.C. § 7206(2) requires that the Government prove beyond a reasonable doubt that Mr. Castro "willfully" prepared fraudulent and false tax returns.  In this context, where the issue turns on whether Mr. Castro utilized a tax-reporting position that he believed had a

---

[43] Treas. Reg. § 1.6662-4(d)(3)(i).
[44] Treas. Reg. § 1.6662-4(d)(3)(ii).
[45] Treas. Reg. § 1.6662-3(b)((3).
[46] Treas. Reg. § 1.6662-3(c).

"reasonable basis" (as that standard is defined for federal tax purposes) that thereby allowed him to report with the position, the defense contends that the Court must therefore find beyond a reasonable doubt that Mr. Castro knew that a tax-reporting position did not rise to the level of having a "reasonable basis" and knowingly and intentionally violated that standard through the use of the tax-reporting position.  It is insufficient to find that Mr. Castro believed that the IRS would disagree with a position.  He was, in other words, legally allowed to take a position that represented a good-faith challenge to the application of a regulation.[47]

The Supreme Court's seminal case with respect to the element of willfulness in the criminal tax context is *Cheek v. U.S.* 498 U.S. 192 (1991).  In *Cheek*, the court held that willfulness requires a "voluntary, intentional violation of a known legal duty."  A good-faith misunderstanding of the law or a good-faith belief that one is not violating the law negates willfulness, whether or not the claimed belief or misunderstanding is objectively reasonable.  The court specifically noted that this heightened *mens rea* requirement was necessary because of the complexity of the tax laws.

Indeed, the Supreme Court has explained that Congress added the element of willfulness to tax crimes to ensure that a taxpayer or professional does not "become a criminal by his mere failure to measure up to the prescribed standard of conduct." *U.S. v. Murdock*, 290 U.S. 389 (1933), *overruled on other grounds by Murphy v. Waterfront Comm'n of New York Harbor*, 378 U.S. 52 (1964).  That is, the issue in this case is *not* whether a tax-reporting position was correct.  A tax-reporting position that is incorrect does not equate to a criminal violation.  Instead, the issue is whether Mr. Castro filed a return knowing that his position did not have a reasonable basis in the law with the specific intent to commit fraud.   In evaluating this ultimate issue, a factfinder must, of course, be careful not to conflate the applicable civil standards (which are, to be sure, relatively

---

[47] Treas. Reg. § 1.6662-3(c).

low) with the much higher standard (of willfully violating those standards) applicable in the criminal context.

Respectfully submitted,

/s/ Franklyn Mickelsen
Franklyn Mickelsen
TX Bar No. 14011020
Broden & Mickelsen
2600 State Street
Dallas, TX 75204
(214) 720-9552
(214) 720-9594 (facsimile)
mick@texascrimlaw.com

Jason B. Freeman
/s/ Jason B. Freeman
TX Bar No. 20469736
7011 Main Street
Frisco, TX 75034
(214) 984-3410
(214) 984-3409 (facsimile)

Attorneys for Defendant
John Anthony Castro

## CERTIFICATE OF SERVICE

I, Franklyn Mickelsen, certify that on May 16, 2024, I caused a copy of the foregoing document to be served via electronic filing on all counsel of record.

/s/ Franklyn Mickelsen
Franklyn Mickelsen