UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

FORT WORTH DIVISION

Case No. 4:24-cr-001

UNITED STATES OF AMERICA

v.

JOHN ANTHONY CASTRO

LETTER REGARDING NEW EVIDENCE AND BRADY VIOLATIONS

To The Honorable Judge Means,

I vividly recall the dream I had that instructed me I could trust your Honor's judgment. This is what led me to pursue a bench trial and take the stand in my own defense. Others called my decision foolish, especially in light of the verdict. But I knew and still know that, as a brother in Christ, your love of and faithfulness to justice, fairness, and transparency will validate my decision.

Although I was initially scared to make any waves prior to sentencing, I was given peace and now write this letter to call your attention to the following matters that I am certain you would want to know of. I beg your forgiveness if this is naive of me, but I could not imagine that any lover of justice would not want to know of these issues that raise genuine and grave concerns.

I. Material Impeachment Evidence Was Suppressed

At trial, the prosecution's two star witnesses were Linda Rivera and Ahmed Jamaal Lampkin.

A) Linda Rivera's Tax Crimes Were Suppressed

The New Client Information Sheet that Linda Rivera initially provided to Defendant's tax firm clearly indicated she was Single; unmarried. Unbeknownst to Defendant, Linda Rivera had been married for many years before, during, and after she engaged Defendant's firm to prepare her income tax returns. However, the prosecution was fully aware that Linda Rivera had been married for all those years. The prosecution was also aware Linda Rivera filed false income tax returns fraudulently claiming a marital status of "Single" and "Head of Household." Linda Rivera avoided filing with a marital status of "Married Filing Jointly" with her husband because he had a significant amount of unpaid child support. If Linda Rivera had filed with her husband as "Married Filing Jointly," her income tax refunds would have been seized by the IRS on behalf of the State of Florida to cover her husband's unpaid child support. By filing false income tax returns knowingly misrepresenting her marital status, Linda Rivera aided and abetted her husband in defrauding his children and obstructing the State of Florida's ability to utilize the IRS to collect the unpaid child support.

The prosecution was fully aware of Linda Rivera's fraudulent misrepresentations regarding her marital status because they thoroughly interviewed, investigated, and audited income tax returns of hers for years unavailable to Defendant. The prosecution was fully aware that her crimes of filing false income tax returns were independent of Defendant and still within the statute of limitations for criminal prosecution. Linda Rivera also knew her crimes were still within the statute of limitations and prosecutable.

In addition to the suppression of Linda Rivera's ongoing fraudulent filing status, the prosecution did not disclose to the defense that immunity from prosecution was implicitly offered to Linda Rivera in exchange for her testimony; the implied acceptance of which is made evident by two facts: Linda Rivera has not been indicted, and the prosecution has no plan to indict her.

Lastly, Linda Rivera created a social media page on Instagram in 2015 to announce the opening of her cupcake business, which was years before she had any association with Defendant. In one post, she publicly stated that she had started Cupcakes Galore while brandishing a professionally made business card; an expense. In another post, she displayed some of the pastries she sold to a customer; income. Both income and expenses.  Based on new evidence, Defendant has learned that Linda Rivera failed to disclose her income from this activity on her 2015 federal income tax return even if to report it as a loss-blocked hobby if she failed to meet the Material Participation threshold.

None of this information was disclosed to the defense.

Linda Rivera's ongoing tax crime of fraudulently misrepresenting her marital status on her false income tax returns, the undisclosed immunity benefit she received in exchange for her testimony, and the new

evidence regarding her concealment of the cupcake activity and failure to report it on her 2015 tax return, viewed cumulatively, would have seriously undermined the testimony of Linda Rivera and could have resulted in an acquittal on this count based on her total lack of credibility based solely on the evidence of her ongoing tax crime of knowingly filing false income tax returns fraudulently misrepresenting her marital status with a clearly established motive.

B) Ahmed Jamaal Lampkin's Past Criminal Convictions and Prior Bad Acts Were Suppressed

At trial, the prosecution presented Ahmed Jamaal Lampkin as a good citizen, and he testified as to his employment-related expenses and character.

However, the prosecution was aware that Ahmed Jamaal Lampkin had a violent history involving domestic physical abuse against his ex-girlfriend that became so violent that she later obtained a civil restraining order against him, substance abuse evidenced by multiple convictions that resulted in the revocation of his driver's license that necessitated his extensive use of public transportation, and assaulting federal law enforcement officers in Washington, DC, which cumulatively demonstrate a total lack of respect for the law.

The prosecution was aware of Ahmed Jamaal Lampkin's past criminal convictions and prior bad acts. The prosecution did not disclose these past criminal convictions and prior bad acts to the defense to ensure a proper cross-examination to aid this Honorable Court in its judgment as to credibility.

Ahmed Jamaal Lampkin's past criminal convictions and habitual history of violence and aggression would have seriously undermined his testimony at trial and made it substantially more likely that Ahmed Jamaal Lampkin had no respect for the law and deceptively provided misleading information to Attorney Joshua Scott Milam, J.D., LL.M., during his annual tax interview by stating that he had extensively utilized public transportation but failing to clarify it was paid for by his employer.

The average monthly cost of the public transit benefit that Ahmed Jamaal Lampkin testified to receiving from his employer was valued at $315 per month in 2024, which totals to $3,780 for the year. It is unclear what the value was in 2017. However, coupled with other single passenger public transportation costs, such as Uber and Lyft, this figure is strikingly close to the amount reported on Mr. Lampkin's return. Being that Ahmed Jamaal Lampkin's employment required frequent travel in and around the Washington, DC, area, his personal Uber and Lyft accounts would confirm the differential. However, Defendant was not provided fair notice and an opportunity to subpoena Mr. Lampkin's Uber and Lyft accounts to determine his usage for that year. To the contrary, Defendant was repeatedly assured that the prosecution's only argument was that his legal positions were outlandish and frivolous. Defendant was further assured by the prosecution that the factual existence of the expenses was not at issue,

which led Defendant to agree to the testimony stipulations and not prepare a defense on that issue. This deprived Defendant of a fair trial.

Defendant was not privy to the tax interview of Ahmed Jamaal Lampkin, but Attorney Milam testified as to his honest tax interview of Mr. Lampkin for that year, which included the deduction claimed for thousands of dollars in public transportation costs. There would have been no way for Attorney Milam to have known of the suspension of Mr. Lampkin's driver's license due to multiple convictions for driving under the influence that necessitated his extensive public transportation usage, whether by Uber or the DC Metro Subway or whether paid for by Mr. Lampkin himself or his employer, but for that information being provided by Mr. Lampkin. This new evidence cumulatively establishes that the source of the information regarding the unusually high expenses for public transportation originated with Ahmed Jamaal Lampkin.

More concerning, when a pre-trial criminal history report for Ahmed Jamaal Lampkin was pulled, there was no reference to any of his past criminal convictions. However, a lingering suspicion afterwards led to the pulling of a subsequent report that revealed the criminal history. This new evidence and disturbing circumstances suggest not just a mere failure to disclose but possibly even active concealment of Ahmed Jamaal Lampkin's past convictions.

## II. Applicable Law

### A) Our Standard of Review

In Giglio v. U.S., the Supreme Court concluded that the suppression of impeachment evidence violated the Brady Rule that the prosecution disclose any and all exculpatory evidence to the defense. See 405 U.S. 150 (1972). In U.S. v. Swenson, the Fifth Circuit reaffirmed that under "the familiar Brady standard, the government violates a defendant's due process rights if it withholds evidence that is favorable," which "extends to impeachment evidence." 894 F.3d 677, 683 (5th Cir. 2018).

To prevail on a Brady claim, a "defendant must show: (1) the evidence at issue was favorable to the accused, either because it was exculpatory or impeaching; (2) the evidence was suppressed by the prosecution; (3) the evidence was material." U.S. v. Dvorin, 817 F.3d 438, 450 (5th Cir. 2016).

The "suppressed evidence need not be admissible to be material under Brady, but it must, somehow, create a reasonable probability that the result of the proceeding would be different. We [the Fifth Circuit] assess the materiality of the suppressed evidence cumulatively, not item by item. Once a Brady violation has been shown, there is no need for further harmless error review and a new trial is the

prescribed remedy, not a matter of discretion." U.S. v. Brown, 650 F.3d 581, 589 (5th Cir. 2011); also see U.S. v. Freeman, 64 F.3d 243 (5th Cir. 1999). In other words, the "material" standard requires that the impeachment evidence could have resulted in a dismissal or acquittal of a particular count. See Speer v. Lumpkin, 824 Fed.Appx. 240 (5th Cir. 2020).

What evidence has been identified by the Fifth Circuit as being "material" for this purpose?

If the impeachment evidence "would seriously undermine the testimony of a key witness," then the "withheld evidence has been found to be material" as a matter of law. U.S. v. Weintraub, 871 F.2d 1257, 1262 (5th Cir. 1989).

Moreover, where the prosecution was aware of past criminal convictions and prior bad acts of key witnesses, the cumulative impact of these multiple Brady violations warranted a new trial. See U.S. v. Sipe, 388 F.3d 471 (5th Cir. 2004). If past convictions and prior bad acts are sufficient to impeach, ongoing crimes would be powerfully more impeaching.

In this case, there is certainly a substantial likelihood that the Court could have reached a different result if it knew that Linda Rivera had been knowingly filing false and fraudulent income tax returns for years before she engaged Defendant's firm to prepare her tax returns, that her crimes continued even after her relationship with Defendant's firm ended, and that her crimes were still ongoing.

This information would have seriously undermined the prosecution's star witness, Linda Rivera, by exposing that she was compromised due to the prosecution's knowledge of her ongoing federal tax crimes.

Therefore, in accordance with established Fifth Circuit jurisprudence, this evidence was "material" as a matter of law.

In addition, there is a substantial likelihood that this Court could have reached a different result if it knew that Ahmed Jamaal Lampkin had a violent history that included recent prior bad acts of physical violence against women that resulted in a restraining order and past convictions for substance abuse and physically assaulting law enforcement officers evidencing a total lack of respect for the law. These past convictions and prior bad acts would have seriously undermined the credibility of Ahmed Jamaal Lampkin's testimony making it substantially more likely that he deceived Attorney Milam into noting deductions for public transportation costs that Ahmed Jamaal Lampkin knew were paid for by his employer.

As the Fifth Circuit concluded in Sipe, "[t]aken together, this evidence would have allowed [the defendant] to attack the government's case... the government's star witness could be impeached... [others] grilled on the benefits they received in exchange for their testimony... a witness the government presented as a good citizen... could have been undermined by revelations that" he had multiple past criminal convictions and prior bad acts. 388 F.3d at 491-92.

The cumulative effect of all of these Brady violations deprived Defendant of powerful impeachment evidence.

B) His Standard of Review

Our citizenship is in heaven. Philippians 3:20. Thus, although we temporarily adhere to this world's laws, we are always subject to, bound by, and judged according to Christ's laws. 1 Corinthians 9:21. A fair and impartial court uncovers everything to judge the hidden. Hebrews 4:13. To judge people's secrets. Romans 2:16. Elder Christian jurists have a responsibility over the younger. 1 Peter 5:2-4. The prosecution knowing a witness previously has and presently is committing tax crimes, another witness having committed past crimes and other bad acts demonstrating a lack of respect for the law, failing to disclose all of that information to the defense to ensure a proper cross-examination to aid the Court in its judgment as to credibility and willfulness, and putting those witnesses on the stand as though they were unquestionably testifying trustworthily must be corrected. 2 Timothy 3:16-17, 4:2; Titus 2:15. No one should practice or tolerate the use of falsehoods. Revelation 22:15; Amos 5:15. Christians are to only speak truth to one another. Ephesians 4:25. There can be no excuse when we all appear before the judgment seat of our Lord Jesus Christ. 2 Corinthians 5:10.

III. Prayer

As I've self-reflected in the Word over the past several months, two words kept repeating in my mind: I strayed. Psalm 119:176. Although disclosed to the authorities, I failed to explain to clients the uncertainty of the legal positions I advocated for and, in doing so, harmed clients that were not in a position to understand and provide informed consent to such a novel and complex legal interpretations. I am in no position to judge others. Matthew 7:1-5. I failed to be holy in everything I did, especially in failing to communicate respectfully with clients. 1 Peter 1:15. I failed to lead by example. Ephesians 5:11; Titus 2:7-8. With my thick pride and arrogance, I failed to serve others humbly. Galatians 5:13; Matthew 23:12. I was insolent, arrogant, and boastful. Romans 1:30. I failed to conduct myself in a way worthy of Jesus. Philippians 1:27. Despite all of my moral failures and shortcomings as a Christian, the Holy Spirit told me to be persistent in pursuing justice. Luke 18:7-8.

My only prayer now is to live a quiet life with my wife and children. 1 Thessalonians 4:11. To put to permanent rest my Earthly nature. Colossians 3:13. To always forgive others as Christ forgave me. Matthew 18:21-35; Ephesians 4:32; Colossians 3:13. To no longer suppress my spirit. 1 Thessalonians 5:19. To draw nearer to Christ and work on myself. 1 Peter 2:4-5. To no longer simply listen to the Word but to apply it to every aspect of my life. James 1:22. To pursue love, faith, and gentleness. 1 Timothy 6:11-12. To live a holy life by faith. 1 Thessalonians 4:7; Romans 1:17. To fan into flame the gift of God. 2 Timothy 1:6; Romans 12:6. To offer myself as an instrument of Christ. Romans 6:13. This ordeal has already led to so much spiritual maturity. James 1:2-4. Even as I sit in prison, I trust my Father in heaven as the Holy Spirit guides me in writing this letter. Luke 12:11-12; Mark 3:29. Come what may, it is well with my soul.

The central virtues of a Christian jurist must be justice, mercy, and faithfulness. Matthew 23:23. Christ taught us to simply faithfully ask. Matthew 7:7-12.  I faithfully ask this Honorable Court for justice to uphold not only the spirit of our laws but the spirit of Christ's laws by determining how to further uncover and remedy these evidentiary issues that were hidden from your Honor so that we may uphold His honor.

Respectfully submitted,

John Anthony Castro

Prisoner # 93890510

Unit FTW-J-A

Federal Medical Center

P.O. Box 15330

Fort Worth, TX 76119