

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

FORT WORTH DIVISION

UNITED STATES OF AMERICA

v.  Case No. 4:24-CR-001

JOHN ANTHONY CASTRO

SECOND LETTER TO THE JUDGE

To the Honorable Judge Means:

"Truth has perished; it has vanished from their lips." Jeremiah 7:28.

When I was just a 16-year-old Sophomore at United High School in Laredo, Texas, I was exposed to injustice. Earlier that year, I had made a choice to become an altar server at Saint Luis Rey Church. Although I was later baptized as a protestant at the age of 24, I had always felt pulled toward the faith. But that year, something shook my faith. I was falsely accused by a female schoolmate who later admitted to the judge she fabricated the story due to romantic feelings she had for my then-girlfriend. It started when I was spending time with my girlfriend after school before football practice. My girlfriend's best friend, Kimberly Martinez, began teasing me and my girlfriend. She was very "Tomboyish," and we horse played back and forth. After my girlfriend and I began to ignore her, she became upset and left. I thought nothing of it. The following day, a uniformed police officer walked into my classroom and asked for me to come with him. I was escorted to the Vice-Principal's office. I asked the officer what the issue was, but he just ignored me. I was scared and confused. When I got into the office, there were two other uniformed police officers. At first, I thought something may have happened to my father who worked for what was then called the U.S. Border Patrol. When I asked why I was there, one of the officers got in my face and yelled, "You know what you did!" pointing his finger inches from my nose. Another officer then showed me photographs of what looked like a female's body with bruises everywhere. Everywhere. Bruises on her neck, torso, back, arms, legs. It looked like a person who had been attacked by multiple people. At the top of the photo, I saw the name: "Martinez, Kimberly." My heart sank. It felt like the temperature in the room suddenly dropped 40 degrees, and I began to tremble uncontrollably. Softly in

disbelief, I said, "I didn't do this." The aggressive officer then yelled again "So what are you saying, that she did it to herself?!" Ironically, as would later be revealed in open court, Kimberly had, in fact, done it to herself. She knew her body bruised easily because she was bulimic. But no one knew that at this time. Another officer calmly walked over to the aggressive officer and whispered in his ear to step outside of the room. I later learned the yelling officer had two daughters, so his reaction was motivated out of love and protection for his own girls. He meant well. His heart was in the right place. He just did not know he was being manipulated. He was being lied to. He was being deceived.

"[A] lying tongue lasts only a moment." Proverbs 12:19.

I was handcuffed and escorted into a police vehicle. I was in shock and emotionless. I was not allowed back onto campus. Instead, I was transferred to a military-style "alternative" school for delinquents where I was told I would remain for the remainder of the year. For several months, I simply focused on my studies and prayed. Finally, the day of trial came. The prosecution offered probation if I pled guilty, but I refused the offer, which infuriated the prosecution. They vowed to pursue the maximum amount of jailtime if I did not accept their offer, but I stood firm. I knew I had done nothing wrong. My attorney pleaded with me to accept the deal and reassured me that once I completed the probationary period, I could have it expunged from my record. I declined the offer. I could not in good conscience admit to something I knew in my heart I did not do.

"He rescues and he saves." Daniel 6:27.

My case was called. I walked up and sat at the table while silently praying. At that moment, the prosecution stood up and said they were dropping all charges. The judge immediately demanded to know why. The prosecution indicated that the alleged victim had recanted her accusations. The judge demanded she be brought out. She was crying and confessed she had hit herself and that she bruised easily because she suffered from bulimia. The judge then said something I will never forget, "Well young lady, because you were honest, you don't have to worry about being charged with perjury." Without even looking at me or acknowledging the humiliation I endured being arrested and kicked out of school, spending months in alternative school, and ruining my sophomore year, the case was simply dismissed. I felt so violated. So worthless. So insignificant. How could this happen? What would have happened if she had not confessed, she was lying? That was the day I firmly decided to go to law school to make sure I could never again be falsely accused.

"To show partiality in judging is not good." Proverbs 24:23.

Months later, I learned that I received such harsh treatment because Kimberly's father was a close friend of then Webb County District Attorney Joe Rubio, who several years prior, was the subject of an FBI

investigation into public corruption. At the conclusion of that investigation years prior, the District Attorney's father took responsibility for a cash-for-dismissal scandal and was sentenced to federal prison, but many people in the city felt he simply took the fall for his son. I learned the City of Laredo had a long history of being run by an overt single-party political patronage system that no one dared to challenge or question for fear of retaliation. I became determined to put an end to it.

"I can do all things through Christ who strengthens me." Philippians 4:13.

At the age of 17, I decided to organize a student anti-corruption group on campus. When our attempt to host a political debate on campus between two judges was met with denial by the school administration and the threat of suspension, I landed on the front page of the Laredo Morning Times, the only local newspaper. Only weeks after forming the student group, we were known all over town. Over the next several years, our student group launched campaigns to raise wages for city workers so they did not have to work two jobs thereby allowing them to focus on increasing the quality of the city services they provided, eliminate discretionary spending that was a critical component of the local political patronage system, and establish a Civil Service Commission to strike at the heart of the political patronage system that offered jobs in exchange for political support. In late 2003, I went door-to-door to obtain petition signatures to be placed on the ballot as a candidate for Webb County Commissioner of Precinct 3 on an anti-corruption platform. Webb County is very homogenous and has a one-party political process; the primary effectively determines who wins the office. Although I received less than 5% of the vote, my candidacy was an inspiration to many other teenaged high school and college students in the city when they saw the televised debates on the local news station.

"[A] little folly outweighs wisdom and honor." Ecclesiastes 10:1.

In the summer of 2003, as my student group was organizing a phone-banking campaign for the Civil Service Commission, the student volunteer working on assembling the phone numbers for several city officials had failed to acquire the home phone numbers for several key individuals. I was planning on personally calling these key people the following day after regular working hours but before evening to make a personal appeal for the Civil Service Commission we were pushing for. I discovered the missing numbers late in the evening; the day before the phone-banking. In a series of events that I sincerely regret and have since profusely apologized for, I made the foolish mistake of grabbing the phonebook and calling every person whose name matched the name of the two city officials whose numbers were missing. The first one was easy. I called several numbers and asked if it was the home of the city official. Eventually, one person confirmed, and I hung up the phone. The second, however, went awry. I called several numbers and each person said their number was not that of the city official I was looking to confirm. However, one number I called refused to confirm and rightfully so considering the late hour. When he rightfully raised his voice and demanded to know why I was calling so late, I panicked and said I saw someone tampering with his vehicle. I asked again whether it was the city official. I just wanted him to confirm so I could hang up. He again understandably demanded more detail and asked what they

were doing to his car. I did not know what to say. I again panicked even more inexplicably chose to say something along the lines of "I don't know sir, it might be an explosive or something." I immediately clenched my teeth realizing I had made a huge mistake and then hung up the phone in fear. I thought to myself, "Why did you say that? Anything else. Why that?" I went to be hoping nothing would come of it, but of course, something did come of it. When I was charged with the offense, someone initially said the FBI was referenced in the call, but that accusation was later dropped. I admitted what I had done and took responsibility because I knew what I had done. There was no excuse. It was my fault and mine alone. Judge Morales placed me on deferred adjudication probation.

"Defend the weak." Psalm 82:3.

The following year, our efforts to establish a Civil Service Commission had gained momentum. At the same time, our organization became known as the go-to group to leak evidence of local public corruption. Mind you, I am still only a college student. At the same time, we were working on cases that implicated the Mayor, District Attorney, and Chief of Police in a bribery scandal. Because of our public efforts, the mayor's nephew assaulted a local activist and told him to tell me that he was planning to murder me. I was terrified. I notified the Laredo Police Department, but they said they would not act on second-hand information. Concerned for my safety, I sent an email to City Public Information Officer Blasita Lopez, wife of the mayor's nephew who issued the death threat. In the email, which I copied multiple local media on, I warned that anyone who entered onto my private property with the intent to cause me or my family harm would be met with self-defense, including deadly force, pursuant to the Texas Castle Doctrine. In truth, I did not own or possess any firearms at any time in those years. I was simply scared for my safety. In response, I was arrested for harassment, formally charged, and again before Judge Morales; the same judge as before. While Judge Morales did admonish me, he also expressed concern whether the communication of the intent to exercise the right to self-defense could be a crime. For that reason, he again placed me on deferred adjudication probation.

"For the Lord is righteous, he loves justice." Psalm 11:7.

Over the next two years, the City Council began to lay the foundation for a Civil Service Commission, District Attorney Joe Rubio announced his retirement, and our organization helped to elect retired FBI Agent Raul Salinas to be Mayor of Laredo. On top of that, the FBI began investigating then-Chief of Police Agustin Dovalina III for taking bribes from local illegal gambling operations to shield them from police raids and provide them with advance notice of any action. After the individual that owned the illegal gambling operations was gunned down in front of his home, the FBI arrested then-Chief of Police Agustin Dovalina III for the bribery scandal, and he was sentenced to federal prison. It was a vindicating end to a tumultuous youth, and it felt good to finally put politics behind me.

"[T]he Lord blesses his people with peace." Psalm 29:11.

On February 2, 2007, I met my wife, Joanna Lynn, in my Statistics class at Texas A&M International University. On December 27, 2007, before the end of the same year we first met, we were married in her parents' church. I began the year single and ended it married. We moved up to Dallas, Texas, so I could support her while she completed her seminary studies at Christ for the Nations Institute (CFNI). She graduated from CFNI in May 2009 after which I began my law school studies. Before I left Texas to begin law school, I called Judge Morales to thank him for being fair and impartial. He said he was proud of me like a father and wished me well. I began my law school studies at New England Law in Boston from 2009-2010. After doing well my first year, I transferred to the University of New Mexico School of Law in Albuquerque, New Mexico for the second and third years from 2010-2012. After graduating and earning my Juris Doctor in May 2012 from UNM Law, I applied to and was accepted to attend Georgetown University Law School's Master of Laws in Taxation Program. In May 2013, I graduated and earned my Master of Laws (LL.M.) in Taxation with a Certificate in International Taxation for having focused the vast majority of my courses in the area of international tax. Some years later, I applied and was accepted into Harvard Business School's Owner and President Management Program (OPM), which I began in 2019 and completed in 2022. I have spent my entire life as a student because I love to learn.

"May he give you the desire of your heart and make all your plans succeed." Psalm 20:4.

When I started my tax practice in October 2014, I never imagined it would have grown as rapidly as it did. In hindsight, it's clear that we were able to attain so many clients because we fully leveraged emerging marketing platforms, such as Google Ads and Facebook, that allow for microtargeting for international tax services. For example, with less than $2500, you can promote an advertisement to 25,000 individuals on Facebook that recently moved from the United Kingdom to the United States. Prior to the prevalence of Facebook, reaching that same audience would have cost more than $250,000. Other firms dismissed the notion of advertising their services on platforms like Facebook. Coupled with the fact that there were hardly any firms exclusively servicing international clients, it was an unexpected recipe for success. I was always trying to out-innovate the market, taking the path less traveled, and finding new ways of doing things. A very inspirational movie, from a business perspective, was "The Founder" starring Michael Keaton. It was about the founding brothers of McDonalds and how they invented the "fast food" process. In the movie, the brothers that founded McDonalds explain how they divided each part of preparing a burger into separate jobs to maximize efficiency. One person for grilling, one person for condiments, another for fries, and one for wrapping and bagging. By segmenting each step in the process, they streamlined and maximized their output. I became convinced that if we developed a segmented system for preparing an income tax return, we could accomplish the same result. One person for the tax interviews, another for data entry, compliance review by a credentialed CPA, and the final legal review by a licensed attorney. After completion of the return preparation process, I would simply deliver the official proposal.

To maximize efficiency, I personally reviewed the applicable law on tax return preparation. The two most important rules appeared to be the Cohan Rule and 31 CFR 10.34(d). The Cohan Rule permits taxpayers to make reasonable good-faith estimates, and 31 CFR 10.34(d) permits tax return preparers to rely on those estimates. Based on this, I designed the Interview Packet to assist taxpayers in making reasonable good faith estimates when they lacked precise figures and to ensure the interviews were streamlined. At the very end of the interview packet on the last page, I asked the interviewer to explain to clients the tax benefits of pursuing a side business activity. Congress created these tax benefits to incentivize entrepreneurial activity. When I discovered that one of the tax interviewers was not reading the final page at the conclusion of the tax interview, I asked him why. He said that the phone interviews were already very long, he was tired, his ears were pulsating, and that when he did read it, the clients would have questions he did not know how to answer. I explained to him that he should just write down their questions, admit he could not answer the questions, but to let clients know he would discuss it with me. I did this so he could learn and become more experienced. After our conversation, I added the stern language to his packet to make sure he typed their response. But that is why the blurb ended with, "We'll determine later if it fully qualifies." It was meant to trigger teaching lessons when read in full context. For example, John Meyer's 2017 Packet indicates he responded by saying he did independent pastoral work. His tax return does not have a Schedule C for that stated activity because we discussed it, and I explained that pastoral work is not done for profit, so it fails the Section 183 "profit motive" requirement. There is no evidence that this blurb resulted in the reporting of fabricated business activities. For example, the Special Agent Report ("SAR") for Federico Turatti even admits that his Schedule C business activity that generated significant losses over multiple years was a legitimate business activity. The SAR only attacks the legitimacy of the Section 119 legal position. Nothing in the SAR suggests that any of the expenses were fabricated; it only attacks the legal theory used to deduct the expenses.

With regard to employee expense deductions, I relied on my interpretation of the interplay between the Cohan Rule and 31 CFR 10.34(d). Even the U.S. Court of Appeals for the Fifth Circuit has explained that, if "the taxpayer can establish that qualified expenses occurred," such as commuting to work, "then the Court should estimate the allowable" amount since it can be reasonably inferred that is how the person arrived to his place of employment. U.S. v. McFerrin, 570 F.3d 672 (5th Cir. 2009).

Estimations and fabrications both involve arriving at final figures that a taxpayer did not expressly provide. However, a fabrication is not based upon any factual reality as it pertains to a situation. An estimation, on the other hand, is based on factual reality, such as the distance between a taxpayer's home and place of work (using Google Maps), the number of workdays to total days in the week, the average cost of gasoline refueling each week, or the average percentage use of a commuting vehicle for work. An estimation has basis in fact while a fabrication does not.

"[P]reserve sound judgment and discretion." Proverbs 3:21.

Nevertheless, the rule of law that I have extrapolated from your Honor's ruling is this: although the Cohan Rule permits taxpayers to make reasonable good-faith estimates of their expenses and 31 CFR 10.34(d) permits tax return preparers to rely upon those client estimates, nothing permits a tax return preparer to make estimates on behalf of taxpayers that is not directly provided by the client. In other words, using estimates, even if based on national averages or simple workdays to total days in the week, such as the (5/7=71% rounded down) 70% work use percentage for vehicles, would fall outside the protections of the Cohan Rule and 31 CFR 10.34(d) thereby permitting a court to classify the figure as a willful fabrication.

If this was your Honor's legal reasoning, then I fully accept responsibility without reservation. If, however, this was not the basis for your Honor's ruling, I humbly beg for clarity on what your Honor determined was fabricated. For example, with regard to the undercover taxpayer, "Angela Jackson," there are no deductions in her return that she did not provide during the recorded phone-based tax interview. The only issue was that the vehicle was treated as 100% work use because she indicated she worked from home and only ever traveled to the airport for work-related flights paid by her employer. The packet I designed failed to include more diligent questions regarding personal use to capture the more precise work-use percentage, but there were no fabrications.

In 2019, a client of mine who was the Vice-President of Bayer recommended I apply for Harvard Business School's Owner and President Management Program (OPM). Much to my surprise and amazement, I was accepted. During the first year session, a group of students from the Massachusetts Institute for Technology (MIT) hosted a course on artificial intelligence. It was during this session that I first had the idea of using artificial intelligence to assist in tax preparation. By the end of 2020, we had a beta version of the software that we introduced to clients late that year. By 2021, with the assistance of Patent Attorney Alan Herda of Haynes & Boone in Dallas, after months of back and forth with the U.S. Patent and Trademark Office, we were granted an official lifetime patent covering the use of artificial intelligence in tax preparation and tax planning. In particular, its decisional intelligence, which is fully auditable with transparent code. We were beyond excited as this would entirely eliminate the risk of human error by completely automating our processes.

"[W]ho can discern their own error?" Psalm 19:12.

What I failed to appreciate at the time was that, while the software process we limitedly introduced for tax year 2019 late in the year and fully implemented for tax years 2020 and 2021 eliminated the possibility of clients misunderstanding legal positions, the "prior segmented process" I implemented for tax years 2017-2019 in calendar years 2018-2020 was prone to human error. In early 2021, we first became aware of an issue with one of our legal positions; the deduction for Unreimbursed Employee

Expenses. It became apparent, after a handful of examinations, that our clients misunderstood what constituted a "reimbursement arrangement." Prior to the implementation of the software in late 2020 during tax year 2019, we would simply simply explain the legal position to clients and then ask them whether they qualified. Even if with the beta software, we had clients watch an explanatory video and then had them confirm they qualified. In hindsight, this was a recipe for disaster as it was simply too much information for clients to process all at once with a single explanation. For tax year 2020, however, the updated software had clients confirm each separate and distinct factual element that comprises a particular legal position. This new simplicity cured the issue for tax years 2020 and beyond, but there was still the issues with tax years 2017-2019. My initial fear was that the IRS would presume we intentionally misled clients into claiming complex legal positions they were not in a position to understand, but many clients were quick to admit via email that they had, in fact, misunderstood the videos they watched on the topic. Still, I should have been more careful. This was more than preparing burgers, where mistakes have more profound consequences. The handful of examinations was quickly expanded to over 100, and I was certain this was the issue the IRS was looking into and rightfully so. We conceded the issue with the IRS, emailed every client about the issue, and agreed to refund clients their fees. In total, we refunded over $730,000 in fees. Most importantly, however, is that not a single client in these 100+ audits ever claimed there was a fabricated deduction in their return. The only issue was that we had communicated that an expense they incurred was deductible under a particular legal theory. To repeat, in the over 100 audits the IRS conducted, not a single claimed that any expense claimed on their return as a deduction had been fabricated. Not a single person. Even the government's witness, Kathryn Nicole Hernandez (Magan), made no such allegation even though she was the attorney that personally handled all communications between the IRS and the IRS on this issue. Moreover, the government's stated case was that the legal positions were frivolous, which was stated at the pretrial hearing: this case is about "outlandish legal positions."

If, however, your Honor is not inclined to grant a new trial, I again humbly beg for clarity, which is needed to properly calculate the tax loss. The Fifth Circuit's Johnson case created a formula for determining the tax loss, which is basically the tax differential multiplied by a falsity rate. The tax differential attributable to all legal positions over the 3-year period was calculated to be $11 million, which means, even assuming a 100% falsity rate, which would require a finding that every single deduction ever claimed was wholly fabricated, the maximum possible tax loss would be the $11 million. Although it is certainly the position of the prosecution that "all" or "almost all" returns had fabrications as stated in the PSR, this is factually impossible since all of the deductions attributable to the Section 119 legal position were all based on verifiable figures reported by third-parties, including, but not limited to, county real estate taxes, utilities, and mortgage interest reported by financial institutions on IRS Form 1098 Mortgage Interest Statements that accounted for an estimated 65% of all deductions, which would make the maximum factually possible tax loss $3.85m assuming the full remaining 35% of all deductions were deemed fabricated. But if your Honor was referring to the estimates and errors as being fabrications, that would account for an estimated 10-15% of all deductions, which would make the tax loss between $1.1 and $1.65 million. If, however, this is not what your Honor meant, I humbly beg for clarity.

In September of this year, my wife helped me in sending taxpayers John Meyer a refund of his fees for $6,499, Linda Rivera a refund of her fees for $1,841.76, Michael Natt a refund for his fees of $1,999, and Michael Putica a refund of his fees for $24,999. In total, $35,338.76 was sent to these taxpayers to

refund their fees.  Coupled with $12,499.00 refund to Randolph Ragsdale back in 2021, a total of $47,837.76 has been reimbursed to the taxpayers named in the counts. My understanding is that this should be taken into account for official IRS restitution calculation purposes in addition to any amounts the IRS already recovered through examinations and voluntary amendments form the taxpayers named in the counts. I will be sending more once I am able to determine the amount anyone had to return to the IRS since, in many cases, it appears the taxpayers were not required to file amended returns and, therefore, those taxpayers did not incur a personal financial loss associated with their taxes, so it appears the remainder is due to the IRS. I am awaiting clarification to complete restitution. If there is anyone else with uncompensated tax loss, I will ensure they are compensated.


Faithfully His,


John Anthony Castro